On November 18th, Mr. Chadderdon submitted an appeal to the Judicial Committee (JC). Mr. Chadderdon (the Appellant) alleged that the body (the Appellees) violated the Libertarian Party of Michigan bylaws by conducting improperly noticed business at the July 9th Candidate Nominating Convention. His appeal and arguments can be viewed here.

All interested parties were given an opportunity to submit argumentation for and against the appeal. The JC reviewed all of the submissions and conducted a hearing on December 9th, allowing all parties to further argue their cases. The submissions and the hearing can be reviewed here.

On Tuesday, December 13th, the JC voted to grant Mr. Chadderdon the appeal, on all points. In this document, the Judicial Committee will provide its analysis of the appeal and the main arguments against it. We have referenced the Libertarian Party of Michigan Bylaws as amended June 26, 2021 and Robert's Rules of Order, Newly Revised (RONR 12th Ed.)

First, we shall consider if the Judicial Committee even has purview over this matter.

*"The appeal cannot be reviewed because the Judicial Committee (JC) has no jurisdiction to overturn decisions of a convention, particularly if the appeal is not raised during the convention."* Submission, Joe Brungardt + Undersigned

The Bylaws, Article V, Section 2 say unambiguously:

"The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions."

No exemptions for a convention are specified in this language. Furthermore, the timeliness of the appeal has no bearing on this matter. Robert's Rules of Order (RONR) states:

23:6 "The only exceptions to the requirement that a point of order must be made promptly at the time of the breach arise in connection with breaches that are of a continuing nature, whereby the action taken in violation of the rules is null and void. In such cases, a point of order can be made at any time during the continuance of the breach - that is, at any time that the action has continuing force and effect - regardless of how much time has elapsed.
A. A main motion has been adopted that conflicts with the bylaws of the organization or assembly.
E. Any action has been taken in violation of a rule protecting absentees … or a rule protecting a basic right of an individual member (25:7, 25:10-11)."

25:10 "Rules protecting absentees cannot be suspended even by unanimous consent of or an actual unanimous vote, because the absentees do not consent to such suspension.
25:11 Rules protecting a basic right of the individual member cannot be suspended."

EXHIBIT 27

Mr. Chadderdon's appeal alleges that not only was the business conducted in violation of the bylaws, but that his rights as a member and the rights of absentee members were violated. These violations (his removal from the Libertarian Executive Committee (LEC) by unnoticed vote of no confidence and subsequent unnoticed elections of officers and representatives) are of a continuing nature as he still is no longer chair of the board and the officers elected at the Candidate Nominating Convention (CNC) are still acting as members of the LEC.

Regardless of how any member feels about this case or Mr. Chadderdon in particular, the protection of our members' rights should be taken very seriously, especially because we are Libertarians. In no circumstance should we find it permissible to knowingly violate a member's rights, nor should we ever dismiss such allegations out of hand. The judicial committee is designed to be the recourse by which members may protect their rights not just from the Libertarian Executive Committee (LEC), but from the other members as a whole. It is entirely in order for the Judicial Committee to adjudicate this matter, and we will proceed accordingly.

Now we proceed to analyze the appellant's case:

*"The election of officers to the Libertarian Party of Michigan Executive Committee (LEC) and removal of an officer from the LEC that were carried out on July 9, 2022 at the Candidate Nominating Convention were done in violation of the bylaws of the Libertarian Party of Michigan (LPMI). LPMI bylaws require AT LEAST 30-day notice for business to be conducted at the convention. The resignations that led to the elections and removal occurred on June 15, 2022, so sufficient notice to carry out those actions at that convention was not and could not be given." Appeal, Chadderdon*

Mr. Chadderdon proceeds to lay out his case as follows:

*"1. The Candidate Nominating Convention that occurred on July 9, 2022 was a special convention as defined in the LPMI Bylaws.
2. LPMI Bylaws, as amended in convention June 26,2021, require that notice for ALL conventions is given with AT LEAST 30-day notice to all members of the Libertarian Party of Michigan and members of the national Libertarian Party that reside in Michigan.
3. Robert's Rules of Order Newly Revised, 12th edition (RONR) states that notice must be given to members for filling vacancies.
4. RONR states that for a special meeting, all substantive business must be designated in the call of the meeting.
5. Resignations of the Chair and 1st Vice Chair occurred on June 15, 2022. Resignations of other officers occurred (District Representatives) on June 14, 2022.
6. The first attempt to make a motion of no confidence to remove an officer from the LEC was sent to members of the LEC on June 19, 2022
7. Details of these violations were provided at convention, prior to the actions being carried out by the convention body. The information was willfully ignored." Appeal, Chadderdon*

We shall analyze these claims in order:

*"1. The Candidate Nominating Convention that occurred on July 9, 2022 was a special convention as defined in the LPMI Bylaws."* <u>Appeal, Chadderdon</u>

The Appellant argues that the CNC on July 9th was a special convention. The arguments against the Appellant contend that the Candidate Nominating Convention is a regular convention and conducting regular business without notice is valid. Here are all references in the bylaws to the "candidate nominating convention" and "regular" conventions. (highlights added):

"III.

1. The officers of the Party shall be a chair, a first vice chair, a second vice chair, a secretary, a treasurer, and the Congressional district representatives described below, hereinafter referred to as the "Executive Committee." These are the same individuals who shall serve as the directors of the "Libertarian Party of Michigan Executive Committee, Inc." None of these offices shall be combined. ==All of these officers shall be elected to a two-year term at a regular convention of the Party by the attending delegates== (as to the Congressional district representatives, those delegates from the respective districts) ==and shall take office immediately upon the close of such convention and shall serve until the final adjournment of the next regular convention.==
2. ==At each regular convention, following the selection of those officers of the Executive Committee elected at large,== the delegates from each Congressional district shall caucus to select one person residing in that district to serve as the Congressional district representative for that district.

V.

1. The judicial power of the Party shall be vested in a Judicial Committee composed of three Party members. ==All of these committee members shall be elected to a two-year term at a regular convention of the Party by the attending delegates and shall take office immediately upon the close of such convention and shall serve until the final adjournment of the next regular convention==. No member of the Executive Committee may be a member of the Judicial Committee.

VI.

1. During years in which a Libertarian Party primary occurs, the Party shall hold a fall state convention after the date of the primary and not less than 60 days before the general November election in accordance with state law (MCL 168.591). ==During even-numbered years in which a Libertarian Party primary election is not required by state law, the Party shall hold a **candidate nominating convention** after the filing deadline for candidates to appear on Michigan's primary ballot and before the date of the primary.== During odd-numbered years, the Party shall hold a **regular state convention** between April 1

==and July 31, performing such business as required herein."==

These bylaws, with the guidance of RONR, serve to establish a cumulative definition of "a regular convention": They must occur on odd-numbered years, officers and the JC shall be elected to two year terms at regular conventions, and shall serve until the adjournment of the next regular convention. In the most plain of readings of these bylaws, it is impossible to consider any other convention as a regular convention. RONR offers some further insight:

56:68
"2) When a provision of the bylaws is susceptible to two meanings, one of which conflicts with or renders absurd another bylaw provision, and the other meaning does not, the latter must be taken as the true meaning."

In Article 6, Section 1, the terms "Candidate Nomination Convention" and "regular convention" are referred to in two distinct sentences, each outlining two distinct conditions. If the Candidate Nominating Convention (CNC) were considered a "regular convention,' that definition would render that and several other articles of the bylaws absurd; Article III Section 1-2 would mandate we elect officers and Article V Section 1 would mandate we elect the JC at the CNC, in spite of the odd year, two year timelines specified in each bylaw. Clearly, we do not elect all officers and the JC at every convention, so every convention cannot be considered regular even in practice.

The Bylaws say, in plain language, that the CNC is a convention with the specific purpose of nominating candidates, therefore all other business is prohibited, per RONR:

56:68
"4) If the bylaws authorize certain things specifically, other things of the same class are thereby prohibited."

We've established that the CNC cannot be considered a regular convention, but can it be considered a special convention as the Appellant alleges? Here are RONR's definitions of Regular and Special Conventions:

"9:1 The term regular meeting refers to the periodic business meeting of a permanent society .. held at weekly … or similar intervals, for which the day should be prescribed by the bylaws and the hour and place should be fixed by a standing rule.
9:2 ==If, instead, an organization follows the practice of scheduling … its regular meetings by resolution, notice (also referred to as the call of the meeting) must be sent to all members a reasonable time in advance of each regular meeting==.
9:13 A special meeting (or called meeting) is a separate session of a society held at a time ==different from that of any regular meeting, and convened only to consider one or more items of business specified in the call of the meeting==. Notice of the time, place, and purpose of the meeting, clearly and specifically describing the subject matter of the motions or items of

business to be brought up, must be sent to all members a reasonable number of days in advance. ==The reason for special meetings is to deal with matters that may arise **between regular meetings** and that require action by the society before the next **regular meeting**, or to dedicate an entire session to one or more specific matters.=="

We have already cited the uses of regular convention, but here is how the bylaws use "special convention":

VI

3. "The Party shall hold ==a special convention== within 45 days upon the call of the Executive Committee or when petitions are submitted by 10% of the current membership, specifying the purpose for the special convention."

Lastly, let's reference once again RONR on the interpretation of Bylaws:

56:68
"8) In cases where the bylaws use a general term and also two or more specific terms that are wholly included under the general one, a rule in which only the general term is used applies to all of the specific terms."

The bylaws use the terms "convention," "regular convention" and "special convention," throughout. "Convention" is a general term, and the applications of "regular" and "special" are specific. We've already established that the various uses of "regular convention" serve to make a cumulative definition of the specific term. However, the term "a special convention" as used specifically only in Article VI, Section 3 of the bylaws is not an exclusive use definition of the term. Furthermore, if we were to define the CNC as a special convention, as used in RONR 9:13, it would not affect the term's use in Article VI, Section 3; It is not rendered absurd and the use of the specific term is not affected.

The JC weighed these arguments and definitions at length. We came to the conclusion that while the Candidate Nominating Convention on July 9th may be considered "a special convention" as the Appellant argues, it cannot be defined as a "regular convention" as the bylaws plainly use and define the term.

*"2. LPMI Bylaws, as amended in convention June 26,2021, require that notice for ALL conventions is given with AT LEAST 30-day notice to all members of the Libertarian Party of Michigan and members of the national Libertarian Party that reside in Michigan.*

*3. Robert's Rules of Order Newly Revised, 12th edition (RONR) states that notice must be given to members for filling vacancies.*

*4. RONR states that for a special meeting, all substantive business must be designated in the call of the meeting." <u>Appeal, Chadderdon</u>*

Here are the pertinent citations from the bylaws:

"Article VI.
4.4 The Executive Committee shall notify every Libertarian Party of Michigan and Michigan resident National Libertarian Party member, whose dues were current within 3 years, of the convention date, time and location no less than 30 days prior to the convention. Notification shall be made by at least one of the acceptable modalities for which contact information has been made available by the member. Acceptable modalities shall include email, phone, and United States Postal Service."

And here is Roberts':

"9:2 If, instead, an organization follows the practice of scheduling … its regular meetings by resolution, notice (also referred to as the call of the meeting) must be sent to all members a reasonable time in advance of each regular meeting.

9:3 In any organization, notice must be sent a reasonable time in advance of each regular meeting that is separated by more than a quarterly time interval from the previous regular meeting. Notice must also be sent a reasonable time in advance of a convention of delegates.

9:13 A special meeting (or called meeting) is a separate session of a society held at a time different from that of any regular meeting, and convened only to consider one or more items of business specified in the call of the meeting. Notice of the time, place, and purpose of the meeting, clearly and specifically describing the subject matter of the motions or items of business to be brought up, must be sent to all members a reasonable number of days in advance. The reason for special meetings is to deal with matters that may arise between regular meetings and that require action by the society before the next regular meeting, or to dedicate an entire session to one or more specific matters.

47:58 Notice of filling a vacancy in an office (including a vacancy in an executive board or executive committee) must always be given to the members of the body that will elect the person to fill it, unless the bylaws or special rules of order clearly provide otherwise.

56:32 The method of filling vacancies may also be provided. Unless the bylaws clearly provide otherwise, notice of filling a vacancy must always be given to the members of the body that will elect the person to fill it."

When we consider these terms as written in both the bylaws and RONR, the Appellant is plainly correct. ALL conventions require a 30 days notice. As discussed in the previous section, the bylaws authorize specific items of business at this convention. The June 8th Call to Convention listed the convention as the "(candidate) Nominating convention." This was the only business noticed 30 days in advance.

The argument by the Appellee's that the "motion for a vote of no confidence" is exempt from such notice has merit and warrants close examination of the bylaw in question:

"Article 3
10. A member of the Executive Committee who misses three consecutive meetings of the Executive Committee or fails to perform his or her fiduciary duties may be removed from the Executive Committee and ==replaced by a two-thirds vote at a **regular meeting of the Executive Committee**== or ==a majority vote at **convention** following a motion for a vote of no confidence.== All Executive Committee members ==must be notified of the intent to remove at least 14 days prior to the meeting==. A **Congressional district representative** may be **replaced** by a majority vote of a congressional district caucus at any state convention. If the chair is so removed, the first vice chair shall assume the chair and a new first vice chair elected. If a Congressional district representative resigns or is so removed, then the Executive Committee must replace him or her with a person residing in the same Congressional district, who shall serve until the next state convention, at which time the caucus for that Congressional district shall select a replacement for the balance of his or her term."

This bylaw creates a decision tree. Once it has been established that an LEC member may be removed (either by missing three consecutive meetings or failing to perform his or her fiduciary duties) they may be removed by two means: Two thirds vote at a <u>regular meeting of the executive committee</u>, or a majority vote at <u>convention</u> following a motion for a vote of no confidence. These two means are entirely distinct. Furthermore, the terms "meeting" and "convention" are not interchangeable, either in this section or in the bylaws as a whole, so to conflate the two is erroneous. The following sentence defines the notice requirement if the member is to be removed at the <u>regular meeting of the executive committee</u>, but it does not set a distinct notice requirement for the convention. The 14 days notice <u>only</u> applies to the removal of the board member at a regular meeting of the executive committee.

The next sentence states that only a Congressional district representative may be removed at any convention. The Congressional district representative is clearly distinct from the other officers defined in the bylaws, and the use of the specific term "replace" only authorizes an election; it does not deal with the removal of the representative.

There is no condition listed in this bylaw to exempt the substantial business of conducting a vote of no confidence or holding elections at convention from the notice requirements laid out in Article VI Section 4.4. We must consider the 30 days notice requirement to be in effect for the removal and replacement of the chair by the convention process.

The proper course of action to remove an officer by this process would be to notify the LEC before the call to convention is issued and to have them consider adding such business to the agenda. Such a decision can only be made by the LEC, as the bylaws state:

Article VI
"6. The Executive Committee shall have supervision and management of all conventions."

This supervision and management entails the scheduling of the convention and noticing the business to be conducted. The LEC as a whole may vote on the content of the call to convention and the business contained therein, but has often delegated that responsibility to the Chair and Secretary in practice. The call to convention that went out on June 8th was in fact approved by both the Chair and the Secretary. However, it is not possible for an individual member who is not the chair to add any business without a vote of the board.

Even if the LEC as a whole had voted to have the vote of no confidence added to the agenda of the CNC after the 30 day deadline, it would have been a violation of these bylaws as written, and RONR is very clear that rules cannot be suspended:

"25:7 Rules contained in the bylaws cannot be suspended - no matter how large the vote in favor of doing so or how inconvenient the rule in question may be - unless the particular rule specifically provides for its own suspension, or unless the rule properly is in the nature of a rule of order as described in 2:14. Nothing in a corporate charter can be suspended unless the charter or applicable law so provides."

The JC considered the Appellee's citation of precedent on the matter:

*"Each of the three conventions referenced in the LPM Bylaws have specific items of business prescribed therein but additional regular business has always been conducted at them such as platform consideration, resolutions, and approval of previous convention minutes.*

*LPM Bylaws in Section III.10 and past precedent provide for filling any vacancies in EC district seats by the selection of a replacement by congressional caucus at "any" state convention. This is what was done to fill the vacancies that existed at the time of the July 9th, 2022 LPM Summer Convention, whether due to prior resignations or resignations from being elected to other offices."* <u>Submission, Joe Brungardt + Undersigned</u>

The parliamentarian retained by the Appellee's, Mr. Martin, refutes this notion by citing RONR:

"2:25 … However, if a customary practice is or becomes in conflict with the parliamentary authority or any written rule, and a Point of Order citing the conflict is raised at any time, the custom falls to the ground, and the conflicting provision in the parliamentary authority or written rule must thereafter be complied with. If it is then desired to follow the former practice, a special rule of order (or, in appropriate circumstances, a standing rule or a bylaw provision) can be added or amended to incorporate it."

The contention of the Appellant is not that the removal and replacement of officers cannot ever happen at a CNC, but that such business must be noticed properly. In the Judicial Committee hearing on December 9th, it was established during the argumentation that the previous calls to

convention did in fact contain notice for these elections, with one exception. The fact that the past practice was to provide proper notice for other business proves that notice is an established part of our processes, as it should be. If the members were not aware of a procedural violation, then of course they could not have contested it at that time. That does not mean that what happened then was correct. Expediency does not ever exempt improper behavior.

*"5. Resignations of the Chair and 1st Vice Chair occurred on June 15, 2022. Resignations of other officers occurred (District Representatives) on June 14, 2022.*
*6. The first attempt to make a motion of no confidence to remove an officer from the LEC was sent to members of the LEC on June 19, 2022*
*7. Details of these violations were provided at convention, prior to the actions being carried out by the convention body." Appeal, Chadderdon*

These are statements of fact and were not contested. They establish that it simply was not possible for the business of calling a vote of no confidence, electing officers or Congressional district representatives at this convention to be noticed properly with 30 days notice.

Considering this case and the arguments therein, the Judicial Committee spent many hours reviewing our organization's bylaws and parliamentary authority. We met several times to discuss our findings at length and consider all of the arguments presented. We came to the conclusion that the Appellant, Mr. Chadderdon, presented a thorough case proving the violations of the bylaws. Our own research and analysis of the matter unveiled even more details reinforcing this case, as we have shown above.

We have decided to grant Mr. Chadderdon's appeal. The vote of no confidence, the election of officers, and the election of Congressional district representatives conducted at the Candidate Nominating Convention on July 9th are to be considered out of order as a violation of our bylaws and parliamentary procedures. The Libertarian Executive Committee shall be reverted to its composition as of July 8th. Any actions taken by the erroneous board which are of a continuing nature are null and void.

The JC wanted to raise a couple points and make recommendations to the party that are pertinent to the matters resolved here:

The language of the motion of the vote of no confidence made at the convention by Mr. Canny levied many accusations upon Mr. Chadderdon. What the delegates had seen at convention was only one man's word versus another; no evidence or case was presented. While the bylaws do not mandate any such process, we recommend that a trial process be installed in our bylaws, in which the accuser may present a case with supporting evidence, and the accused may face their accuser and refute the claims levied against them. This process would ensure that such accusations are properly substantiated. RONR section 63 discusses at length the rights of the accused and the processes by which a fair disciplinary trial can take place. This should be a prerequisite to considering a motion calling for a vote of no confidence. We

recommend adopting a bylaw which simply points to that citation in regards to disciplinary matters greater than simply missing meetings. Ensuring consistent processes and standards would allow contentious matters to be adjudicated in a fashion that all factions can find just and fair.

Many of the matters involving notice, especially the elections of officers and the vote of no confidence, did not have exemptions in the bylaws. Obviously, the party may choose to amend the bylaws to include such provisions. However, we believe the current standards of providing notice are sufficient.

Signed


Connor J. Nepomuceno, Judicial Committee Chair


Joshua M. Smith


Robert W. Roddis, Esq.

**CONCURRING OPINION OF ROBERT W. RODDIS, ESQ.**

I concur with the decision of my two colleagues. However, I write separately because I am convinced that determination of the impropriety of the removal of Andrew Chadderdon can and should be determined without reference to any notice requirement. Simply, no evidence was ever produced or introduced to suggest that Mr. Chadderdon "failed to perform his fiduciary duties".

Section III-10 of the Bylaws states in part:

> A member of the Executive Committee who…..fails to perform his or her fiduciary duties may be removed from the Executive Committee and replaced by a two-thirds vote at a regular meeting of the Executive Committee or a majority vote at convention following a motion for a vote of no confidence.

Section V-2 of the Bylaws state:

> The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions.

Tim Yow, elected state party Chair at the March, 2022 convention, resigned as Chair on June 15, 2022 stating in part:

> The national party is heading off a cliff and I no longer have state leadership who are willing to help me unhitch our affiliate before it pulls us down with it. They all resigned yesterday. All but me and my 1st vice chair and dear friend, Ben Boren. I avoided making this public until I had spoken with him about my intent. Turns out we are both on the same page. With that, we turn the gavel, figuratively, over to your 2nd vice chair.
>
> Andrew Chadderdon is divisive and hateful towards anyone who would challenge or criticize him or his precious caucus. He also has proven, time and again, that he is incapable of putting party priorities ahead of those of his faction. I supported his run for his current seat and I now regret that decision. He has already alienated, attacked, and run off several of our best volunteers. The delegation in the upcoming convention would do well to elect a chair and 1st vice chair who will continue our trend of standing up to his bullying and reprehensible conduct.

No mention was made of exactly what was said by Mr. Chaddedon or to whom. No mention was made of exactly whom was "alienated, attacked, and run off" by Mr. Chadderdon.

First Vice Chair Ben Boren also resigned stating in part:

> For the last year it's become apparent that this is no longer the Libertarian Party of Michigan. This is now the Mises party of Michigan. I tried my hardest to stay

1

> and keep balance. I went into debt just to attend a national convention to try to prevent a full blown takeover. At this point I am nothing more than a puppet for a board controlled by Mises. I also can no longer effectively do my job as I have lost any and all inspiration to be a part of this. It seems best to walk away and let them have full control.

Mr. Chadderdon automatically became state party Chair upon the resignation of Mr. Yow and Mr. Boren June 15, 2022.

Brandon Warzybok had resigned from the Libertarian Party of Michigan on June 14, 2022 stating in part:

> Going into the National Convention in Reno. I drew a clear red line with myself; if the delegates removed the language in our national platform about bigotry being "irrational and repugnant", I would leave. I drew this line because I see it as fundamental that an organization which accepts the right of private discrimination must also clearly disavow it. The delegates did remove the language, and, being true to myself, I left the national party, Now, our state leadership has regrettably charted a similar course.
>
> In equal measures of "wokeness" and liberty,
> Brandon Warzybok
> Lawrence, Michigan
> June 14, 2022

On June 19, 2022, after Mr. Chadderdon had been Chair for a total of four days, Dave Canny, District 5 Representative Genesee County Affiliate Chair, sent a message to the Libertarian Party of Michigan Executive Committee (EC) which states in part:

LEC Officers and Members,

> In accordance with Libertarian Party of Michigan Bylaws, Section 111-10, I am on this date advising the Libertarian Party of Michigan Executive Committee (EC), and all members of the State Party of my intention to introduce a Motion of No Confidence and the subsequent removal of the Party Chair, Andrew Chadderdon, at the Summer Convention in July.
>
> Currently the state party is divided to the point of being ineffective, creating a working environment that has resulted in numerous members, especially new members, leaving in frustration. In addition, it has been determined that our bylaws are insufficient and that situation must be addressed immediately. It is imperative that, at convention, the party members as a whole fulfill their right and obligation to select or approve of a party chair by vote of the entire body. This vote will determine if there is majority support for an unelected chair and eliminate a cause of division going forward.

> I propose that that Andrew Chadderdon has failed to fulfill his fiduciary duty in his role as 2nd Vice Chair by failing to create a productive environment within the LEC, supported by evidence that other members have refused to work with him and have even left the party in frustration, rendering us less effective and diverse as a party. This behavior will prevent Andrew from executing the duties as party chair as required going forward. (Please note that the statements of Mr. Yow, Mr. Boren, Mr. Warzybok and Mr. Canny can be found in the Appendix to the original Appeal filing of Mr. Chadderdon.)

Similar vague allegations were made against Mr. Chadderdon at the July convention without there being any evidence of exactly what Mr. Chadderdon allegedly said to whom, who would allegedly not "work with him" or exactly why or who allegedly resigned in frustration due to Mr. Chadderdon's alleged failure to perform his fiduciary duties.

Sixty seven members attended the July 9, 2022 convention. The vote to remove Mr. Chadderdon was in favor 38-18. There are over three hundred members of the Libertarian Party of Michigan.

I submit that due a complete failure to present proof on the issue of Mr. Chadderdon's alleged failure to perform his fiduciary duties, the Motion to Remove was without any basis in the Bylaws and is void and vacated.