## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LIBERTARIAN NATIONAL COMMITTEE, INC.,**

*Plaintiff,*

*v.*

Case No. 23-cv-11074

**MIKE SALIBA, RAFAEL WOLF, GREG STEMPFLE, ANGELA THORNTON-CANNY, JAMI VAN ALSTINE, MARY BUZUMA, DAVID CANNY, and JOSEPH BRUNGARDT,**

Hon. Judith E. Levy

*Defendants.*

## DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

The defendants respectfully request that this Court deny the Libertarian National Committee's (LNC's) motion to preliminarily enjoin them from using the name "Libertarian Party." The LNC is unlikely to prevail on its claims under the Lanham Act for at least three reasons, and the equities do not otherwise favor granting its requested relief.

*First*, the Sixth Circuit has held that the Lanham Act would run afoul of the First Amendment's free-speech protections if construed to apply beyond the limited context of commercial speech. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir.

2003). As a result, noncommercial political speech is outside the scope of the statute and cannot constitute trademark infringement. *See Radiance Found., Inc. v. Nat'l Ass'n for Advancement of Colored People*, 786 F.3d 316, 327 (4th Cir. 2015) ("trademark infringement is not designed to protect mark holders from consumer confusion about their positions on political or social issues"); *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 506 n.8 (5th Cir. 2018) (citing cases in the *Taubman* line and suggesting, without reaching the issue, that the Lanham Act does not apply to political speech); *Tax Cap Committee v. Save Our Everglades*, 933 F. Supp. 1077, 1080 (S.D. Fla. 1996) (circulating initiative petitions is not a "service" for purposes of the Lanham Act); *cf. Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (noting that political speech, including contributing and soliciting contributions to political campaigns, is among "the most fundamental First Amendment activities"). Because the allegedly infringing speech and activities identified in the complaint in this case are purely political in nature, the LNC's claims fail as a matter of law.

*Second*, even if the Lanham Act applies, the defendants have a contractual right to use the name "Libertarian Party" and therefore are not infringing the LNC's mark by doing so. As explained in the accompanying brief, the defendants are all members of the Libertarian Party of Michigan (LPM), and as such are authorized to use the LNC's marks under article 5 of the bylaws of the Libertarian Party. The LNC's claim that it has "constructively disaffiliated" the defendants is contrary to the plain

language of the bylaws, which require a ¾ supermajority vote for disaffiliation and prohibit the LNC from abridging the autonomy of state-level affiliates.

*Third*, the defendants' use of the name "libertarian party" is not likely to confuse potential LPM donors and dues payers. The ongoing governance dispute within the LPM is well known within libertarian circles. It has been covered in mainstream publications as well as publications focusing specifically on libertarian politics, and has been explained to the LPM membership in numerous direct communications from defendants Saliba and Brungardt. Further, the defendants and their supporters not only acknowledge — but expressly emphasize — the fact that the LNC has backed their rival faction. The evidence strongly suggests that many individuals who have donated to the defendants did so at least in part because they believe the LNC's interference with a state-level affiliate is inappropriate and contrary to the Libertarian Party bylaws.

*Finally*, even if the LNC could establish a likelihood of success on the merits, the equities would still weigh against enjoining the defendants from using the name "Libertarian Party" while this case proceeds. Doing so would substantially undermine the defendants' claim that they are they are the legitimate elected leaders of the LPM, and would therefore constitute unwarranted judicial interference in the affairs of a political party. *See Heitmanis v. Austin*, 899 F.2d 521, 525 (6th Cir. 1990) ("Courts have historically been reluctant to intervene in intra-party disputes.").

Moreover, to the extent the defendants have violated state law or federal campaign-finance law through their use of the name (as the LNC erroneously claims), any such violation would be more appropriately addressed in the pending state court action regarding LPM's internal governance dispute or in the pending matter that LNC chair Angela McArdle has filed with the Federal Election Commission.

For these reasons, as set forth more fully in the accompanying brief, Defendants respectfully request that the Court deny plaintiff's motion for a preliminary injunction.

DATED: July 10, 2023                    Respectfully submitted,

                                        By: /s/ *C. Nicholas Curcio*
                                        C. Nicholas Curcio
                                        CURCIO LAW FIRM, PLC
                                        16905 Birchview Drive
                                        Nunica, MI 49448
                                        Telephone: (616) 430-2201
                                        ncurcio@curciofirm.com

— 4 —

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LIBERTARIAN NATIONAL COMMITTEE, INC.,**

      *Plaintiff,*

*v.*

**MIKE SALIBA, RAFAEL WOLF, GREG STEMPFLE, ANGELA THORNTON-CANNY, JAMI VAN ALSTINE, MARY BUZUMA, DAVID CANNY, and JOSEPH BRUNGARDT,**

      *Defendants.*

Case No. 23-cv-11074

Hon. Judith E. Levy

## DEFENDANTS' BRIEF IN SUPPORT OF RESPONSE TO MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Index of Exhibits .................................................................................... ii

Statement of Issues Presented ............................................................... iii

Controlling and Most Appropriate Authorities ....................................... v

Introduction ........................................................................................... 1

Statement of Facts .................................................................................. 1

    A.    The rise and fall of Andrew Chadderdon ............................. 1

    B.    Mr. Chadderdon clings to power and splits the state party ................ 4

    C.    The LNC backs Mr. Chadderdon, "constructively disaffiliates" LPM's elected leaders, and threatens to sue them for trademark infringement. ........................................................................ 7

    D.    LPM's elected leaders fight back against the LNC with broad support from party members in and out of state................................. 8

Legal Standard ..................................................................................... 11

Argument ............................................................................................. 11

    A.    Injunctive relief is not warranted because the LNC is unlikely to succeed on the merits of its claims...................................... 11

        1.    The noncommercial speech and activities of a political organization are outside the scope of the Lanham Act. ......... 11

        2.    Even if the Lanham Act applies, the defendants have the contractual right to use the name "Libertarian Party" because they are members of the LNC's state-level affiliate, and because the LNC lacks the power of "constructive disaffiliation."................................... 15

        3.    The defendants' use of the name "Libertarian Party" is not confusing because potential donors and dues payers are aware of the governance dispute within the state party and understand that the LNC supports Mr. Chadderdon ..... 18

    B.    Even if the LNC were likely to prevail on the merits, the equities weigh against the broad preliminary injunction it seeks .................... 23

Conclusion ........................................................................................... 25

# INDEX OF EXHIBITS

Declaration of Angela Thornton ..................................................... 1

Declaration of Brandon Warzybok ............................................... 2

Declaration of Brian Ellison ......................................................... 3

Declaration of Jami Van Alstine ................................................... 4

Declaration of Michael Saliba ...................................................... 5

Bylaws of the Libertarian Party of Michigan (June 26, 2021) ....... 6

Complaint in *Comerica Bank v Libertarian Party of Michigan, et al.* ...... 7

Draft minutes of the April 2023 LPM convention ........................ 8

Emails from LPM chairs to LPM members .................................. 9

Email from Attorney Zito regarding constructive disaffiliation ................... 10

FEC complaint filed by LNC Chair McArdle (MUR 8130) ....................... 11

Kelly Weill, Libertarian Party is Fighting a Civil War Over its Right-Wing Mises Caucus, *The Daily Beast*, September 29, 2022 ..................... 12

lncfight.org page printouts .......................................................... 13

michiganlp.net page printouts ..................................................... 14

Minutes of the July 2022 LPM convention ................................. 15

Minutes of LNC executive committee meeting, February 5, 2023 ............. 16

Minutes of LNC executive committee meeting, March 8, 2023 ................. 17

Minutes of LNC executive committee meeting, April 8, 2023 ................... 18

Mises Caucus strategic action plan for 2022 national convention (Excerpts) .............................................................................. 19

Resignation letter from former LPM Chair Yow ......................... 20

*Robert's Rules of Order* (Excerpts) .............................................. 21

Sampling of articles published by *Independent Political Report* ............ 22

Spreadsheet of donations to defendants (February 2023–June 2023) ......... 23

## ISSUES PRESENTED

1.      Whether the Lanham Act extends to noncommercial political speech like soliciting political donations, filing campaign-finance paperwork, and disseminating political articles and information.

| | |
|---|---|
| Plaintiff answers: | Yes |
| Defendants answer: | No |
| This Court should answer: | No |

2.      Whether the LNC can "constructively disaffiliate" LPM members, without following the disaffiliation process in article 5 of the Libertarian Party bylaws, as a means of taking sides in an intraparty state-level governance dispute.

| | |
|---|---|
| Plaintiff answers: | Yes |
| Defendants answer: | No |
| This Court should answer: | No |

3.      Whether the defendants' use of the name "Libertarian Party" is likely to confuse potential LPM donors and dues payers, given the extensive effort defendants have made to inform LPM members of the ongoing intraparty governance dispute and the LNC's backing of a rival faction.

| | |
|---|---|
| Plaintiff answers: | Yes |
| Defendants answer: | No |
| This Court should answer: | No |

4.      Whether the equities favor granting a broad injunction that would prohibit the defendants from using the name of the political party to which they belong and in which they serve as elected leaders.

|                          |      |
|--------------------------|------|
| Plaintiff answers:       | Yes  |
| Defendants answer:       | No   |
| This Court should answer:| No   |

## CONTROLLING AND MOST
## APPROPRIATE AUTHORITIES

**Argument A.1:**

*All. for Good Gov't v. Coal. for Better Gov't,*
    998 F.3d 661 (5th Cir. 2021) (Dennis, J., dissenting).

*All. for Good Gov't v. Coal. for Better Gov't,* 901 F.3d 498 (5th Cir. 2018).

*Buckley v. Valeo,* 424 U.S. 1 (1976)

*Radiance Found., Inc. v. Nat'l Ass'n for Advancement of Colored People,*
    786 F.3d 316 (4th Cir. 2015).

*Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003).

**Argument A.2:**

Libertarian Party Bylaws, article 5.

**Argument A.3:**

*Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.,*
    931 F.2d 1100 (6th Cir. 1991).

*Innovation Ventures, LLC v. N.V.E., Inc.,* 694 F.3d 723 (6th Cir. 2012).

*Nartron Corp. v. Stmicroelectronics, Inc.,* 305 F.3d 397 (6th Cir. 2002).

*Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003).

**Argument B:**

*Carey v. Fed. Election Comm'n,* 791 F. Supp. 2d 121 (D.D.C. 2011).

*Heitmanis v. Austin,* 899 F.2d 521 (6th Cir. 1990).

# INTRODUCTION

In moving for a preliminary injunction, the LNC claims that this "is a straightforward case of trademark infringement." ECF 12, Page I.D. 385. But even a cursory review of the complaint reveals that's not so. Unlike in an ordinary trademark case, the plaintiff and the defendants are not commercial competitors. Rather, the defendants are long-time members — and, in the eyes of many, the rightful leaders — of the political party that serves as the plaintiff's state-level affiliate. Given this fact, the LNC's attempt to use the Lanham Act to silence their political activity is well beyond the intended scope of the statute and is also contrary to the bylaws of the Libertarian Party.

## STATEMENT OF FACTS

### A.    The rise and fall of Andrew Chadderdon.

In the summer of 2022, the two highest ranking officers of the Libertarian Party of Michigan (LPM) resigned from their leadership positions just weeks before the party's candidate nominating convention. Ex. 5 at 2 (Saliba Declaration). In a letter explaining his decision, former-Chair Tim Yow cited hostility from the third ranking LPM officer at that time, Mr. Andrew Chadderdon, and concern with the ideology of the political caucus to which he belonged. Ex. 20 (Yow Letter). That caucus, known as the Mises Caucus, had just taken control of the national party by

winning most of the leadership positions on the LNC. Ex. 1 at 7 (Thornton Declaration).

As a result of the resignations, Mr. Chadderdon ascended to the position of acting chair pursuant to the LPM bylaws. Ex. 5 at 2 (Saliba Declaration). Other members of the LPM executive committee were concerned that Mr. Chadderdon would not be able to effectively lead the party because of his poor relationship with party members and his poor performance in his prior role of LPM political director. *Id.* at 2–3. Considering these concerns, party leaders notified Mr. Chadderdon in mid-June that they intended to call a vote-of-no confidence to remove him from the executive committee during the July 9 convention. *Id.* at 3. They further indicated their intent to conduct elections to fill the vacancies on the executive committee during and asked that written notices of the elections be sent to party members. *Id.*

Mr. Chadderdon openly opposed these efforts and attempted to thwart them. *Id.* As part of his strategy, he refused to send notices of the elections as requested, so he could then argue that the elections were improper. *Id.* In his opening comments at the convention, Mr. Chadderdon made clear that he had no intention to allow votes on his removal or on the filling of executive committee vacancies.  *Id.* Instead, he proposed a convention agenda that did not include either of those items. *Id.*

When a motion was made from the floor to approve a substitute agenda that included both items, Mr. Chadderdon ruled the motion out of order on the grounds

that a notice of the intent to fill the vacancies had not been given. *Id.*; Ex. 15 at 1 (July 2022 Convention Minutes). Immediately thereafter, a subsequent motion was made to appeal Mr. Chadderdon's ruling to the full assembly on the grounds that the party customarily allowed items to be added to convention agendas by motion from the floor. Ex. 5 at 4 (Saliba Declaration); Ex. 15 at 1 (July 2022 Convention Minutes). Mr. Chadderdon then ruled that motion out of order too, citing a provision of *Robert's Rules of Order* that prohibits the introduction of "frivolous or absurd" motions. Ex. 15 at 1 (July 2022 Convention Minutes); Ex. 21 at 4 (*Robert's Rules*).

The delegates responded to Mr. Chadderdon's second ruling by moving to replace him as convention chair. Ex. 5 at 4 (Saliba Declaration). That motion passed by a standing vote. Ex. 15 at 1 (July 2022 Convention Minutes). Under the leadership of the replacement chair, defendant Joe Brungardt, the convention delegates then proceeded to remove Mr. Chadderdon from the executive committee through a vote-of-no confidence and to fill the vacancies on the executive committee. *Id.* at 2–4. The motion in support of the vote-of-no confidence stated, among other things, that Mr. Chadderdon had "consistently used the Bylaws and *Robert's Rules* as a weapon against those who oppose him." *Id.* at 3. After discussion, a vote on the motion was called — without any procedural objection from Mr. Chadderdon or others on the floor — and was approved by over two-thirds of the delegates. *Id.* Accordingly, First Vice Chair Brungardt ascended to the position of acting chair,

and Mike Saliba was elected to the position of first vice chair shortly thereafter. *Id* at 3. Accordingly, Mr. Brungardt, Mr. Saliba, and the other individuals elected to the executive committee became the new leadership of the LPM.

**B.     Mr. Chadderdon clings to power and splits the state party.**

Following the convention, the newly elected executive committee met and conducted its work without objection for four months. Ex. 5 at 4 (Saliba Declaration). Then, in mid-November, Mr. Chadderdon sent a letter to the LPM's judicial committee asking it to overturn his removal from the executive committee and to void the results of the vacancy elections conducted at the convention. ECF No. 12-29, Page I.D. 527 (Judicial Committee Decision). The judicial committee is a body created by the LPM bylaws to "decide cases involving alleged violations of the[] bylaws or resolutions." Ex. 6 at 6 (LPM Bylaws). At the time it received and acted on Mr. Chadderdon's request, it consisted of three of Mr. Chadderdon's fellow Mises Caucus members. Ex. 5 at 5 (Saliba Declaration).

In support of his request to the judicial committee, Mr. Chadderdon alleged that the votes to remove him from office and fill vacancies at the July convention were unlawful because the convention was a "special meeting" for purposes of the bylaws and *Robert's Rules* and, as a result, business could only be conducted if it was specifically referenced in the written document calling the meeting. *Id.* at 528. Despite the extensive discussion of procedural issues during the July convention and

the executive committee meetings leading up to it, no one (including Mr. Chadderdon) had previously suggested this interpretation of the party's rules. Ex. 5 at 5 (Saliba Declaration). Moreover, the interpretation is inconsistent with the fact that candidate nominating conventions are held at specified intervals as provided in the LPM bylaws, Ex. 6 at 6 (LPM Bylaws), and that the party has historically considered business items at candidate nominating conventions other than those listed in the call to convention, *see* Ex. 5 at 5 (Saliba Declaration).

In December 2022, the LPM judicial committee considered Mr. Chadderdon's request and ruled in his favor. ECF No. 12-29, Page I.D. 535. The judicial committee not only sided with Mr. Chadderdon on the merits, but also stated in its opinion that the "Executive Committee shall be reverted to its composition as of July 8th," the day before the convention took place. *Id.*

The release of the judicial committee opinion created substantial confusion within the party. Ex. 5 at 5 (Saliba Declaration). Although the judicial committee had existed for several decades, it had never previously claimed the authority to overrule decisions made by convention delegates. *See id.* at 5–6. Further, because the judicial committee is a "committee," *Robert's Rules of Order* indicates that its proper role is to "report its findings or recommendations to the assembly," not to order self-executing remedies. *Id.* at 6; Ex. 21 at 6 (*Robert's Rules*). Accordingly, while some members of the executive committee were initially under the impression that they

— 5 —

had been removed from their committee seats, they eventually concluded that was not the case. Ex. 5 at 6 (Saliba Affidavit). Rather, they determined that they remained in their positions unless and until the party's members adopted the recommendations of the judicial committee and removed them from office. *Id.* at 6.

On February 2, LPM Chair Joe Brungardt described this position in detail in an email sent to all registered LPM members. Ex. 9 at 1–3 (LPM Emails); Ex. 14 at 9 (michiganlp.net Printouts). After explaining that the appropriate role of a committee is to issue recommendations to the broader assembly, Mr. Brungardt stated:

> [T]he Judicial Committee has no authority to overrule the delegates of a convention body. Therefore, should the Executive Committee believe that the Judicial Committee is overstepping its authority, it is incumbent upon the Executive Committee to assert the rights of its members in opposition to the Judicial Committee if necessary.

Ex. 9 at 2 (LPM Emails). In order to exercise this responsibility, Mr. Brungardt announced that the party would hold a convention on April 1 so that party members could discuss the judicial committee's recommendations. *Id.* at 1–2.

Meanwhile, Mr. Chadderdon began acting as if the judicial committee's opinion was self-executing. Ex. 5 at 6. Sometime in early 2023, he began conducting so-called "executive committee" meetings of his own with a committee consisting of his political allies. *Id.* As a result of these actions, a contentious governance dispute emerged within the party, dividing its members into two factions. *Id.*

## C. The LNC backs Mr. Chadderdon, "constructively disaffiliates" LPM's elected leaders, and threatens to sue them for trademark infringement.

A few days after Mr. Brungardt sent his email to the LPM membership, the LNC met in executive session to discuss the emerging leadership dispute in Michigan and similar disputes in other state-level affiliates. *See* Ex. 5 at 5 (LNC Minutes – February 2022); *see also* Ex. 12 (*Daily Beast* Article) (describing governance disputes in other states since the Mises Caucus took control of the LNC). Then, on February 16, LNC Chair Angela McArdle sent a letter to Mr. Brungardt informing him that the LNC "recognized" Mr. Chadderdon as the rightful chair of the LPM and that it viewed the executive committee chaired by Mr. Brungardt as "a different political party" that was not a state-level affiliate of the Libertarian Party. ECF No. 12-10, Page I.D. 474–475 (McArdle Letter). Ms. McArdle further stated that, as officers of a separate political party, Mr. Brungardt and the other members of his committee were not entitled to use the Libertarian Party's trademarks and would be sued for trademark infringement if they continued to do so. *Id.*

Importantly, Ms. McArdle's letter did not indicate that the LNC voted to disaffiliate the LPM, which requires a ¾ vote for good cause under the Libertarian Party bylaws. *See id.*; *see also* ECF No. 12-7, Page I.D. 454 (LP Bylaws). Nor did it explain how the LNC had the authority to take sides in a state-level governance dispute given the language in the bylaws stating that the "autonomy of the affiliate

and sub-affiliate parties shall not be abridged by the National Committee . . . ." *Id.* In subsequent correspondence, the LNC has asserted the power to "constructively disaffiliate" individual members and groups of members within state-level affiliates, even though that power is not mentioned in the bylaws. *See* Ex. 10 (Zito Email).

### D.   LPM's elected leaders fight back against the LNC with broad support from party members in and out of state.

After receiving Ms. McArdle's letter, the LPM's elected leaders continued preparations for the April 1 convention in Lansing as planned. A total of 66 delegates attended the convention, which was 6 more than had attended the last convention before the split in the party occurred. *Compare* Ex. 8 at 1 (April 2023 Draft Convention Minutes), *with* Ex. 15 at 1 (July 2022 Convention Minutes). At the convention, defendant Mike Saliba, who had taken over as acting chair of the elected leadership, see Ex. 5 at 1, gave a detailed update on the governance dispute with Mr. Chadderdon, including a dispute over the funds in LPM's deposit accounts with Comerica Bank.[1] Ex. 8 at 1–2 (April 2023 Draft Convention Minutes). In doing so, Mr. Saliba explained that the LNC recognized Mr. Chadderdon as LPM chair and viewed his chairmanship as illegitimate. *Id.* at 12. Nevertheless, the delegates at the convention expressed their support for Mr. Saliba by electing him by acclamation to continue serving as LPM chair. *Id.* at 10. The delegates also adopted a motion, by a

---

[1] The funds in the deposit accounts are now subject to an interpleader lawsuit pending in Washtenaw County Circuit Court. *See* Ex. 7 (*Comerica* Complaint).

vote of 58 to 4, indicating that they would affirm the removal of Andrew Chadderdon from the executive committee if it were necessary to do so. *Id.* at 16.

As part of their effort to fight back against Mr. Chadderdon's continued claims to party leadership, LPM's elected leadership setup the michiganlp.net website. This was necessary because Mr. Chadderdon's faction had control of LPM's historic domain name, michiganlp.org. *See* ECF No. 12, Page I.D. 421 (Harlos Declaration). The michiganlp.net website includes several articles explaining the ongoing governance dispute with Mr. Chadderdon and expressly acknowledges that the LNC supports Mr. Chadderdon. Ex. 14 (michiganlp.net Printouts). These acknowledgements were echoed in email communications that Mr. Saliba has sent to the members of LPM over the last few months. *See* Ex. 9 at 7–12 (LPM Emails).

In addition, recognizing the potential for legal action relating to the governance dispute, LPM's elected leadership began fundraising for legal expenses. This effort began by directly soliciting known supporters in early February 2023, and has since grown into a nationwide operation with multiple avenues for donating online. One of those avenues is through the michiganlpm.net website. As described in detail in declarations accompanying this brief, supporters of the elected leadership have driven significant traffic to the payment link on the website through posts on various social media platforms. *See, e.g.*, Ex. 1 at 5 (Thornton Declaration). Many of

those posts expressly reference the elected leadership's dispute with the LNC, as shown on the next page:

  

*See id.* at 5–6; Ex. 2 at 2–3 (Warzybok Declaration); Ex. 3 at 3–4 (Ellison Declaration). Further, the attached spreadsheet of LPM donations shows that donations to the legal defense fund were often received within days after LNC meetings where the LNC took action in support of the Chadderdon faction. *See* Ex. 1 at 6 (Thornton Declaration); Ex. 23 (Donation Spreadsheet). Nevertheless, even though the defendants are confident that their donors understand the antagonistic relationship they have with the LNC, they recently (in an abundance of caution) posted the following disclaimer on the legal defense fund donation page on michiganlp.net:



Ex. 14 at 1 (michiganlp.net Printouts). Similarly, Treasurer Thornton and others

— 10 —

setup a new fundraising website, lncfight.org, that describes the LNC's interference in the LPM governance dispute in even further detail and asks supporters to "defend the rights of libertarians across this country from National overreach." Ex. 1 at 7 (Thornton Declaration); Ex. 13 at 2–3 (lncfight.org Printouts). Through these various efforts and websites, the defendants have received approximately 100 donations into the legal defense fund, with approximately 70 of those coming from donors who reside out of state. Ex. 23 (Donation Spreadsheet).

## LEGAL STANDARD

"[P]reliminary injunctions are extraordinary remedies governed by the following considerations: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (cleaned up). "The party seeking [a] preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

## ARGUMENT

**A.    Injunctive relief is not warranted because the LNC is unlikely to succeed on the merits of its claims.**

**1.    The noncommercial speech and activities of a political organization are outside the scope of the Lanham Act.**

The Sixth Circuit, like at least four others, has held that the Lanham Act would run afoul of the First Amendment's free-speech protections if construed to apply beyond the limited context of commercial speech. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *see also All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 406 n.8 (5th Cir. 2018) (citing cases). Accordingly, courts in this circuit must keep the First Amendment in mind when construing the various terms that trigger coverage under the Act, such as "use in commerce," "in connection with," and "goods and services." *See Radiance Found., Inc. v. Nat'l Ass'n for Advancement of Colored People*, 786 F.3d 316, 322–24 (4th Cir. 2015) (holding that First Amendment's commercial speech doctrine provides "the best guidance in applying the Act.").

In implementing this principle, courts have rejected trademark claims in a variety of situations where the allegedly infringing use constituted noncommercial speech under the First Amendment. For example, in *Savannah College of Art and Design, Incorporated v. Houeix*, 369 F. Supp. 2d 929 (S.D. Ohio 2004), the court rejected a trademark claim involving a website that contained information for foreign students about the American education system, including critiques of the school that the plaintiff operated. In doing so, the court noted that the defendant's website was a "gripe site" with no paid advertising, and concluded that the First Amendment precluded the imposition of trademark liability for this type of protected noncommercial speech. *Id.* at 947–48. Similarly, another court within the circuit has

held that the Act does not apply to high school coaches who used plaintiff's "Winning Isn't Normal" trademark to teach their student athletes life lessons, even if the coaches also engaged in fundraising activity. *Bell v. Worthington City Sch. Dist.*, No. 2:18-cv-961, at *12-13 (S.D. Ohio June 2, 2020).

While it does not appear that any court in the Sixth Circuit has had the opportunity to consider *Taubman* in the context of a political organization, *Taubman* clearly precludes the use of the Lanham Act to silence political speech. As the Supreme Court has emphasized, political speech, including contributing and soliciting contributions to political campaigns, is among "the most fundamental First Amendment activities." *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976). Accordingly, the Lanham Act cannot be read to extend to activities like disseminating political information, promoting political candidates, or soliciting political donations, because doing so would extend the statute far beyond the context of commercial speech and would subject it to strict — rather than intermediate — scrutiny.

Notably, in a recent case involving similar issues, several judges on the Fifth Circuit suggested that *Taubman* compels this result. First, in a 2018 opinion, a three-judge panel noted that the "interplay between the Lanham Act and the First Amendment's political and commercial speech doctrines raises a thicket of issues." *All. for Good Gov't*, 901 F.3d at 506 n.8 (5th Cir. 2018). The panel specifically noted a circuit split in which the Sixth Circuit and at least four others had held that the Act

applies only to the noncommercial use of marks, while the Second Circuit has held otherwise and applied it to purely political uses. *Id.* Specifically, in *United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.*, 128 F.3d 86, 88 (2d Cir. 1997), the Second Circuit held that political fundraising and making political endorsements are "services" for purposes of the Lanham Act and can therefore give rise to liability. Ultimately, the 2018 panel determined that it was unnecessary for the Fifth Circuit to weigh in on this circuit split, because the defendants in the case had not properly raised the issue at the district court level. *All. for Good Gov't*, 901 F.3d at 506 n.8.

Three years later in a subsequent appeal in the same case, Judge Dennis criticized the 2018 opinion for ducking the question, which he believed was necessarily implicated by plaintiff's theory of liability. *All. for Good Gov't v. Coal. for Better Gov't*, 998 F.3d 661, 674 n.4 (5th Cir. 2021) (Dennis, J., dissenting). Judge Dennis then went onto explain why, in his view, applying the Lanham Act to noncommercial political speech was so "clearly erroneous and manifestly unjust" that the latter panel could correct the prior error. *Id.* at 677 n.7. In doing so, he emphasized that the Second Circuit is the "sole outlier court in an otherwise uniform line of federal appellate authority holding that the Lanham Act does not apply to noncommercial speech," and further asserted that the Second Circuit was "incorrect that purely political speech is a 'service' under the Lanham Act." *Id.* at 677 n.5. He

then further criticized the Second Circuit's decision for its potential to "stifl[e] the political speech that is key to the functioning of our democracy."

For its part, the LNC's theory of liability in this case relies principally on the Second Circuit's decision in *United We Stand*. *See* ECF No. 1, Page I.D. 11 (Complaint) (alleging infringement in connection with services such as "political party communications, political party activities, political press activity, political candidate screenings, official filing and registrations and endorsements"). This Court should decline the LNC's invitation to extend that decision into this circuit, because doing so would be plainly contrary to *Taubman* and would infringe the defendants' free-speech rights. Moreover, to the extent that the Second Circuit's decision was based on the policy concern that the absence of Lanham Act protection in this context would be "impractical for the functioning of our political system," *United We Stand*, 128 F.3d at 90, that concern is misplaced. If Congress believes that legislation is necessary to avoid public confusion in the areas of political speech and political fundraising, it can enact appropriate legislation under the Elections Clause and does not need to stretch its authority under the Commerce Clause. Indeed, Congress has already enacted a statute that prohibits fraudulent misrepresentation in political fundraising, 52 U.S.C. § 30124(b)(1), and the LNC is already pursuing claims under that statute before the FEC. Ex. 11 (FEC Complaint).

**2.      Even if the Lanham Act applies, the defendants have the contractual right to use the name "Libertarian Party"**

**because they are members of the LNC's state-level affiliate, and because the LNC lacks the power of "constructive disaffiliation."**

As acknowledged in its complaint, the LNC was incorporated in the District of Columbia and has its principal offices in Virginia. ECF No. 1, Page I.D. 1 (Complaint). Under the law in both those jurisdictions, "the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005); *accord Gottlieb v. Economy Stores,* 102 S.E.2d 345, 351 (Va. 1958). The defendants in this case are all members of the LPM, which is the state-level affiliate of the LNC. *See* Ex. 4 at 2, 4 (Van Alstine Declaration). As such, they have contractual rights under the Libertarian Party bylaws, several provisions of which are relevant to the dispute in this case.

First, article 5, section 1 of the bylaws provides" "No person, group, or organization may use the name 'Libertarian Party' or any confusingly similar designation except the Party or an organization to which the Party grants affiliate party status or as otherwise provided in these bylaws." ECF No. 12-7, Page I.D. 454 (LP Bylaws). In light of this, the LNC admits that "chartered affiliates are licensed to use the LNC's federally registered trademarks." ECF No. 1, Page I.D. 3 (Complaint).

Second, article 5, section 6 of the bylaws prescribes a process for the disaffiliation of affiliate parties, stating in pertinent part:

The National Committee shall have the power to revoke the status of any affiliate party, for cause, by a vote of 3/4 of the entire National Committee. A motion to revoke the status of an affiliate party for cause must specify the nature of the cause for revocation. [ECF No. 12-7, Page I.D. 454 (LP Bylaws)].

Third, article 5, section 5 provides in its entirety: "The autonomy of the affiliate and sub-affiliate parties shall not be abridged by the National Committee or any other committee of the Party, except as provided by these bylaws." *Id.* Further, no other provision of the bylaws authorizes the LNC to choose between competing factions in a governance dispute within an affiliate party. *See id.* at 453–61.

When read together, the three provisions above debunk the LNC's claim that it can "constructively disaffiliate" members of state-level parties and thereby prohibit them from using its trademarks. The bylaws prescribe a single procedure for disaffiliation that: (1) applies only to parties as a whole, not to individual members; (2) requires a ¾ supermajority vote of the LNC; and (3) can be invoked only for cause. *Id.* at 454. Because this is the only disaffiliation procedure mentioned, ordinary principles of interpretation compel the conclusion that it's the exclusive procedure. *See Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.")

Article 5, section 5's prohibition on abridging the autonomy of state-level parties further reinforces this reading. Considering that provision, it is implausible that the drafters of the bylaws intended for the LNC to have the sweeping implied

power of "constructive disaffiliation" that it claims. As demonstrated here, the existence of such a power would allow the LNC chair (or at least a bare majority of the LNC) to arbitrarily choose which members of state-level parties are allowed to call themselves members of the "Libertarian Party." Under any reasonable reading of the bylaws, this would abridge the autonomy of state-level parties to govern themselves and enroll their own members, and it is therefore plainly prohibited.

Accordingly, because Ms. McArdle's "constructive disaffiliation" letter to Mr. Brungardt exceeded her powers under the bylaws, it was ineffective in revoking the defendants' contractual license to use the LNC's marks. *See, e.g.*, *Sheriff v. Medel Elec. Co.*, 412 A.2d 38, 41 (D.C. 1980) (explaining that the termination of a contract is ineffectual if proper procedures are not followed). This case is therefore distinguishable from the two principal cases on which the LNC relies, both of which involved situations where the trademark holder followed the applicable revocation procedures. *See United States Jaycees v. Phildelphia Jaycees*, 639 F.2d 134, 146 (3d Cir. 1981) ("This action . . . does not directly challenge the . . . revocation of the charter.); *Republican Nat'l Comm. v. Canegata*, 3:22-cv-0037, at \*13 (D.V.I. Aug. 10, 2022).

### 3. The defendants' use of the name "Libertarian Party" is not confusing because potential donors and dues payers are aware of the governance dispute within the state party and understand that the LNC supports Mr. Chadderdon.

In determining whether a likelihood of confusion exists, this Court considers the following factors: (1) the strength of the plaintiff's mark, (2) the relatedness of the

goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 731 (6th Cir. 2012). Under this test, the "ultimate question" is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

This case is so far outside the intended scope of trademark law that it is difficult to discuss some of these factors intelligibly. To begin, since LPM is a political party that engages in political rather than commercial activity, the task of defining its relevant "consumers" presents an essentially hypothetical question. The defendants contend that the closest thing LPM has to "consumers" are the individuals who make payments to the party either through donations or membership dues. *Cf. Radiance Found*, 786 F.3d at 327 (4th Cir.) ("trademark infringement is not designed to protect mark holders from consumer confusion about their positions on political or social issues"). As a matter of common sense, these individuals are far more likely than the general public to follow Libertarian Party politics and to be aware of the intraparty disputes that have arisen both in Michigan and in other states since the Mises Caucus

took control of the LNC in 2022. *See, e.g.*, Ex. 5 at 6–7 (Saliba Declaration) (describing evidence that supporters and donors are fully informed); Ex. 1 at 6–8 (Thornton Declaration) (same). They would therefore be likely to exercise a high degree of "care and sophistication" when donating or paying membership dues to the party, so as not to accidently support factions that they oppose.

A similar conceptual problem exists with respect to the fourth factor — evidence of actual confusion. Because the defendants are LPM members and LPM is currently a recognized affiliate of the Libertarian Party, *see* Ex. 4 at 2, 4 (Van Alstine Declaration), an individual who believes that the defendants' political services are affiliated with the LNC is not "actually confused," but is instead correct in that belief. As a result, the most that the plaintiff can possibly show with respect to this factor is confusion as to whether the LNC supports Mr. Saliba or Mr. Chadderdon in the ongoing intraparty governance dispute.[2] That's a fundamentally different question than what trademark law typically asks. *See Homeowners Grp.*, 931 F.2d at 1107 (defining the "ultimate question" in trademark cases). Accordingly, even if the LNC can show confusion regarding its position in the governance dispute, that does not amount to confusion regarding the affiliation between the LNC and the political

---

[2] The videoclip referenced in the LNC's brief arguably constitutes evidence of such confusion on the part of 1 of the 66 delegates at the April 2023 convention. See ECF No. 12, Page I.D. 399 (Plaintiff's Brief). The videoclip, as quoted in the brief, also shows that Mr. Saliba immediately dissipated any confusion by responding that "Andrew (Chadderdon) is the chair of the board that they recognized." *Id.*

services performed by LPM members. Moreover, the evidence shows that many of the donations to the LPM legal defense fund were made shortly after LNC meetings at which the LNC discussed and took various actions in support of Mr. Chadderdon's claim to be the rightful chair of the LPM. Ex. 1 at 6 (Thornton Declaration); Ex. 23 (Donation Spreadsheet). The timing of these donations, along with the content of the social media posts that appears to have driven them, strongly suggests that many individuals who donated to the defendants did so at least in part because they believe the LNC's interference with a state-level affiliate is inappropriate and contrary to the Libertarian Party bylaws — not because of any confusion about the relationship between the LNC and the defendants. *see, e.g.*, Ex. 2 at 2–3 (Warzybok Declaration); Ex. 3 at 3–4 (Ellison Declaration). For these reasons, the fourth factor weighs in favor of the defendants to the extent it applies.

The remaining factors are more directly applicable to this case, and at least three of them strongly weigh in favor of the defendants. First, the mark "Libertarian Party" is quite weak, despite its incontestable status. *See Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 428–30 (6th Cir. 2017) (explaining that incontestable status gives rise to a rebuttable presumption of strength). In terms of conceptual strength, the mark is merely descriptive at most, and arguably even generic. For purposes of trademark law, a merely descriptive mark is one that describes the qualities or characteristics of a good or service. *Nartron Corp. v.*

— 21 —

*Stmicroelectronics, Inc.*, 305 F.3d 397, 404 n.7 (6th Cir. 2002). The phrase "libertarian party" certainly doesn't do any more than this, since the word "libertarian" is a common term for describing a political ideology that seeks to maximize individual rights and minimize the role of the state. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed.). As a result, an ordinary English speaker would understand the phrase "libertarian party" to mean a political party that advocates policies aligning with this ideology, and would only associate it with a particular political party to the extent the speaker was aware its secondary meaning.

Second, the marketing channels that the defendants and their supporters use are unlikely to cause confusion, because the defendants have been honest and transparent about their relationship with the LNC throughout the governance dispute. As described above, Mr. Saliba has sent multiple emails to the full membership of the LPM describing the governance dispute and acknowledging that the LNC supports Mr. Chadderdon's claim to power. Ex 9 (LPM emails). Similar acknowledgments appear in articles in the "News" page of the michiganlp.net website, Ex. 14 at 5–9 (michiganlp.net Printouts), and many of the social media posts that have driven donations to the defendants' legal defense fund expressly reference the LNC or this trademark suit, *see, e.g.*, Ex. 1 (Thornton Declaration). Finally, and perhaps most notably, the defendants recently added a disclaimer to the "Donation" pages on michiganlp.net that describes the governance dispute in detail, provides a

link to the Chadderdon faction's website, and states that "the Libertarian National Committee (LNC) . . . has thrown its support behind Mr. Chadderdon." Ex. 14 at 1–2 (michiganlp.net Printouts). This Court has held that the use of such disclaimers can be effective in presenting consumer confusion. *See Taubman,* 319 F.3d at 776–77.

Third, the seventh factor weighs in favor of the defendants because the defendants do not use the name "Libertarian Party" with the intent to misappropriate the LNC's mark. Rather, the defendants are longtime members of the Libertarian Party of Michigan and have a good faith claim to being its elected leaders. The evidence shows that a substantial number of LPM members support that claim, which strongly counsels against any finding of malintent. *See e.g.*, Ex 8 at 1 (April 2023 Draft Convention Minutes) (noting 66 delegates in attendance).

## B. Even if the LNC were likely to prevail on the merits, the equities weigh against the broad preliminary injunction it seeks.

Setting aside the LNC's likelihood of prevailing on the merits, this Court considers three other factors in determining whether to grant the extraordinary remedy of a preliminary injunction. All three factors counsel against doing so.

First, because the LNC has not sufficiently demonstrated that individuals who might be inclined to donate or pay membership dues to the party are likely to be confused by the defendant's use of the name "Libertarian Party," they have not established that they would suffer an irreparable injury absent a preliminary injunction. Because potential donors and party members are generally aware of the

intraparty dispute, they are unlikely to mistakenly provide financial support to rival factions within the party. Indeed, Ms. Thornton, LPM's elected treasurer, has indicated that no one who provided financial support to the defendants since the governance dispute began has requested a refund or otherwise informed her that they were confused about the relationship between the defendants and the LNC. Ex. 1 at 7 (Thornton Declaration). Moreover, to the extent the defendants are violating state law or federal campaign-finance law through their fundraising efforts (as the LNC erroneously contends), any such violation could be addressed in the *Comerica Bank* case or in the pending matter before the FEC.

Second, if this Court were to grant a preliminary injunction barring the defendants from using the name "Libertarian Party," it could cripple them in the ongoing governance dispute and the related legal matters referenced above. One of the more significant assets the defendants have in these matters is the broad support they enjoy from the party's membership. If the defendants are precluded from even referring to the name of the party, however, they could lose credibility in the eyes of the membership and their support could dwindle. Moreover, the inability to refer to themselves as the "Libertarian Party" could hamstring the defendants' fundraising efforts, including efforts to raise funds to continue defending this lawsuit.

Third, granting a preliminary injunction would be contrary to the public interest in at least two distinct ways. For one, in light of the constitutional values

embodied in the First Amendment, it is well established that the "public interest is supported by protecting the right to speak, both individually and collectively." *Carey v. Fed. Election Comm'n,* 791 F. Supp. 2d 121, 136 (D.D.C. 2011). Accordingly, if this Court has any doubt that the defendants' use of the name "Libertarian Party" in connection with their political activities may be outside the scope of the Lanham Act, it should err on the side of protecting the defendants' free-speech rights while this suit is pending. In addition, the Sixth Circuit has recognized that courts "have historically been reluctant to intervene in intra-party disputes." *Heitmanis v. Austin,* 899 F.2d 521, 525 (6th Cir. 1990). Granting the LNC's requested injunction would, in effect, allow one faction within the LPM to continue calling itself the "Libertarian Party of Michigan" while prohibiting the other faction from doing so. This Court should refrain from that type of intervention unless and until the LNC conclusively establishes its entitlement to relief in this case, which it has not done thus far.

## CONCLUSION

For these reasons, the Defendants respectfully request that this Court deny the LNC's motion for a preliminary injunction.

DATED:  July 10, 2023              Respectfully submitted,

                                   By: /s/ *C. Nicholas Curcio*
                                   CURCIO LAW FIRM, PLC
                                   16905 Birchview Drive
                                   Nunica, MI 49448
                                   Telephone: (616) 430-2201
                                   ncurcio@curciofirm.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**LIBERTARIAN NATIONAL COMMITTEE, INC.,**

     *Plaintiff,*

*v.*

**MIKE SALIBA, RAFAEL WOLF, GREG STEMPFLE, ANGELA THORNTON-CANNY, JAMI VAN ALSTINE, MARY BUZUMA, DAVID CANNY, and JOSEPH BRUNGARDT,**

     *Defendants.*

Case No. 23-cv-11074

Hon. Judith E. Levy

### CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

DATED:  July 10, 2023

Respectfully submitted,

By: /s/ *C. Nicholas Curcio*
C. Nicholas Curcio
CURCIO LAW FIRM, PLC
16905 Birchview Drive
Nunica, MI 49448
Telephone: (616) 430-2201
ncurcio@curciofirm.com