SUMMARY PAGE OF LIBERTARIAN PARTY JUDICIAL COMMITTEE RULING
in the matters of:
WILL MCVAY (et. al) VS. LIBERTARIAN NATIONAL COMMITTEE
BILL HINDS (et. al) VS. LIBERTARIAN NATIONAL COMMITTEE

<u>Date Issued</u>:   February 13, 2022
<u>Appellants</u>:   Will McVay (et. al.) on behalf of the Libertarian Party of Delaware (LPDE);
and separately Bill Hinds (et. al.) on behalf of the Libertarian Party of Delaware
<u>Respondents</u>:   Appellants are also respondents in cross-appeals;
Libertarian National Committee (LNC)

**Background**:

- On December 9, 2021 we received a filing from Will McVay and eight others purporting to be the chair and board of the LPDE alleging that the LPDE was disaffiliated by LNC's adoption of a motion regarding Delaware on December 5, plus Region 5's election and seating of alternate Otto Dassing to the LNC.
- Separately on December 20, 2021, we received a filing from Bill Hinds and two others purporting to be the chair, vice-chair, and board member of the LPDE alleging that a sequence of LNC actions on November 21, 2021 was a disaffiliation of the LPDE as chaired by Mr. Hinds, and another motion adopted by the LNC on December 5, 2021 was a confirmation of the disaffiliation.
- There were two different individuals claiming to be the rightful chair of the LPDE due to disputed actions by LPDE board members on October 1, 2021 and November 20, 2021.
- The Judicial Committee held a hearing on January 16, 2022, continued that hearing on January 23, 2022, and subsequently considered all the arguments.
- On February 13, 2022 the Judicial Committee members voted as shown below.
- Judicial Committee members have chosen to author or co-sign the attached written statements regarding the vote.

**Votes (2 key findings and 1 ruling)**:

**Motion 1**

Events in the October 1 and November 20 Delaware meetings were not valid, and thus did not change the leadership and rules of the Libertarian Party of Delaware.

<u>Voting Yes</u>:  Turney, Arnold, Mattson, Ruwart
<u>Voting No</u>:  Supreme
<u>Abstaining</u>:  Moulton, Robinson

The motion was adopted with a 4-1 vote.

**Motion 2**

The LNC's actions culminating in the December 5 motion constructively disaffiliated the rightful Delaware affiliate.

<u>Voting Yes</u>:  Turney, Arnold, Supreme, Mattson, Moulton, Ruwart
<u>Voting No</u>:  (none)
<u>Abstaining</u>:  Robinson

The motion was adopted with a 6-0 vote.

**Motion 3**

Thus we rule to reinstate the LP's Delaware affiliate, recognizing its officers (Mr. Hinds as chair) and other duly elected board members (including Dr. LePore and Mr. Casey) chosen by that affiliate under its properly adopted rules as they stood prior to the events of October 1.

<u>Voting Yes</u>:  Turney, Arnold, Mattson, Ruwart
<u>Voting No</u>:  Supreme, Moulton
<u>Abstaining</u>:  Robinson

The motion was adopted with a 4-2 vote.

**<u>Effect</u>**: This ruling is self-executing to effectuate the above reinstatement.

OPINION IN TWO APPEALS OF ALLEGED CONSTRUCTIVE DISAFFILIATION
OF THE DELAWARE AFFILIATE
Will McVay vs. Libertarian National Committee
Bill Hinds vs. Libertarian National Committee

Opinion of Alicia Mattson voting with the majority to reinstate.  Mary Ruwart and Jim Turney concurring.

*NOTE:  References to Robert's Rules of Order Newly Revised (RONR) are to the 12th edition.*

## 1.0 Executive Summary

Having reviewed voluminous filings by two groups both claiming to represent the Libertarian Party of Delaware, filings by the Libertarian National Committee (LNC), numerous amici filings, the national Libertarian Party (LP) bylaws, both the articles of association and the bylaws of the Libertarian Party of Delaware (LPDE), RONR, and having conducted a hearing on the matter on January 16, 2022 which hearing was continued on January 23, 2022, the national Libertarian Party's Judicial Committee rules as follows:

> To reinstate the LP's Delaware affiliate, recognizing its officers (Mr. Hinds as chair) and other duly elected board members (including Dr. LePore and Mr. Casey) chosen by that affiliate under its properly adopted rules as they stood prior to the events of October 1.

## 2.0 Background

The Judicial Committee (JC) has received two appeals on overlapping subjects regarding alleged disaffiliation of the LP's Delaware affiliate.

On December 9, 2021 we received a filing (the "McVay appeal") from Will McVay and 8 others purporting to be the chair and board of the LPDE alleging that the LPDE was disaffiliated by:

1) LNC's adoption of a motion regarding Delaware on December 5, 2021 to require a mass meeting of members to determine its officers, plus
2) Region 5's election and seating of alternate Otto Dassing to the LNC because McVay was not allowed to vote on the matter.

This filing asserts JC jurisdiction under LP Bylaws Article 8.2.a, which grants jurisdiction over "suspension of affiliate parties" as described in LP Bylaws Article 5.6.  This appeal requests that the JC:
1) void the LNC's December 5 motion, and
2) void the Region 5 Alternate election or permit the Delaware affiliate to withdraw from Region 5.

On December 20, 2021, we received a filing (the "Hinds appeal") from Bill Hinds and two others purporting to be the chair, vice-chair, and board member of the LPDE alleging that the LNC's failure on November 21, 2021 to adopt a motion to recognize "the board elected at the Libertarian Party of Delaware convention of 2021" was a de facto recognition of the McVay board. The filing states that since the Hinds board is the legitimately elected board, and the McVay board is not the legitimately elected board, the LNC's failed motion was, "a constructive disaffiliation of the LPDE."  The Hinds appeal

further notes that also on November 21, 2021 the LNC voted on a second motion to "[d]isaffiliate the Libertarian Party of Delaware for having two boards and the Libertarian National Committee unable to decide an appropriate board," and this motion to disaffiliate also failed to be adopted. It then alleges the December 5, 2021 LNC motion (generally to require a mass meeting to determine LPDE's officers) served to confirm the constructive disaffiliation of LPDE caused by LNC's failure to adopt its November 21 motion (to recognize the Hinds officers).

The Hinds appeal cites LP Bylaws Article 5.1-6 for jurisdiction, as it regards the revocation of an affiliate's status. The appeal requests as relief that the JC "direct the LNC to recognize the LPDE affiliate led by Bill Hinds, the duly elected Chair, and repudiate its constructive disaffiliation of same."

In general, the LNC's adopted December 5 motion (to require a mass meeting to determine LPDE's officers) includes a directive to continue sharing affiliate data with both the McVay board and the Hinds board, encourages those who were LPDE members as of the date of the 2021 LPDE state convention to hold a meeting to determine the rightful leadership of the LPDE and establishes that the LNC shall recognize that outcome, or alternatively if competing meetings are held the LNC shall recognize the outcome of whichever meeting had the greatest number of LPDE members.

### 3.0 Jurisdiction

The Judicial Committee has jurisdiction over revocation of affiliate status under LP Bylaws Article 5.6 and Article 8.2.a as cited by the parties. LP Bylaws Article 5.3 establishes that, "There shall be no more than one state-level affiliate party in any one state." LP Bylaws Article 5.2 prescribes how an affiliate relationship is established, and it requires submission of a petition for affiliation followed by the LNC granting the request. No group has recently submitted such a petition, much less has the LNC granted the request of such a petition. Therefore, the LNC has not acted to create a second affiliate in Delaware. Nothing in that bylaw suggests that providing data to an organization is alone sufficient to make them an LP affiliate. The LNC at times provides data to non-affiliate entities, such as our Presidential campaigns.

There is only one affiliate in Delaware. What is disputed is the identity of the rightful officers of that affiliate. Under LP Bylaws Article 5.6 (underline added), "The <u>affiliate party</u> may challenge the revocation of its status by written appeal to the Judicial Committee within 30 days of receipt of notice of such revocation." Only the rightful affiliate has standing to appeal under this article. Therefore, no more than one of the appeals submitted to us could possibly be accepted under Articles 5.6 and 8.2.a. To determine who has standing to file such an appeal, the JC needs to determine who are the rightful LPDE officers, a task that the LNC failed to do.

What is an affiliate? General dictionary definitions of the noun "affiliate" are typically about being a branch or subsidiary of a larger organization. Given the construct of our bylaws, we use it in a way more similar to the verb form "to affiliate," which is about creating a relationship or association between two entities. An LP affiliate is an organization that has established a two-way relationship with the national party, each having duties to the other. The affiliated organization has many variables which object-oriented language programmers might call "properties." It usually has members, bylaws, assets, a board, and officers. The relationship involves certain LP bylaws-prescribed behaviors between the national LP and the affiliate. (The national LP provides certain information to affiliate chairs. The national LP supports activities of affiliates. The affiliates send delegates to the national conventions. Etcetera.) As will be itemized below, the LP bylaws do prescribe various interactions with the affiliate

chairs, and the chairs chosen under the affiliate's rules are the most obvious representatives of the affiliates.

When the bylaws give the JC jurisdiction with a phrase such as, "The affiliate party may challenge the revocation of its status…" then to apply this bylaw the JC must of necessity be able to determine whether or not the appellant is legitimately representing the affiliate. The JC must first determine whether Mr. McVay or Mr. Hinds is the LPDE chair in order to determine which of the appeals to accept and which to dismiss for lack of standing. The bylaw would be pointless if the JC were precluded from discerning this reality. If Xi Jinping contacted the JC claiming to represent a wrongfully disaffiliated LP affiliate, no one would disagree that the JC should not accept the case, as he clearly does not represent any of our affiliates.

### 3.1 Range of Authorized Remedies

Regardless of which of the two appeals the JC accepts, both are framed as an appeal of a constructive revocation of affiliate status. If a disaffiliation occurred, the only options for the JC under LP Bylaws Article 5.6 are to either affirm the revocation, or to reinstate the affiliate. We are not authorized to fashion a different remedy.

The McVay appeal under LP Bylaws Articles 5.6 and 8.2.a requests that we 1) void the LNC's December 5 motion, and 2) either void the Region 5 Alternate election or permit the Delaware affiliate to withdraw from Region 5.

Voiding LNC decisions is only an option under LP Bylaws Article 7.12 and 8.2.d, but that requires an, "appeal by ten percent of the delegates credentialed at the most recent regular convention or one percent of the Party sustaining members," which was not done here. Rather, the McVay petition was submitted by nine individuals purporting to be the LPDE board. It is not permissible to use the easier appeal path of Article 5.6 regarding alleged disaffiliation and then use it as a shoehorn to address issues that can only be raised under an Article 7.12 appeal.

The JC's jurisdiction is limited to items listed in LP Bylaws Article 8.2. Nothing in the LP Bylaws permits the JC to issue a ruling voiding an election of a regional alternate or altering the regional makeup, as requested in the McVay appeal. If the LNC's December 5 motion (requiring a mass meeting to determine LPDE's officers) is determined to be a disaffiliation, then the only action within our power for an appeal under LP Bylaws Articles 5.6 and 8.2.a is to affirm the disaffiliation or reinstate the status of an affiliate. The LNC's credentialing decision to seat an allegedly improperly elected region rep is potentially appealable, but it would require following the procedure in LP Bylaws Article 7.12, not merely a request of nine individuals.

The Hinds appeal under LP Bylaws Article 5.6 requests that the JC "direct the LNC to recognize the LPDE affiliate led by Bill Hinds, the duly elected Chair, and repudiate its constructive disaffiliation of same." LP Bylaws Article 8.2 grants the JC no jurisdiction to direct the LNC to repudiate its past actions, or even to "direct" the LNC to recognize the LPDE affiliate led by Bill Hinds. The only action within our power (for an appeal under LP Bylaws Articles 5.6 and 8.2.a) is to affirm disaffiliation or reinstate the status of an affiliate -- if a disaffiliation has occurred. It is the ruling of the JC that would effectuate a reinstatement without a need for further motions from the LNC. In other words, its decision to reinstate is self-executing.

### 4.0 Standing

The only way for the JC to determine whether Mr. Hinds or Mr. McVay is the rightful LPDE chair without violating the affiliate's autonomy (their right of self-rule) is to apply the LPDE's *own* articles and bylaws to the dispute, which we do below.  This dispute arose due to events on October 1, 2021 to purportedly hold a board meeting and amend LPDE bylaws to alter the way in which board members can be removed.  Those actions led to the disputed replacement of board members (Mr. Hinds, chair; Dr. LePore, vice chair; and Mr. Casey, New Castle County representative) and substantial restructuring of the organization and its governing documents.

### 4.1  Notice for October 1 Bylaw Amendment

As of October 1, 2021 LPDE Bylaw 5 provided that:

> *"These By-Laws may be amended in either of two ways:*
> *A. A simple majority vote of members present (quorum required) at a meeting of the State Board as long as notice of proposed changes was made at least 30 days in advance.*
> *B. A simple majority vote of members present at a State Convention as long as notice of proposed changes was made at least 30 days in advance."*

Even for amendments by the board, the bylaws required notice of the proposed changes at least 30 days in advance.

As of the date in question, LPDE Article of Association X provided that (underline added),

> *"Many actions described in these Articles of Association and the accompanying By-Laws require notice of that pending action <u>be provided to members</u>. Any one of the following methods shall constitute proper notice:*
> *1. Posting on the LPD Facebook page*
> *2. Posting to the LPD Facebook group*
> *3. Posting on the LPD webpage"*

Even within the language of this article authorizing ways in which members could be notified, the underlined phrase "be provided to members" acknowledges the inherent intent of requiring notice, that members will likely receive it.

RONR advocates that previous notice for bylaw amendments ought to be required by the bylaws, and notice is better understood in RONR's explanation of why notice ought to be required.  It's why there is a concept of "scope of notice" as the passage in RONR 57:11 explains (underline added):

> *"If the bylaws require previous notice for their amendment (as they should), or if they do not but notice has been given and a majority of the entire membership is not present, no amendment to a bylaw amendment is in order that increases the modification of the article or provision to be amended (see 35:2(6)). This restriction prevents members from proposing a slight change and then taking advantage of absent members by moving a greater one as an amendment to the amendment.  Thus, if the bylaws place the annual dues of members at $10 and an amendment is pending to strike out 10 and insert 25, an amendment to change the 25 to any number between 10 and 25 would be in order, but an amendment to change the number to less than 10 or greater*

> *than 25 would not be in order, even with unanimous consent. <u>Had notice been given</u> that it was proposed to increase the dues to more than $25 or to reduce them below $10, <u>members who opposed such a change might have attended the meeting to vote against the amendment.</u>"*

Notice is a communication intended to be received by members, informing them about the range of options to be considered, and thus impacting the members' decisions whether to exercise their fundamental right to attend meetings to either support or oppose proposed actions.  In the unique case of LPDE, after receiving notice the affiliate's three county organizations could have potentially acted to change their representation on the state board to prevent an objectionable amendment from being adopted by the board.

McVay asserts that notice of the October 1 proposed change was given by virtue of a vague August 31 post on the LPDE Facebook group, a post that did not even at minimum say it was intended to constitute notice.  It merely said, "Change Bylaw 4?:"  Especially given that the Facebook group is used for broad general discussion, it's important to expressly say that it is notice so as to distinguish that post from one merely seeking feedback on a draft idea.  This vague phrasing in such a mixed-use forum should not be considered as notice having been properly given.

When the bylaws require notice, it is understood that this precludes engaging in acts intended to thwart its receipt by members. For example, if the bylaws required a mailed notice, the bylaws wouldn't also have to say that hijacking the mail carrier's truck after placing the notices in the mailbox is prohibited. The bylaws don't have to say that a hypothetical white text on a white background isn't valid notice. Requiring that notice be given inherently implies that one cannot take actions to intentionally prevent members from receiving the notice, and that is what undeniably, admittedly happened in this case.  An admittedly orchestrated meme dump happened immediately after the Facebook post was made so as to bury it from view.  Comments on the post were turned off (initially by Mr. McVay himself) to further make it less visible in the Facebook algorithms.   Further, there were none of the customary hashtags applied to the post to identify it as being notice.

If action is taken to prevent previous notice from having its effect, no proper notice was given. Observers of the Facebook page would mostly never even see the post, and if they did, would not likely think it constituted notice.  No proper notice was given for the purported October 1 bylaw amendment. That amendment proposed lowering the bar for removing members of the ten-member State Board. Instead of requiring a 4/5 vote of the State Board (provided it is later affirmed by a majority vote at the next Convention), the language purportedly adopted on October 1 allows removal by a vote of two of the three County Chairs and dispenses with the required affirmation vote at the Convention. Effectively, the amendment empowers two people to remove any and all members of the board.

LPDE Bylaw 3.B adopts RONR as its parliamentary authority.  Under RONR, without proper notice, the purported October 1 adoption of the bylaw amendment was action taken in violation of a rule in the bylaws protecting absentees.  (See RONR 23:6 especially exception (e), also 23:9, 39:5). A requirement for previous notice of a bylaw amendment is a rule protecting absentees (RONR 25:10). RONR 23:9 provides that a finding of an RONR 23:6(e) violation means the action must be declared null and void.

### 4.2  Actions Relying on Purported October 1 Bylaw Amendment

Moments after the purported bylaw amendment on October 1, two LPDE County Chairs while serving on the State Board (rather than at a noticed meeting of County Chairs) relied on the invalid bylaw

amendment to purportedly remove three absent board members, two of whom were officers, and without any charge of misconduct as contemplated by LPDE Bylaw 4.

As explained above, the bylaw amendment was not properly adopted, is null and void, and the bylaws at the time would instead have required accusation of misconduct plus "a vote of 4/5 of the members of the State Board confirmed at the next Convention by a majority vote to remain in effect." Thus Mr. Hinds, Dr. LePore, and Mr. Casey were not actually removed from their positions on October 1, leaving no path to appoint Mr. McVay as chair, and there were no vacancies for the McVay group to backfill.

After the October 1 coup, the McVay group (with Mr. McVay as its purported new chair) did not represent a board acting under the LPDE articles and bylaws. The rogue board proceeded to backfill vacant positions with themselves and their allies, disaffiliate the New Castle County affiliate chaired by Mr. Casey and reconstitute a different New Castle County affiliate, drastically amend the bylaws regarding membership such that only individuals approved by the State Board could become LPDE members, and take full control of the function of the county affiliates. All this was done without allowing participation by properly elected board members and with the participation of improperly back-filled board members. The culmination of these steps accomplished the purpose McVay and his cohorts sought: to eliminate and ban all opposition, and vest full control of the party in themselves.

### 4.3 Alleged Do-Over Meeting on November 20

For whatever reason, the now-rogue McVay group purported to offer the three allegedly removed board members (Hinds, LePore and Casey) an opportunity to re-do the October 1 bylaw amendment vote at the 4th quarter regular board meeting on November 20, with notice, but this time with a different proposed bylaw amendment that would eliminate any requirement that removal was only for the board members "accused of misconduct" and instead proposing that removal could be accomplished, "By a majority vote of all current State Board members on a motion to remove."

An actual do-over vote would have been a full reset to the conditions prior to October 1 in which Mr. Hinds was recognized as the chair, the articles and bylaws were unaltered from that date, and the New Castle affiliate was represented by Mr. Casey. The draft minutes provided by McVay make clear that is not what happened. The initial attendance lists Mr. McVay as the chair and lists as board members several who were not board members as of October 1. In other words, this was not actually a meeting of the LPDE board.

A review of the video and draft minutes of the 4th quarter regular meeting on November 20 makes clear that it was a farce.
- LPDE Article of Association IV required that "All votes conducted at regular meetings shall be by roll call." The video reveals that the votes were not conducted by roll call. Instead Mr. McVay rapidly gaveled through (see RONR 43:7 which says this is not legitimate parliamentary procedure). Mr. McVay:
    - often gave no real opportunity for debate
    - often did not ask for both the aye and nay votes
    - very rapidly conducted voice votes or show-of-hand votes rather than the article-required roll call votes

    Voting in this manner was a violation of the LPDE articles.
- The draft minutes inaccurately portray that roll call votes were taken, though the video shows they were not. Without the required roll call votes, the illegitimate process, and with the draft

- minutes demonstrated to be factually inaccurate portrayals of the events of the day, there's no reason to just trust the accuracy of those alleged vote results in the minutes, or that those in the purportedly back-filled board member positions did actually abstain in the votes and thus did not impact the outcome. RONR 23:8 provides a remedy that if there is any possibility that improper votes affected the outcome, the result of the vote must be declared invalid.
- The draft minutes list the individuals who had allegedly back-filled board positions and had taken the county representation positions in the rebuilt New Castle affiliate as "abstaining" from various votes.  This implies they were eligible to cast votes, but they chose not to.  These individuals were not on the board on October 1.
- The draft minutes simultaneously list the allegedly-removed members as also having been eligible to participate, but they were merely absent.

This was Schrödinger's meeting, where some clearly not on the board as of October 1 and others who clearly were, were treated as simultaneously being on the board and off the board.  There were 12 pseudo-members of the 10-member board.  That is not a do-over of the October 1 meeting, its unreliable vote results are null and void, and thus cannot have cured the flaws of October 1.

Further, the 4th quarter meeting purported "to ratify all actions taken by the State Board since 10/1." Even if this meeting had been properly conducted, RONR 10:55 makes clear that a motion to ratify bylaw violations is prohibited.

Mr. McVay was never properly chosen as the chair of the LPDE affiliate under the LPDE articles and bylaws, thus his appeal purporting to be the LPDE chair must be rejected for lack of standing, as he does not represent the LPDE affiliate.

## 5.0 Hinds Appeal

Neither of the appellants disputes that Hinds and LePore were duly elected at the LPDE convention and were officers at the time of the disputed actions.

The Hinds appeal primarily alleges that the LNC's failure on November 21, 2021 to adopt a motion to recognize "the board elected at the Libertarian Party of Delaware convention of 2021" was a de facto recognition of the McVay board, and since the McVay board is not the legitimately elected board, the LNC's failed motion was, "a constructive disaffiliation of the LPDE."

It is not correct in the parliamentary sense to deduce that failing to adopt a motion to recognize the board elected at the Libertarian Party of Delaware convention of 2021 is the equivalent of having adopted a motion to recognize the McVay board.  See RONR 10:12:

> *"In this connection, it should be noted that voting down a motion or resolution that would express a particular opinion is not the same as adopting a motion expressing the opposite opinion, since—if the motion is voted down—neither opinion has been expressed. A member may be in complete agreement with the views contained in such a resolution yet feel that his organization should not speak out on the matter, and he might therefore vote against the resolution."*

Perhaps LNC members believe Mr. Hinds is the rightful LPDE chair, but that it's not a question within its power to address.  Perhaps the LNC vote just meant "not at this time."  Perhaps they intended to

resolve the dispute in some other manner, such as the December 5 motion.  All we can deduce is that the LNC did not at that time on November 21 make a decision regarding who to recognize as the LPDE officers/board, and the circumstances of the December 5 motion do suggest that the LNC had an intention to resolve the question in some other manner.

We know that another LNC motion to disaffiliate the LPDE also failed to be adopted on November 21.  The LNC expressly voted against disaffiliation of LPDE at that time.  The nature of the subsequent December 5 motion clearly shows that the LNC unanimously believed they still had an affiliate in Delaware, but there is a dispute over which officers the LNC should recognize as representatives of that affiliate.

Must the LNC make any decision when it is disputed who the key affiliate officers are, particularly the office of chair?  The LP Bylaws say yes, and do so in numerous places.  Appendix A to this opinion is a listing of at least 15 provisions in the LP Bylaws that require knowing the identity of the state affiliate, certain of its officers, and its governing documents.  An ability to determine who represents an affiliate and who are its officers is baked into the very nature of these bylaw provisions.

Just as JC jurisdiction for a situation in which, "The affiliate party may challenge the revocation of its status…" necessarily requires the JC to identify whether the appealing party is actually the affiliate, the Appendix A bylaw provisions establishing LNC obligations for affiliate interaction necessarily authorize the LNC to identify the organization it has affiliated and the officers of the affiliate with whom they must interact.  Otherwise the bylaws would be absurd.  RONR 56:68(2) provides that when interpretation is necessary, a not-absurd interpretation option must be chosen over one which "renders absurd another bylaw provision."  The Appendix A references do not have any clauses which say "unless there is a dispute over who the affiliate officers are."  A decision must be made in order to faithfully comply with these bylaw provisions.

This need to recognize affiliate officers is commonly accepted during times when there is no affiliate dispute in play.  To facilitate ordinary party activities, LP staff keeps a list of contact information for affiliate state chairs.  LNC officers and staff routinely use the list to contact affiliates about various party functions. If Xi Jinping were to email the LNC asserting to be the chair of the LPDE, should the LNC ignore all the warning signs surrounding the assertion and treat it as fact, or should the LNC reject the invalid claim? A mere assertion is not sufficient to make one the rightful affiliate chair.

Now that there is a dispute in Delaware, many misread LP Bylaws Article 5.5, which says (underline added):

> "The autonomy of the affiliate and sub-affiliate parties shall not be abridged by the National Committee or any other committee of the Party, <u>except as provided by these bylaws</u>."

That passage does not end after, "The autonomy of the affiliate and sub-affiliate parties shall not be abridged by the National Committee or any other committee of the Party."  There's another clause which impacts the meaning, "except as provided by these bylaws."

The LNC respecting an affiliate's rules and elections by working with the rightful affiliate chair (as opposed to someone who is not the rightful chair) *is* respecting the affiliate's autonomy, not abridging it. The LP bylaws provide at least 15 requirements in Appendix A, including duties to interact with the affiliate and its officers, which mean that even IF applying the affiliate's rules to determine its chair's

identity is perceived by some as an abridging of its autonomy, the LNC and other Party committees are *required* to do so in order to abide by these bylaws.  The LNC is actually obligated by the bylaws to know who certain affiliate officers are, and if disputes arise, affiliate autonomy is preserved so long as the LNC accurately applies the affiliate's own rules to determine with whom the LNC will work.  It would violate affiliate autonomy for the LNC to substitute its own preferences for those of the affiliate and not let the affiliate's own rules answer the question.

LP Bylaws Article 5.6 requires that disaffiliation may only happen with a specified supermajority of the LNC adopting a motion to do so.  That inherently means that the LNC is not allowed to effectuate a disaffiliation in some other way, such as refusing to recognize the actual affiliate officers and instead treating others as though they were the affiliate officers. This would also be a violation of numerous provisions listed in Appendix A.

At what point does failure to resolve a disputed-officer problem eventually become constructive disaffiliation?  Certainly, an LNC needs a reasonable time to review the situation and decide, but just sitting on their hands over time can result in constructive disaffiliation.  They've had more than two months to evaluate this situation.  They've adopted the December 5 motion which says that they "shall" later recognize a set of officers based on the outcome of one or more mass meetings in Delaware…which meetings seem unlikely to ever happen, given the objections voiced by both Hinds and McVay.  The December 5 motion is not a clear path to fulfilling the LNC's obligation to recognize only the rightful officers, but instead actually opens the possibility of recognizing Mr. McVay as the chair, though he is not the rightful chair under the LPDE articles and bylaws.

LP Bylaw 5.6 establishes that, "The National Committee shall not revoke the status of any affiliate party within six months prior to a regular convention."  Why might that time frame matter?  One reality is that its proximity to convention increases the chances of gamesmanship by the LNC which could impact political outcomes at the convention.  Another reality is that time frame is when affiliates have state conventions to select delegates to the national convention, the credentials committee is performing its function, delegates are making hotel reservations and other (sometimes not refundable) travel plans.  On the whole, there needs to be some certainty about the affiliates in this time period.

We crossed into the six-months-prior territory between the November 21 LNC votes and the December 5 LNC votes.  We're now even closer to the date of the national convention, and there is still not yet resolution.

### 6.0 Ruling

Given the bylaw obligations to interact with the actual affiliate and the timing concerns relative to the national convention, the JC rules that the combined circumstances of the LNC's failure to act on November 21, plus the LNC's December 5 motion that opened the door to recognizing those who are not the rightful officers, collectively serve as a constructive disaffiliation of the LPDE affiliate as chaired by Mr. Hinds.  Therefore, we rule to reinstate the LP's Delaware affiliate, recognizing its officers (Mr. Hinds as chair) and other duly elected board members (including Dr. LePore and Mr. Casey) chosen by that affiliate under its properly adopted rules as they stood prior to the events of October 1.

# APPENDIX A
## Bylaws Provisions and Practical Party Management Tasks that Require Knowledge of Affiliate Parties, Their Officers, and Their Bylaws

Following is a list of numerous matters of mandatory Libertarian Party Bylaws compliance for which it is imperative that the LNC (and at times other committees) be able to identify which organization is our affiliate in a state, who are the rightful officers of each of our affiliates, and what their bylaws are.

1) The Party purposes in Article 2 include chartering affiliate parties, promoting affiliate activities, and supporting affiliate party candidates for public office. If two groups are each claiming to be the officers of the affiliate, and perhaps they have each nominated different candidate slates, which of the activities and candidates should the LNC support?

2) Libertarian Party Bylaws Article 5.3 states:

> *There shall be no more than one state-level affiliate party in any one state. Each state-level affiliate party shall, in accordance with its own bylaws and these bylaws, determine who shall be its delegates to all regular conventions. A state-level affiliate party may charter sub-affiliate parties within the state, which will entitle such sub-affiliates to use the name "Libertarian Party."*

If two groups are each claiming to be the officers of the affiliate, and each of the groups has chartered a different set of sub-affiliate parties within the state, which group of sub-level affiliates is entitled to use the name "Libertarian Party"?

3) Libertarian Party Bylaws Article 5.2 designate the LNC as the body that grants affiliate status to those organizations "which adopt the Statement of Principles and file a copy of their Constitution and/or Bylaws with the Party Secretary." Common sense argues that this power necessarily includes the authority to later identify who are the officers representing the affiliate to which the LNC has granted affiliate status.

4) Libertarian Party Bylaws Article 5.1 restricts that the name "Libertarian Party" may only be used by the Party or by an organization to which the Party has granted affiliate status. It is necessary to be able to identify the officers of an affiliate to know who is authorized to use the name "Libertarian Party".

5) Libertarian Party Bylaws Article 5.4 states, *"No affiliate party shall endorse any candidate who is a member of another party for public office in any partisan election. No affiliate party shall take any action inconsistent with the Statement of Principles or these Bylaws."* A violation of these prohibitions could potentially constitute cause for which the LNC could later decide to disaffiliate an existing affiliate. The LNC must be able to

determine whether the actions in question were taken by those in positions of authority within the affiliate, or by others not representing the affiliate.

6) Libertarian Party Bylaws Article 7.1 states that the LNC has *"control and management of all the affairs, properties and funds of the Party consistent with these Bylaws"*. One of the assets of the Party managed by the LNC is a trademark on the name "Libertarian Party". To protect that trademark, the LNC must know who are the officers of our affiliates, thus who is entitled to use the name.

7) For the conduct of LNC business, the LNC must know who the legitimate LNC members are. Libertarian Party Bylaws Article 7.4 establishes that an LNC member shall not be the candidate of any party except the Party or an affiliate. The LNC must know who the officers of the affiliate are to know who to trust to tell us who are the candidates of the affiliate so we can know if the LNC members are in compliance with this bylaw.

8) For the conduct of LNC business, the LNC must know who the legitimate LNC members are. Libertarian Party Bylaws Article 7.8 establishes scenarios wherein state chairs can remove a regional representative from the LNC. If the removal of a regional representative to the LNC was conducted by the legitimate state chairs, the LNC should no longer permit the removed representative to participate in LNC business. If the "removal" was conducted by people who are not the legitimate state chairs, the LNC should allow the representative to continue to participate in LNC business.

9) Libertarian Party Bylaws Article 10.3 through Article 10.6 set eligibility requirements for national convention delegates, dependent on action of the affiliate party and its officers.

10) How can the Libertarian Party Secretary comply with Libertarian Party Bylaws Article 10.4.b and send delegation totals to the chair of each affiliate without knowing who the chair of each affiliate is?

11) How can the Credentials Committee know from whom to accept affiliate delegate listings in accordance with 10.4.c and 10.4.d without knowing which officers hold positions in the affiliate and thus are entitled to submit delegate listings?

12) How can alternate substitution at national conventions be properly permitted in compliance with Article 10.6 if the Credentials Committee cannot determine what the affiliate's current rules are regarding substitution?

13) Libertarian Party Bylaws Article 11.3 mandates that the Platform Committee be composed partially of representatives from various affiliates. The identity of the officers of the affiliate must be determined to know whose word to accept regarding the identity of that affiliate's committee representatives.

14) Libertarian Party Bylaws Article 11.4 mandates that the Credentials Committee be composed partially of representatives from the top-five affiliates. The identity of the officers of the affiliate must be determined to know whose word to accept regarding the identity of that affiliate's committee representative.

15) Libertarian Party Bylaws Article 14.2 regarding eligibility requirements for presidential candidates necessitates knowing whether an individual agreed to be placed on a nomination petition of a state affiliate, or whether it was the petition of some other group.

In practice, all of these above factors make it imperative that the LNC be able to identify the officers of the entity to which it has granted affiliate status to facilitate compliance with our bylaws in the most fundamental inner workings of the party.

---

Besides matters of mandatory bylaws compliance, the LNC in its role of managing the affairs of the party employs staff and directs them to provide various services and benefits to the Libertarian Party state affiliates. These are offered to serve the purposes of the party. Among these services are:

1) LNC Policy Manual Section 2.08.3 restricts potential use of Party assets to provide information or services for candidates contingent upon whether "the service or candidate has been approved by the state chair".

2) LNC Policy Manual Section 3.02.2 sets conditions under which privileged data will be shared with affiliate organizations.

3) The LNC frequently supports ballot access drives in cooperation with our affiliates. Without knowing who the legitimate officers of an affiliate are, how can the LNC determine with whom they should work?

4) Staff members employed by the LNC place links from our website at www.lp.org to those groups which we recognize as our affiliates. Our staff depends on the word of officers of the affiliate to tell us which website belongs to their affiliate.

5) Staff members employed by the LNC rely on the word of the chairs of our state affiliates to determine which local candidates should be listed for each state on the www.lp.org website.

Though this is not an all-inclusive list, it is sufficient to demonstrate the necessity and obligation of the LNC to reasonably identify who are the officers of the organizations chartered as our affiliates.