STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WASHTENAW
BUSINESS COURT

COMERICA BANK,
           Plaintiff/Counter-Defendant,

vs.

LIBERTARIAN PARTY OF MICHIGAN
EXECUTIVE COMMITTEE, INC.;
JOSEPH BRUNGARDT; MICHAEL
SALIBA; and ANGELA THORNTON,
a/k/a ANGELA CANNY,
           Defendants/Counter-Plaintiffs,

and

ANDREW CHADDERDON,
           Defendant.

Case No. 23-000557-CB

Hon. Timothy P. Connors

_____/

Henry Stancato (P29538)
STANCATO TRAGGE WELLS PLLC
Attorney for Comerica Bank
P.O. Box 270
Grosse Ile, MI  48138-0270
(248) 731-4500
hstancato@stwlawfirm.com

C. Nicholas Curcio (P75824)
CURCIO LAW FIRM PLC
Attorney for Libertarian Party of Michigan
Executive Committee, Inc., Joseph Brungardt,
Michael Saliba, and Angela Thornton
16905 Birchview Drive
Nunica, MI  49448
(616) 430-2201
ncurcio@curciofirm.com

Bruce T. Wallace (P24148)
Fawn C. Armstrong (P74980)
Oscar A. Rodriguez (P73413)
HOOPER HATHAWAY, P.C.
Attorneys for Andrew Chadderdon
126 South Main Street
Ann Arbor, MI  48104
(734) 662-4426
bwallace@hooperhathaway.com
farmstrong@hooperhathaway.com
orod@hooperhathaway.com

_____/

## DEFENDANT ANDREW CHADDERDON'S ANSWER TO PLAINTIFF COMERICA BANK'S FIRST AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

FILED IN Washtenaw County Trial Court; 6/22/2023 2:23 PM

EXHIBIT 45

NOW COMES the Defendant Andrew Chadderdon, by and through counsel, and for his Answer to Plaintiff's Complaint, states unto this Honorable Court as follows:

## INTRODUCTION

The pivotal question in this lawsuit is what group constitutes the legitimate board of the Libertarian Party of Michigan Executive Committee, Inc. ("LPMEC"). Defendant Andrew Chadderdon ("Chadderdon") is the chairman of the nationally recognized LPMEC board. The insurgent defendants (Joseph Brungardt, Michael Saliba, and Angela Thorton) have been sued by the national Libertarian party, have unsuccessfully disputed Mr. Chadderdon's Chairmanship and lost that dispute on appeal within the Michigan party, and have been found by the Michigan party's counsel to have instigated an illegal insurgency to try to obtain LPMEC's funds and take over LPMEC control.

In order to establish ultimate legitimacy, Mr. Chadderdon does not appear in this lawsuit as LPMEC, the tactic illegally and unethically undertaken by the insurgent defendants. But he does respond in this lawsuit, both individually, and as the chairman of the nationally recognized LPMEC. Mr. Chadderdon respects this process, and the Court's jurisdiction to make the ultimate decision. As set forth below, he will demonstrate through proof of recognition by the national party, documentation of the organization's legal counsel, and proof of the ruling of the Judicial Committee, the ultimate arbiter of this decision within the Michigan party, that the individuals who have misappropriated the identity of the LPMEC in this litigation have done so illegally and without evidentiary support. By not filing pleadings on behalf of LPMEC until this Court has issued its ruling, Mr. Chadderdon is not waving any right or argument as to his legitimate leadership of the Michigan organization.

2

## ANSWER

1.      This action constitutes a business or commercial dispute within the meaning of MCL

600.8031(c)(iii) because LPMEC is a nonprofit organization, and the claims arise out of that party's

organizational structure, governance, or finances.

      **ANSWER**: Admitted.

2.      This is an action for interpleader relief under MCR 3.603 or, alternatively, for declaratory

relief under MCR 2.605.

      **ANSWER**: Admitted.

3.      Comerica Bank, as stakeholder, seeks to interplead $38,233.30 belonging, on information

and belief, to its former deposit customer, Libertarian Party of Michigan Executive Committee,

Inc. ("LPMEC"). Comerica seeks this relief because a dispute among the individual defendants

concerning which of them is legally authorized to take receipt of funds and instruments belonging

to the corporate defendant leaves Comerica open to the risk of multiple liability.

      **ANSWER**: Admitted.

4.      Comerica Bank ("Comerica") is a Texas banking association authorized to conduct

banking operations in Michigan. Comerica operates several branches in Washtenaw County.

      **ANSWER**: Admitted.

5.      LPMEC is a Michigan non-profit corporation with a registered office in Oakland County,

Michigan.

      **ANSWER**: Admitted with clarification. The Libertarian National Committee, Inc.

("LNC") is the National Committee of the Libertarian Party as defined by 52 USC § 30101(14)

which manages the business of the Libertarian Party through the United States at the national level.

The LNC is authorized to charter affiliates throughout the United States. In 1972, the LNC

3

chartered the Libertarian Party of Michigan ("LPM") as an affiliate of the Libertarian Party. The Defendant Libertarian Party of Michigan Executive Committee ("LPMEC") is the governing arm of the LPM, and the directors of the LPMEC are defined in their Articles of Incorporation and Corporate Bylaws and are recognized as an affiliate by LNC. The LNC recognizes Chadderdon as the legitimate Chair of the LPMEC and has filed suit against the insurgent defendants Joseph Brungardt ("Brungardt"), Michael Saliba ("Saliba"), and Angela Thornton ("Thornton") for trademark infringement for illegitimately claiming to hold LPMEC positions and for unauthorized use of its Trademarks. [*See* Exhibit 1, Complaint for Trademark Infringement and Other Lanham Act Violations Under 15 USC §§ 1114, 1125, Libertarian National Committee, Inc., v Saliba, et al, 23-cv-11074.][1]

6.      Joseph "Joe" Brungardt is an individual who resides, on information and belief, in Macomb County, Michigan.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

7.      Andrew Chadderdon is an individual who resides, on information and belief, in Wayne County, Michigan.

**ANSWER**: Admitted.

8.      Michael "Mike" Saliba is an individual who resides, on information and belief, in Macomb County, Michigan.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

---

[1] This federal lawsuit is still pending before the United States District Court for the Eastern District of Michigan. On June 15, 2023, Plaintiff LNC filed a motion for preliminary injunction seeking to stop the insurgent defendants' unlawful use of Plaintiff's registered trademarks.

9.      Angela Thornton, also known as Angela Canny, is an individual who resides, on information and belief, in Genesee County, Michigan.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

10.     Venue in properly laid in Washtenaw County because the cause of action arose, in part, at a Comerica branch in Washtenaw County as described below.

**ANSWER**: Chadderdon does not contest that venue is properly laid in Washtenaw County.

11.     Before March 22, 2023, LPMEC was a deposit customer of Comerica with respect to five deposit accounts.

**ANSWER**: Admitted in part and denied in part. In February 2023, there were three deposit accounts with Comerica: General Fund or Administrative account, Fund for State level campaign funds, and Fund for Federal level campaign funds. In order to protect LPMEC's accounts from unauthorized spending, the legitimate officer(s) of LPMEC opened three new accounts on February 27, 2023, and moved the funds in the old accounts to the new ones, corresponding to each fund's purpose. However, the legitimate officer(s) left $1,000.41 in the General Fund to cover any authorized automated subscriptions or payments for ongoing expenses. Therefore, LPMEC was a deposit customer of Comerica with respect to six deposit accounts, with two of those at zero balances.

12.     On or about February 13, 2023, Joe Brungardt was the sole signer of record for LPMEC deposit account xxx6457. At that time, Comerica's books and records reflected that Joe Brungardt was the LPMEC president.

**ANSWER**: Denied. Deposit account xxx6457 was opened by Chadderdon as the legitimate Chair of LPMEC on February 27, 2023, as a new deposit account for the LPMEC. Therefore,

Brungardt could not have been the sole signer of record for that account on February 13, 2023, as it did not yet exist. In December 2022, the Judicial Committee found that Brungardt's chairmanship was a violation of the LPMEC's bylaws and parliamentary procedures, and the Libertarian Executive Committee was reverted to its composition as of July 8, 2022. [*See* Exhibit 2 – Judicial Committee Ruling, Dec. 2022]. Per the bylaw procedures, Defendant Chadderdon was the Chair of the Executive Committee on July 8, 2022, therefore Chadderdon was declared the legitimate Chair or President. At the January 25, 2023 LPMEC meeting, the board issued a directive, at Brungardt's prompting or insistence, for Brungardt to accompany Chadderdon to Comerica Bank to add Chadderdon as a signer.[2] But after this meeting, Brungardt, Saliba, and Thornton decided to splinter off from the LPMEC, declared themselves to be the "true" LPMEC, and held their own illegitimate meeting on January 31, 2023. In a calculated move, Brungardt deliberately ignored the LPMEC's directive to accompany Chadderdon to Comerica Bank to add him as a signer on the accounts. And so Chadderdon and the other legitimate officers of the LPMEC began to gather documentation to regain control of LPMEC's bank accounts. On February 15, 2023, legal counsel for the Michigan affiliate party of the national party – the LPM - sent a cease-and-desist letter to Brungardt, demanding that he immediately terminate any further misrepresentation as having any authority to govern the affairs of LPM, to return all property belonging to LPM, and to sign documents to transfer the LPM bank accounts to Chadderdon or his designee. [*See* Exhibit 3, Letter from Eric Doster to Brungadt, 2/15/2023.) Brungardt again unlawfully refused to follow this demand from LPM's counsel. Ultimately the national Libertarian Party - the LNC - initiated a federal suit against them for Trademark infringement, which is

---

[2] During that **recorded** meeting, Brungardt pushed for this directive to be approved because the Treasurer had resigned for health reasons, and Brungardt did not want to have the liability of being the sole signer on accounts when he was not the authorized or legitimate Chair.

pending in the Eastern District. [*See* Exhibit 1, *supra*.] As to what Comerica's books and records reflect, Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, Comerica did receive documentation from Chadderdon and others that reflected that Chadderdon was the LPMEC Chair or president.

13.     On that date, Joe Brungardt signed documentation at Comerica branch 68 adding Mike Saliba and Angela Thornton as additional signers on account xxxx6457.

**ANSWER**: As to what Brungardt did on February 13, 2023, Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, it would have been impossible for Brungardt to have attempted to add Saliba and Thornton onto account no. xxxx6457 on February 13, 2023, because that account did not exist until Chadderdon opened it as a new account on February 27, 2023. Account no. xxxx6457 was created as the new General Fund, with the old General Fund's account no. being xxxx4062.

14.     On or about February 22, 2023, Andrew Chadderdon appeared at a different Comerica branch (219) in Washtenaw County asserting that he, rather than Mr. Brundgardt, was the duly elected LPMEC president and seeking to substitute himself in place of the signers of record on account xxxx6457.

**ANSWER**: Admitted in part; denied in part. Admitted that Chadderdon was forced to seek alternate means to obtain access to LPMEC's accounts after Brungardt failed and/or refused to perform his duties to transfer access to him as the rightful Chair of LPMEC, as demanded by the LPM. [*See* Exhibit 3.] Denied that on February 22, 2023, Chadderdon sought to substitute himself as the signer of record on account xxxx6457, as that account number did not exist until Chadderdon

opened it on February 27, 2023. On this date, Chadderdon provided the following to Plaintiff to substantiate his role as the legitimate Chair or president: a letter from secretary Daniel Ziemba stating that Chadderdon was the Chair and was authorized to take control of the accounts; meeting minutes from the LPMEC January 25, 2023 meeting reflecting that Brungardt was directed to add Chadderdon to the accounts; a LARA filing from February 17, 2023 reflecting that Chadderdon was the LPMEC Chair or president; Brungardt's letter of resignation from the LPMEC board; the cease-and-desist letter to Brungardt from Eric Doster, legal counsel for LPM; and the cease-and-desist letter to Brungardt from Angela McArdle, national Libertarian Party Chair.

15.    Comerica staff informed Mr. Chadderdon that it would not process his request without certification by the LPMEC treasurer as to his status as president.

**ANSWER**: Admitted with clarification. Chadderdon and the legitimate officer(s) of LPMEC informed Plaintiff that the treasurer had resigned for health reasons, and so Plaintiff would need certification by the LPMEC secretary.

16.    At that time, publicly available information through the State of Michigan Department of Licensing and Regulatory Affairs Corporations Online Filing System ("LARA") indicated that the LPMEC treasurer was Joseph Ziemba.

**ANSWER**: Denied. LARA would have reflected that the LPMEC secretary was Daniel Ziemba, and Norm Peterson was treasurer. Chadderdon and Ziemba brought a printout from LARA to Comerica and Comerica staff looked it up themselves as well, and both reflected this information.

17.    On or about February 23, 2023, Joseph Ziemba certified to Comerica that Andrew Chadderdon was the LPMEC president. This certification was consistent with the publicly

available information through LARA at the time which identified Mr. Chadderdon as the LPMEC president.

**ANSWER**: Admitted with clarification. Mr. Ziemba's first name is Daniel.

18.    Accordingly, Comerica processed Mr. Chadderdon's request to be substituted as signer for LPMEC on all five of that corporation's deposit accounts as well as a change of address for the deposit customer. Then Mr. Chadderdon closed two existing deposit accounts to open two new successor deposit accounts in the name of LPMEC.

**ANSWER**: Admitted in part; denied in part. Admitted that Comerica processed Chadderdon's request to be substituted as signer on February 23, 2023, but it was for the three original deposit accounts. Chadderdon then opened up the three new accounts on February 27, 2023, and was then the sole signer on those accounts. Denied that Chadderdon closed or requested any LPMEC accounts to be closed. Chadderdon lacks knowledge or information sufficient to form a belief as to how one or more accounts were closed, other than receiving information from Plaintiff on or about March 22 or 23, 2023, that Plaintiff closed all six accounts.

19.    On or about March 9, 2023, Mike Saliba appeared at Comerica branch 68 to complain about having been removed as an account signer for LPMEC.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

20.    On the same date, an attorney named Nick Curcio transmitted a letter purporting to act as attorney for LPMEC and asserting on behalf of LPMEC that Andrew Chadderdon was not a LPMEC officer and that some of the LARA filings for LPMEC were fraudulent.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, the LPMEC

held an Executive Session on May 4, 2023, and the committee unanimously voted to retain Hooper Hathaway, P.C., as its legal representation, and not Nick Curcio.

21.    On March 10, 2023, Mike Saliba returned to Comerica branch 68 with newly filed LARA documentation that contradicted, in large part, the previously filed LARA materials that Comerica reviewed when processing Andrew Chadderdon's claim to be LPMEC president.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, the LNC has alleged in its federal Complaint against Brungardt, Saliba, and Thornton that any LARA filings made by them violate and infringe on LNC's Trademark of "Libertarian Party." [*See* Exhibit 1, p 8.]

22.    In reaction to this controversy, Comerica unsuccessfully attempted to reach Daniel Ziemba to determine whether he, in his capacity as LPMEC secretary, would certify the materials now being presented by Nick Curcio as proof that LPMEC had removed Andrew Chadderdon as president.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, when Mr. Ziemba provided a sign letter to Plaintiff attesting to Chadderdon's legitimate position as Chair or president, he included his contact information to Plaintiff. Mr. Ziemba informed Chadderdon that he could not find any record of a missed or attempted contact from Plaintiff.

23.    When this effort proved unsuccessful, Comerica decided to exercise its contractual right to terminate its deposit relationship with LPMEC.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

24.     To execute its decision terminating the deposit relationship with LPMEC, Comerica issued cashier's checks as follows representing the closing balances for each of the four deposit accounts with positive balances (Account xxx9283 was at zero balance at this time):

| Account No | Cashier's Check No | Amount |
|---|---|---|
| xxx6457 | 001684797 | $21,839.69 |
| xxx6465 | 001684795 | 7,476.75 |
| xxx6440 | 001684796 | 7,989.47 |
| xxx4602 | 001684794 | 927.39 |
| | | **Total: $38,233.30** |

**ANSWER**: Admitted in part. Admitted that Comerica issued cashier's checks and the account numbers, check numbers, and amounts, except that xxx4602 should be xxx4062. Account No. xxx4062 was the General Fund, but all but $1,000.41 was transferred from this account to Account No. xxx6457 as the new General Fund. As to the remainder, Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

25.     On or about March 22, 2023, Comerica mailed the cashier's checks to 30005 Malvern St. Westland, Michigan which was the address of record on Comerica's books at that time for LPMEC. On information and belief, this is an address at which Andrew Chadderdon receives mail.

        **ANSWER**: Admitted.

26.     On information and belief, defendants Brungardt, Saliba and Thornton contest whether delivery of the cashier's checks to the address provided by Chadderdon constitutes payment by Comerica of its debt to LPMEC.

        **ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same. However, both the LNC and the LPM recognize Chadderdon as the legitimate Chair of the LPMEC, and both have demanded that Brungardt cease misrepresenting himself as the Chair of the LPMEC and demanded

that he turn over all of LPM's and LPMEC's property and to transfer all LPM and LPMEC's bank accounts to Chadderdon as the LPMEC's Chair.

27.     As of this date, none of the cashier's checks had been presented to Comerica for payment.

     **ANSWER**: Admitted.

28.     As a matter of law, a deposit relationship between a bank and its depositor is a debtor/creditor relationship in which the bank is indebted to its depositor for the amount of the deposit balance.

     **ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

29.     Comerica does not contest that it is indebted to LPMEC in the amount of $38,233.30.

     **ANSWER**: Admitted.

30.     Termination of Comerica's deposit relationship with LPMEC requires, therefore, that Comerica discharge its debt by payment of this deposit balance to LPMEC.

     **ANSWER**: Admitted.

31.     The competing, mutually exclusive claims by the individual defendants make it impossible for Comerica to identify which of them is authorized to endorse and negotiate instruments payable to the order of LPMEC.

     **ANSWER**: Denied that it would be impossible to identify which party should have authority to endorse and negotiate instruments on behalf of LPMEC, as Plaintiff admitted that the information it found on LARA at the time reflected that Chadderdon was president or Chair of the LPMEC and that it also had contact with the secretary of LPMEC on February 23, 2023, Daniel Ziemba, who certified to Plaintiff that Chadderdon was the LPMEC president or Chair.

32.     If Comerica unilaterally refuses to honor the any of the cashier's checks, then Comerica incurs the risk of liability for expenses, interest and consequential damages under UCC 3-411; MCL 440.3411(2).

   **ANSWER**: Admitted.

33.     Comerica, on the other hand, has no independent means for assessing the reliability of representations of the individual defendants who challenge Mr. Chadderdon's authority to take possession of the cashier's checks on behalf of LPMEC.

   **ANSWER**: Denied. Plaintiff received a copy of the cease-and-desist letter from the national Libertarian party – the LNC – addressed to Brungardt, recognizing Chadderdon as the Chair of the LPMEC. [*See* Exhibit 4, letter from the national Libertarian Party through Chair Angela McArdle to Brungardt, 2/16/2023.] Plaintiff also received a copy of: a letter from secretary Daniel Ziemba stating that Chadderdon was the Chair and was authorized to take control of the accounts; meeting minutes from the LPMEC January 25, 2023 meeting reflecting that Brungardt was directed to add Chadderdon to the accounts; a LARA filing from February 17, 2023 reflecting that Chadderdon was the LPMEC Chair or president; Brungardt's letter of resignation from the LPMEC board; and the cease-and-desist letter to Brungardt from Eric Doster, legal counsel for LPM.

34.     There is no mechanism available, therefore, for LPMEC to make a facially valid declaration of loss and claim under UCC 3-312; MCL 440.3312.

   **ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

35.     Without judicial relief, Comerica is unable to protect itself from the risk of multiple liability.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

36.     Accordingly, Comerica seeks interpleader relief under MCR 3.603 and proposes to interplead an amount equal to LPMEC's aggregate closing deposit balance less whatever amount this Court may award under MCR 3.603(E) as reimbursement for stakeholder expenses and fees.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

37.     In order to preserve the possibility for complete relief while this Court considers the merits of the individual defendants' competing claims, an order restraining negotiation and payment on the cashier's checks is appropriate under UCC 3-602; MCL 440.3602(5)(a).

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

38.     Alternatively, Comerica seeks declaratory relief under MCR 2.605.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

39.     Comerica has become involuntarily entangled in an actual controversy among the individual defendants concerning which of them is authorized to function as an LPMEC officer.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

40.     This Court otherwise has jurisdiction over this dispute on the basis of its power to grant interpleader and other equitable relief.

**ANSWER**: Admitted.

41.     Comerica seeks a declaratory judgment that identifies who is entitled to take custody LPMEC's deposit balance from Comerica.

**ANSWER**: Admitted.

42.     All of the defendants except Andrew Chadderdon have filed a counterclaim asserting that Comerica is liable for the amount of draws against LPMEC's deposits during the time that Andrew Chadderdon acted as sole signer for LPMEC.

**ANSWER**: Admitted in part, denied in part. Admitted that as of the date of Comerica's First Amended Complaint and of the date of this Answer, Chadderdon has not filed a counterclaim. As to the remainder, Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

43.     When he files a responsive pleading, Andrew Chadderdon may make a corresponding claim against Comerica arising out of any draws made by the other individual defendants while they acted as signers for LPMEC.

**ANSWER**: Admitted.

44.     Comerica contests whether it should be held liable to reimburse any of the defendants for any draws made by any of the individual defendants.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

45.     In the event, however, that Comerica is held liable for honoring any draw authorized by any individual defendant, then Comerica ask [sic] for a corresponding award of damages against that individual defendant.

**ANSWER**: Chadderdon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies the same.

WHEREFORE, Defendant Andrew Chadderdon asks for the following relief:

1. An Order enjoining Defendants, Joseph Brungardt, Michael Saliba, and Angela Thornton from endorsing or negotiating the cashier's checks issued by Comerica payable to the order of LPMEC. (Check Nos 001684794, 001684795, 001684796 and 001684797.)

2. An Order denying the award of Comerica's actual costs as stakeholder under MCR 3.603(E), or in the alternative, order Defendants Brungardt, Saliba, and/or Thornton to pay any award of Comerica's actual costs under MCR 3.603(E).

3. An Order requiring Comerica to deposit with the Clerk of this Court the total interpleader stake ($38,233.30).

4. A Declaration that Defendant Chadderdon is the true, legitimate, and lawful Chair and President of LPMEC.

5. An Order directing Comerica to deliver the deposit balance to LPMEC with Defendant Chadderdon as the individual with authority to accept the deposit balance on behalf of LPMEC.

6. An award of money damages to Defendant Chadderdon and/or LPMEC along with an award of attorney fees, expenses, and costs in addition to whatever additional interest, penalties and sanctions may be allowed by law or court rule.


Respectfully submitted,

HOOPER HATHAWAY, P.C.


Dated: June 22, 2023         By:   /s/ Oscar A. Rodriguez
                                   Oscar A. Rodriguez (P73413)
                                   Attorney for Andrew Chadderdon

## AFFIRMATIVE DEFENSES

1.      Plaintiff's claims are barred, in whole or in part, for failure to state a claim.

2.      Plaintiff's claims are barred, in whole or in part, due to fraud or due to fraud by other parties.

3.      Plaintiff's claims are barred, in whole or in part, due to misrepresentation or due to misrepresentation by other parties.

4.      Plaintiff's claims are barred, in whole or in part, because it has not suffered any injuries or damages.

5.      Plaintiff's claims are barred, in whole or in part, because it failed to comply with its contractual terms.

6.      Plaintiff's claims are barred, in whole or in part, by MCR 2.116(C)(6), (C)(7), (C)(8), (C)(9), and/or (C)(10).

7.      Plaintiff's claims are barred, in whole or in part, for the reasons set forth in Defendant Chadderdon's answer.

8.      Plaintiff's losses or damages, if any, were caused by its own actions or inactions.

9.      Plaintiff's losses or damages, if any, were caused by persons and/or entities other than Defendant Chadderdon.

10.      Plaintiff's claims are barred, in whole or in part, by the applicable doctrine of laches, waiver, estoppel, and/or unclean hands.

11.      Plaintiff's claims are barred, in whole or in part, by Michigan common law.

12.      Plaintiff's claims are barred, in whole or in part, by Michigan statutory law.

13.      Plaintiff's claims are barred, in whole or in part, due to its bad-faith actions.

14.      Plaintiff's claims are barred, in whole or in part, due to lack of causation.

17

15.     Plaintiff's claim to an award of actual costs under MCR 3.603(E) is barred by the doctrine of unclean hands because Plaintiff wrongfully declined to honor the cashier's checks sent to LPMEC through rightful chair, Defendant Chadderdon, violating or breaching the Deposit Contract with LPMEC.

16.     Plaintiff's claims are barred, in whole or in part, because the Libertarian National Committee, Inc., has solely recognized Defendant Chadderdon as the legitimate chair of the LPMEC.

17.     Plaintiff's claims are barred, in whole or in part, because on February 15, 2023, legal counsel for the legitimate LPM sent a cease-and-desist letter to Defendant Brungardt to immediately terminate any further misrepresentation as having any authority to govern the affairs of the LPM and the LPMEC and to return its property.

18.     Plaintiff's claims are barred, in whole or in part, because the Libertarian National Committee, Inc., sent a cease-and-desist letter to Defendant Brungardt, demanding an immediate termination to any representations of being the legitimate Michigan state affiliate of the Libertarian National Committee, Inc., and use of its Trademarks, and from identifying as the recognized LPMEC.

19.     Plaintiff's claims are barred, in whole or in part, because Defendant Chadderdon provided Plaintiff with documentation from LPM's legal counsel and from the Libertarian National Committee, Inc. that established him as the legitimate Chair of the LPMEC.

20.     Plaintiff's claims are barred, in whole or in part, because despite providing sufficient proofs that Defendant Chadderdon is the legitimate Chair of the LPMEC, Plaintiff has refused to allow the LPMEC through Chair Chadderdon to secure the funds belonging to LPMEC,

18

or otherwise prevented the legitimate LPMEC to access its rightful funds, which has damaged both the LPMEC and the Libertarian National Committee, Inc.

21.     Plaintiff's claims are barred, in whole or in part, because Plaintiff allowed Defendant Brungardt, who did not have official recognition from the Libertarian National Committee, Inc. or from the LPM, to add Defendants Saliba and Thornton to LPMEC's bank accounts at Comerica.

22.     Plaintiff's claims are barred, in whole or in part, because the Judicial Committee has found the election of Defendants Brungardt, Saliba, and/or Thornton were out of order as a violation of its bylaws and parliamentary procedures and held that any actions taken by the erroneous board which are of a continuing nature and null and void.

23.     Plaintiff's claims are barred, in whole or in part, because on January 25, 2023, the LPM, through its counsel, directed Defendant Brungardt to add the legitimate Chair, Defendant Chadderdon, to the LPMEC's bank account at Comerica Bank and Brungardt ignored these instructions.

24.     Defendants Brungardt, Saliba, and/or Thornton have filed frivolous claims or defenses.

25.     Plaintiff's claims are barred, in whole or in part, due to Plaintiff violating the LPMEC's and/or Defendant Chadderdon's rights to due process.

26.     Plaintiff's claims are barred, in whole or in part, because Section 535 of the Michigan Nonprofit Corporation Act (MCL 450.2535) does not apply to the LPMEC as it is organized on a directorship basis and has no members in law.

27.     Plaintiff's claims are barred, in whole or in part, because the affairs of the LPM and the LPMEC are governed by the LPM bylaws and not by a state statute, as the First Amendment to the United States Constitution requires that the political party rules prevail.

28.     Plaintiff's claims are barred, in whole or in part, because both the LPM Bylaws and the Michigan Nonprofit Corporation Act require adherence to the Judicial Committee's December 19, 2022 decision, which invalidated Brungardt's selection as LPMEC Chair and recognized Chadderdon as the legitimate Chair.

29.     Plaintiff's claims are barred, in whole or in part, because the bylaws of the LNC state that there shall be no more than one state-level affiliate party in any one state, and the LNC does not recognize Brungardt, Saliba, or Thornton to be legitimate officers or representatives of the LPMEC.

Defendant Chadderdon reserves the right to amend and supplement these Affirmative Defenses based upon facts established in the course of additional pre-trial proceedings.

Respectfully submitted,

HOOPER HATHAWAY, P.C.

Dated: June 22, 2023                    By:     /s/ Oscar A. Rodriguez
                                                Oscar A. Rodriguez (P73413)
                                                Attorney for Andrew Chadderdon

20

## PROOF OF SERVICE

I hereby certify that on June 22, 2023, I electronically filed the foregoing document with the Clerk of the Court via the MiFILE TrueFiling system, which will serve copies of upon service contacts of record.

I declare that the above statements are true to the best of my knowledge, information and belief.

/s/ R. Abigail Adams
R. Abigail Adams, Paralegal

Prepared by:

/s/ Oscar A. Rodriguez
Oscar A. Rodriguez (P73413)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, Michigan 48104
(734) 662-4426
Counsel for Defendant Andrew Chadderdon

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

LIBERTARIAN NATIONAL      |
        COMMITTEE, INC.,      |
            |
     **Plaintiff,**      |
**v.**        |     **CIVIL ACTION NO.:**
            |
**MIKE SALIBA,**      |     **23-cv-11074**
**RAFAEL WOLF,**      |
**GREG STEMPFLE,**      |
**ANGELA THORNTON-CANNY,**      |
**JAMI VAN ALSTINE,**      |
**MARY BUZUMA, and**      |
**DAVID CANNY,**      |
**JOSEPH BRUNGARDT**      |     **JURY TRIAL DEMANDED**
            |
     **Defendants.,**      |
_____|

## COMPLAINT FOR TRADEMARK INFRINGEMENT AND OTHER LANHAM ACT VIOLATIONS UNDER 15 U.S.C. §§ 1114, 1125

1.     This is an action under the laws of the United States, Title 15 of the United States Code, for trademark infringement, false designation of origin, false advertising, unfair competition, passing off, and unjust enrichment under 15 U.S.C. §§ 1114, and 1125(a)(1)(A) and (B), in which Plaintiff Libertarian National Committee, Inc. ("LNC" or "Plaintiff"), makes the following allegations against Mike Saliba, Rafael Wolf, Greg Stempfle, Angela Thornton Canny, Jami Van Alstine, Mary Buzuma, Danny Canny and Joseph Brungardt (collectively "Defendants").

## PARTIES

2.     Plaintiff LNC is a District of Columbia Corporation, having its primary office at 1444 Duke St, Alexandria, Virginia, 22314.

3.      Defendant Mike Saliba ("Saliba") is an individual residing within Michigan. Upon information and belief, Saliba resides at 16231 Scenic Clinton TWP, Macomb, Michigan 48038.

4.      Defendant Rafael Wolf ("Wolf") is an individual residing within Michigan. Upon information and belief, Wolf resides at 1418 Elkerton Avenue, Kalamazoo, Michigan 49048.

5.      Defendant Greg Stempfle ("Stempfle") is an individual residing within Michigan. Upon information and belief, Stempfle resides at 2615 Hyland, Ferndale, Michigan 48220.

6.      Defendant Angela Thornton Canny ("Thornton Canny") is an individual residing within Michigan. Upon information and belief, Thornton Canny resides at 15223 Ripple Drive, Linden, Michigan 48451.

7.      Defendant Jami Van Alstine ("Van Alstine") is an individual residing within Michigan. Upon information and belief, Van Alstine resides at 28158 Heather Way, Romulus Michigan 48174.

8.      Defendant Mary Buzuma ("Buzuma") is an individual residing within Michigan. Upon information and belief, Buzuma resides at 714 S. Beacon Blvd, Apt. 76, Grand Haven, Michigan 49417.

9.      Defendant David Canny ("Canny") is an individual residing within Michigan. Upon information and belief, Canny resides at 15223 Ripple Drive, Linden, Michigan 48451.

10.     Defendant Joseph Brungardt ("Brungardt") is an individual residing within Michigan. Upon information and belief, Brungardt resides at 4140 8-1/2 Mile Road, Sterling Heights, Michigan 48116.

## JURISDICTION AND VENUE

11.     This action arises under the commerce and trade laws of the United States, Title

15 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

12. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1)&(2).

## FACTS COMMON TO ALL CLAIMS

13. Plaintiff, Libertarian National Committee, Inc., is the National Committee of the Libertarian Party as defined by 52 U.S.C. §30101(14) and manages the business of the Libertarian Party throughout the United States at the national level, including by functioning as a libertarian political entity separate and distinct from all other political parties or movements; electing Libertarians to public office to move public policy in a libertarian direction; chartering affiliate parties throughout the United States and promoting their growth and activities; nominating candidates for President and Vice-President of the United States, and supporting Libertarian Party and affiliate party candidates for political office; and entering into public information activities.

14. The LNC is authorized to charter affiliates throughout the United States. Properly chartered affiliates are licensed to use the LNC's federally registered trademarks. In 1972, the LNC chartered the Libertarian Party of Michigan (LPM), as an affiliate of the Libertarian Party. In January 2023, a group of individuals, Defendants, challenged the legitimate leadership of the officially recognized state-level affiliate of the Libertarian Party, the LPM. Plaintiff has continued to recognize the legitimate affiliate organization. However, Defendants, individually and as a group, have, without permission and without license, beginning in January 2023, willfully adopted, used and infringed one or both of the LNC's federally registered trademarks. Defendant's infringement and caused harm and damage to the LNC, including monetary harm, political harm and reputational harm to the LNC, the Libertarian Party and the

LPM, and dilution and disparagement of the Plaintiff's federally registered trademarks and the good will associated therewith. Defendants have used the LNC's federally registered marks to, among other things, solicit funds and to illegitimately suggest their activities and organization are affiliated with the Plaintiff without the Plaintiff's consent.

15. The governing arm of the LPM is the Libertarian Party of Michigan Executive Committee, Inc. ("LPMEC"). The directors of the LPMEC are defined in their Articles of Incorporation and Corporate Bylaws and are recognized as an affiliate by the Plaintiff, LNC. [see Exhibit 1, Articles of Incorporation and Bylaws of LPMEC,] The LPM has a legitimate LPMEC that is recognized and authorized by the LNC to use Plaintiff's Trademarks.

16. The following LPMEC positions have been illegitimately claimed by the following Defendants: Brungardt (Chair- originally) Saliba (Chair-current), Wolf (1st Vice-Chair), Stempfle (2nd Vice-Chair), Thornton-Canny (Treasurer), and Van Alstine (Secretary). The Defendants' claims of recognition are denied by the Plaintiff who recognizes a different set of officers as representing its Michigan affiliate and as authorized to use its trademarks. The LPMEC is authorized to charter sub-affiliates. Until April 7, 2023, two of those sub-affiliates were the Libertarian Party of West Michigan ("LPWM") and the Libertarian Party of Genesee County ("LPGC"). Defendant Buzuma is the Chair of LPWM, and Defendant Canny is the Chair of LPGC. Currently, neither of these organizations are recognized by Plaintiff LNC and are not authorized to use either Registered mark.

**THE TRADEMARKS**

17. As part of its management of the Party, Plaintiff has registered a number of trademarks ("Libertarian Party Trademarks") with the USPTO that are associated and identified with its national and local political activities and affiliations.

Page 4 of 19

18.     Plaintiff's Trademarks include the federally registered trademark rights to:

 - "Libertarian Party" Reg. No. 2,423,459 [Exhibit 2].  This mark has been in use in commerce at least since January of 1972.

- the "Libertarian" logo Reg. No. 6,037,046 [Exhibit 3].  This mark has been in use in commerce at least since 2015.

19.     The Plaintiff currently and has continuously actively used the Libertarian Party Trademarks in commerce [Exhibit 4, screenshot of front page of Plaintiff's website LP.org].

20.     Plaintiff grants the use of its Trademarks to its officially recognized state-level affiliates and their officially recognized sub-affiliates pursuant to Plaintiff's Bylaws [Exhibit 5, Libertarian Party Bylaws, specifically, Article 5.1].

21.     On or about January 31, 2023, Defendants wrongfully claimed to be officers of the LPMEC and thus entitled to use the Plaintiff's Trademarks and to authorize sub-affiliates to do likewise.

22.     On February 15, 2023, counsel for the representatives of the legitimate LPMEC recognized by the Plaintiff, sent a cease and desist letter to Defendant Brungardt, the original self proclaimed unrecognized chair of the Defendant Group, to immediately terminate any further misrepresentation as having any authority to govern the affairs of LPMEC and return their property [see Exhibit 6, cease and desist letter from Eric Doster, Esq. dated February 15, 2023, and Exhibit 7, response email from Defendant's former board member Scotty Boman dated February 15, 2023].

23.     On February 16, 2023, Plaintiff sent a cease and desist letter to Defendant Brungardt, demanding an immediate termination to any representations of being the legitimate Michigan state affiliate of the Plaintiff and use of its Trademarks, including the designation

"Libertarian Party" and identifying as the recognized LPMEC at that time [see Exhibit 8, cease and desist letter from LNC Chair Angela McArdle dated February 16, 2023, and Exhibit 9, response from Brandon G. Warzybok dated February 8, 2023].

### FACTS COMMON TO DEFENDANTS BRUNGARDT, SALIBA, WOLF, STEMPFLE, THORNTON-CANNY, AND VAN ALSTINE

24.     On January 25, 2023, the governing arm of the LPM, the LPMEC,  directed Defendant Brungardt to add the Chair, Andrew Chadderdon, to the LPMEC's bank account at Comerica Bank. Brungardt ignored these instructions and on January 31,2023, claimed that he was the LPMEC Chair.  Subsequently, under the direction of the other Defendants, Brungardt added Defendants Saliba and Thornton-Canny to the account while claiming that these were rightful officers of the LPMEC who were entitled to use Plaintiff's Trademark "Libertarian Party" and to operate as an affiliate of  Plaintiff.  Thereafter, Chadderdon successfully appealed to Comerica's legal department to have his name added to the LPMEC bank account based upon documentation from LPMEC's legal counsel and from Plaintiff.  However, on or about March 22, 2023, Defendants had the assets frozen after attempting to draw upon the account. Chadderdon made a second successful appeal after which Comerica provided him with cashier's checks for the balance and closed the account.  However, on or about April 28, 2023, Chadderdon was notified that an Interpleader/Declaratory action (Case No. 23-557-CB Washtenaw County Circuit Court, State of Michigan) was filed by Comerica due to the continued attempts of Defendants to secure the funds properly belonging to LPMEC.  Lack of access to funds has damaged the LPMEC and Plaintiff LNC.

25.     On or about April 20, 2023, Thornton-Canny filed a campaign finance report with the state of Michigan purporting to be on behalf of the legitimate LPMEC entitled to use the

Plaintiff's Trademark of "Libertarian Party" [see Exhibit 9, screenshot of Michigan campaign finance filing dated April 20, 2023].

26.     On February 5, 2023, and March 19, 2023, under color of being the legitimate Treasurer of LPMEC, and thus falsely authorized to use the Plaintiff's Trademark of "Libertarian Party," Thornton-Canny filed false amended Statements of Organization with the Federal Elections Commission ("FEC") claiming a change in Treasurer, website, and address. Under 52 U.S.C. §§ 30101-46, this is an improper attempt to be recognized as a state-level affiliate of a recognized national party.  As claimed by Thornton-Canny in the filings, an organization must be recognized as part of the official structure of said national political party, however, Thornton-Canny was fully aware that the organization referenced in her filing did not have official recognition from Plaintiff LNC [see Composite Exhibit 11, Amended Statements of Organization dated February 5, 2023, and March 19, 2023, filed by Angela Canny Thornton to the FEC; and Exhibit 12, letter from the FEC to the LNC's counsel dated November 17, 2016]. These false filings have harmed the Libertarian Party and may adversely affect the ability of the Libertarian Party to put its 2024 Presidential and Vice-Presidential candidate on the ballot in Michigan.

27.     On February 3, 2023, Defendants Brungardt, Saliba, Wolf, Stempfle, Thornton-Canny and Van Alstine, registered a website (michiganlp.net) using the Plaintiff's Trademark of "Libertarian Party" which was further deceptively similar to the website of the recognized LPMEC (michiganlp.org) [see Exhibit 13, screenshot of WhoIs information for the michiganlp.net domain] and attempted to have the legitimate website taken down by its hosting provider, Domain IT.  Until such time as this trademark suit is resolved, the legitimate LPMEC is locked out of making any domain transfers or other fundamental identity changes to its

website due to this fraudulent and bad faith take-down effort as per a phone call from Domain IT made to Mr. Chadderdon on or about March 7, 2023.

28.     On multiple dates, including February 7, 2023, Defendants filed documentation with the Michigan Corporations registry ("LARA") claiming to be the legitimate directors of LPMEC and entitled to the use of the Plaintiff's Trademark of "Libertarian Party" [see Exhibit 14, LARA filing dated February 7, 2023].

29.     On or about March 3, 2023, Plaintiff sent an email to its membership in Michigan alerting them to the identity of the correct website and contact email [see Exhibit 15, email from Plaintiff to Michigan membership dated March 3, 2023].

30.     In response and on the same day, Defendants sent out an email to the Michigan membership fraudulently "spoofing" the email address of the recognized affiliate identified by the Plaintiff and using Plaintiff's Trademark of "Libertarian Party" in an infringing manner [see Composite Exhibit 16, email from Defendants dated March 3, 2023, and screenshot of email header showing spoofed sender].  They have sent numerous other emails representing themselves as the Michigan affiliate and using Plaintiff's Trademark of "Libertarian Party" without engaging in spoofing.

31.     Defendants have set up several social media accounts falsely holding themselves out to be representatives of the affiliated LPMEC and using Plaintiff's Trademark of "Libertarian Party" [see Composite Exhibit 17, depicting Twitter and Facebook pages infringing upon Plaintiff's Trademark].

32.     Defendants have further advertised numerous meetings, including an alleged annual convention [see previously referenced Exhibit 16], representing themselves as the Michigan affiliate and infringing upon Plaintiff's Trademark.

33.     Defendants have published Bylaws upon their website explicitly claiming that they are operating as an affiliate of the Plaintiff and using the Plaintiff's Trademark throughout [see Composite Exhibit 18, screenshots of Defendants' website using Plaintiff's Trademark including the explicit claim of affiliation with Plaintiff].

34.     Defendants have taken money from individuals as "membership dues" using their claims of false association with the Plaintiff and took receipt of other funds from individuals related thereto and is actively soliciting same [see Exhibit 19, donation page from Defendants' website].

35.     Defendants and their associates have made it clear that their intent is to disrupt, dilute, and defame the Trademark and good will of the Plaintiff and ignore any demands for cessation.  They have further made harassing and potentially defamatory claims to and about the attorney of the affiliated LPMEC [see Composite Exhibit 20, screenshot of post from Defendant Saliba joking about burning any cease and desist letters, screenshot of post from Defendant Canny describing damaging Plaintiff's brand as a "Holy Quest," picture of Defendants' fellow board member Brian Ellison disrupting a legitimate board meeting by stripping off of his clothes, and screenshot of post by Defendants' former fellow board member Scotty Boman accusing attorney of malpractice].

36.     Plaintiff anticipates receiving complaints regarding the same – wherein individuals contact Plaintiff to inquire about non-existent memberships in the LNC or the "Libertarian Party," and/or the LPM and are upset that they've paid money but have no membership with the Plaintiff or have given personal and private contact information in reliance upon the claim of association with the Plaintiff and use of Plaintiff's Trademark.

**FACTS RELATING TO DEFENDANT CANNY**

37.     Defendant Canny is the chair of LPGC, a formerly recognized affiliate of the LPMEC previously entitled to use Plaintiffs' trademarks.  Canny had been notified as of April 7, 2023, that LPGC's affiliation would be revoked if the organization did not meet certain conditions which were not met [see Exhibit 21, email from Andrew Chadderdon to LPGC notifying of intent to disaffiliate and to cease further infringing activities].

38.     Defendant Canny operates a website using Plaintiff's Trademarks without authorization [see Exhibit 22, screenshot of LPGC website depicting use of both of Plaintiff's Trademarks].

39.     Further, Canny has used LPGC in order to process money in assistance of fundraising efforts in furtherance of the infringing activities described above [see Exhibit 21 referenced previously, and Exhibit 23, screenshot of donation page on michiganlp.net noting the LPGC as the processor for donations].

**FACTS RELATING TO DEFENDANT BUZUMA**

40.     Defendant Buzuma is the chair of LPWM, a formerly recognized affiliate of the LPMEC previously entitled to use Plaintiffs' trademarks.  Buzuma had been notified as of April 7, 2023, that LPGC's affiliation would be revoked if the organization did not meet certain conditions which were not met [see Exhibit 24, email from Andrew Chadderdon to LPWM notifying of intent to disaffiliate].

41.     Defendant Buzuma operates a website using Plaintiff's Trademarks without authorization [see Exhibit 25, screenshot of LPWM website depicting use of both of Plaintiff's Trademarks].

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114

42. Plaintiff restates herein and incorporates by reference all of the above paragraphs.

43. Plaintiff LNC is the exclusive owner and registrant of Plaintiff's Trademarks, Reg. No. 2,423,459 and Reg. No. 6,037,046 and to all common law rights thereto and associated therewith.

44. Plaintiff's registrations of the Trademarks at the USPTO are valid and active, and in full force and effect.

45. Plaintiff has used, and continues to use, its registered Trademarks in commerce.

46. Defendants have, without the consent of the Plaintiff, used the Trademarks, reproductions of the Trademarks, counterfeits of the Trademarks, copies of the Trademarks, and/or colorable imitations of the Trademarks in commerce in a manner that is confusing and/or confusingly similar.

47. Defendants' Infringing uses have been in connection with repeated and continuous distribution, advertising, registration, and publication of information and materials containing references to "Libertarian Party" and as far as Defendants Canny and Buzuma, using the Libertarian Party "torch eagle" logo.

48. Defendants' Infringing uses of Plaintiff's Trademarks occurred, and occur, in related commercial fields for related commercial services (*e.g.*, political party communications, political party activities, political press activity, political candidate screenings, official filing and registrations and endorsements).

49. Defendants' Infringing uses of Plaintiff's Trademarks further include Defendants soliciting funds from individuals – by misleading and deceiving those individuals as to

Defendants' relationship, affiliation or sponsorship with or by Plaintiff, by using Plaintiff's Trademarks and in other manners.

50. Defendants' Infringing uses of Plaintiff's Trademarks – especially when considered in light of their knowing and defiant continued uses – have been intentional, to create a false impression of affiliation, authorization or sponsorship.

51. Defendants' Infringing uses of Plaintiff's Trademarks – especially when considered in light of their knowing and defiant continued uses – have been intentional, to harm Plaintiff's marks, to harm Plaintiff's good will and to dilute Plaintiff's marks.

52. Defendants' Infringing uses have therefore caused confusion and mistake, and are likely to continue to cause confusion or mistake as Defendants' association, affiliation or relationship with Plaintiff. Such confusion or mistake is probable, given the relatedness of Defendants' Infringing Uses.

53. Defendants' Infringing uses constitute trademark infringement and trademark dilution in violation of the Lanham act and 15 U.S.C.

54. Defendants' infringing activities and willful conduct in relation thereto, constitute trademark infringement in violation of 15 U.S.C. § 1114(1) and the Lanham Act.

55. Plaintiff has been, and will continue to be harmed by Defendants' Infringing activities. Defendants' conduct has irreparably harmed Plaintiff, and will continue to do so unless enjoined by this Court.

56. As a result of Defendants' conduct, Plaintiff has been harmed and is entitled to damages, including, but not limited to, actual damages, statutory damages, treble damages, and corrective advertising damages and a temporary and permanent injunction.

57. The harm caused to Plaintiff's business, goodwill, reputation, trademarks and

finances are a direct and proximate result of Defendants' intentional, deliberate, and willful use of Plaintiff's Trademarks in an infringing manner.

58.    The intentional, deliberate, and willful actions of Defendants render this an exceptional case, entitling Plaintiff to enhanced damages and an award of attorney's fees and costs associated with the action pursuant to 15 U.S.C. § 1117(a).

59.    The damage caused to Plaintiff by Defendants cannot be fully measured or compensated for in economic terms. Such irreparable harm will continue unless Defendants are enjoined from such conduct.

## COUNT II
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)(1)(A)

60.    Plaintiff herein restates and incorporates by reference all paragraphs above.

61.    Defendants have, without the consent of the Plaintiff, used the Libertarian Trademarks – including, but not limited to, words, terms, names, symbols, and combinations thereof.

62.    Defendants have, without the consent of the Plaintiff, used the Libertarian Trademarks in false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, regarding the Trademarks.

63.    Defendants' unlawful usage of Plaintiff's Trademarks has caused and is likely to continue to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants or their activities with the Plaintiff.

64.    Defendants' unlawful usage of Plaintiff's Trademarks is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of their commercial activities by the Plaintiff.

Page 13 of  19

65.     Defendants' unlawful usage of Plaintiff's Trademarks has caused confusion, mistake and deception as to the origin, sponsorship, or approval of their commercial activities by the Plaintiff.

66.     Defendants' Infringing Uses of Plaintiff's Trademarks include Defendants receiving money from individuals – by misleading and deceiving those individuals as to Defendants' relationship, affiliation or sponsorship with or by Plaintiff, using Plaintiff's Trademarks.

67.     Defendants' unlawful usage of Plaintiff's Trademarks is willful and deliberate.

68.     Defendants have acted purposefully to create a false or misleading association in order to trade off of the extensive goodwill that Plaintiff's Trademarks have established.

69.     Defendants' unlawful usage of Plaintiff's Trademarks and willful conduct in relation thereto constitute false designation of origin, false descriptions, and dilution of the Trademarks in violation of 15 U.S.C. § 1125(a)(1)(A).

70.     Plaintiff has been, and will continue harmed by Defendants' unlawful usage of Plaintiff's Trademarks. Defendants' conduct has irreparably harmed Plaintiff, and will continue to do so unless enjoined by this Court.

71.     As a result of Defendants' unlawful usage of Plaintiff's Trademarks, Plaintiff has been harmed and is entitled to damages, including but not limited to, actual damages, statutory damages, treble damages, and corrective advertising damages.

72.     The harm caused to Plaintiff's business, goodwill, reputation, and finances are a direct and proximate result of Defendants' intentional, deliberate, and willful misuse of Plaintiff's Trademarks in an unlawful manner.

73.     The intentional, deliberate, and willful actions of Defendants render this an

exceptional case, entitling Plaintiff to enhanced damages and an award of attorney's fees and costs associated with the action pursuant to 15 U.S.C. § 1117(a).

74.     The damage caused to Plaintiff by Defendants cannot be fully measured or compensated for in economic terms. Such irreparable harm will continue unless Defendants are enjoined from such conduct.

**COUNT III**
**FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)(1)(B)**

75.     Plaintiff herein restates and incorporates by reference all of the above paragraphs.

76.     Defendants have, without the consent of the Plaintiff, used the Trademarks – including, but not limited to, words, terms, names, symbols, and combinations thereof.

77.     Defendants have, without the consent of the Plaintiff, used the Trademarks in false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, regarding the Trademarks.

78.     Defendants have, without the consent of the Plaintiff, used the Trademarks in commercial advertising and promotion.

79.     Defendants' unlawful usage of Plaintiff's Trademarks in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of their commercial activities.

89.     Defendants' unlawful usage of Plaintiff's Trademarks has caused confusion, mistake and deception as to the origin, sponsorship, or approval of their commercial activities by the Plaintiff.

81.     Defendants' Infringing uses of Plaintiff's Trademarks include Defendants receiving money from individuals – by misleading and deceiving those individuals as to

Defendants' relationship, affiliation or sponsorship with or by Plaintiff, using Plaintiff's Trademarks.

82.     Defendants' unlawful usage of Plaintiff's Trademarks is willful and deliberate.

83.     Defendants have acted purposefully to falsely advertise and promote their activities in order to trade off of the extensive goodwill that Plaintiff's Trademarks have established.

84.     Defendants' unlawful usage of Plaintiff's Trademarks and willful conduct in relation thereto constitute false advertising of the Trademarks in violation of 15 U.S.C. § 1125(a)(1)(B).

85.     Plaintiff has been, and will continue harmed by Defendants' unlawful usage of Plaintiff's Trademarks. Defendants' conduct has irreparably harmed Plaintiff, and will continue to do so unless enjoined by this Court.

86.     As a result of Defendants' unlawful usage of Plaintiff's Trademarks, Plaintiff has been harmed and is entitled to damages, including but not limited to, actual damages, statutory damages, treble damages, and corrective advertising damages.

87.     The harm caused to Plaintiff's business, goodwill, reputation, and finances are a direct and proximate result of Defendants' intentional, deliberate, and willful misuse of Plaintiff's Trademarks in an unlawful manner.

88.     The intentional, deliberate, and willful actions of Defendants render this an exceptional case, entitling Plaintiff to enhanced damages and an award of attorney's fees and costs associated with the action pursuant to 15 U.S.C. § 1117(a).

89.     The damage caused to Plaintiff by Defendants cannot be fully measured or compensated for in economic terms. Such irreparable harm will continue unless Defendants are

enjoined from such conduct.

## COUNT IV
## INJUNCTIVE RELIEF UNDER 15 U.S.C. § 1116(a)

90.    Plaintiff herein restates and incorporates by reference all paragraphs.

91.    Plaintiff has shown, herein, that Defendants has unlawfully used Plaintiff's Trademarks in violation of 15 U.S.C. §§ 1114, 1125(a)(1)(A) and 1125(a)(1)(B).

92.    Plaintiff has shown, herein, that Defendants' infringement of Plaintiff's Trademarks is willful, deliberate and ongoing.

93.    Plaintiff has shown, herein, that Plaintiff has been, and will continue to be, harmed by Defendants' infringement of Plaintiff's Trademarks.

94.     Plaintiff has shown, herein, that Plaintiff has been irreparably harmed by Defendants' infringement of Plaintiff's Trademark, and that Defendants will continue to do so unless enjoined by this Court.

95.    The damages caused to Plaintiff by Defendants cannot be fully measured or compensated for in economic terms. Such irreparable harm will continue unless Defendants are enjoined from such conduct.

## DEMAND FOR JURY TRIAL

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter:

A preliminary injunction enjoining Defendants and others acting in concert with Defendants from infringing on plaintiffs trademarks and from using, advertising or publicizing

Page 17 of  19

any information that includes or refers to Plaintiff's Trademarks or any colorable imitation thereof;

A judgment in favor of Plaintiff that Defendants violated 15 U.S.C. § 1114;

A judgment in favor of Plaintiff that Defendants violated 15 U.S.C. § 1125(a)(1)(A);

A judgment in favor of Plaintiff that Defendants violated 15 U.S.C. § 1125(a)(1)(B);

A judgment in favor of Plaintiff that Defendants intentionally violated 15 U.S.C. § 1114;

A judgment in favor of Plaintiff that Defendants intentionally violated 15 U.S.C. § 1125(a)(1)(A);

A judgment in favor of Plaintiff that Defendants intentionally violated 15 U.S.C. § 1125(a)(1)(B);

A judgement in favor of Plaintiff that Defendants have violated the Federal trademark rights of Plaintiff.

A judgement in favor of Plaintiff that Defendants have violated Plaintiffs' Lanham Act rights.

A judgment and order requiring Defendants to pay Plaintiff monetary damages – in an amount to be determined at trial – in addition to awarding Plaintiff's' attorney's fees, costs, expenses, enhanced and/or exemplary damages, and pre-judgment and post-judgment interest;

A permanent injunction enjoining Defendants and others acting in concert with Defendants from infringing on plaintiffs trademarks and from using, advertising or publicizing any information that includes or refers to Plaintiff's Trademarks or any colorable imitation thereof; and

Any and all other relief to which Plaintiff may show itself to be entitled.

May 5, 2023                                    Respectfully Submitted,


                                                 /s/ Joseph J. Zito
                                                Joseph J. Zito
                                                FRESH IP PLC
                                                1250 Connecticut Avenue, NW
                                                Suite 700
                                                Washington, DC 20036
                                                jzito@steinip.com
                                                (202) 466-3500
                                                **ATTORNEYS FOR PLAINTIFF**
                                                **LIBERTARIAN NATIONAL**
                                                **COMMITTEE**

# EXHIBIT 2

On November 18th, Mr. Chadderdon submitted an appeal to the Judicial Committee (JC). Mr. Chadderdon (the Appellant) alleged that the body (the Appellees) violated the Libertarian Party of Michigan bylaws by conducting improperly noticed business at the July 9th Candidate Nominating Convention. His appeal and arguments can be viewed here.

All interested parties were given an opportunity to submit argumentation for and against the appeal. The JC reviewed all of the submissions and conducted a hearing on December 9th, allowing all parties to further argue their cases. The submissions and the hearing can be reviewed here.

On Tuesday, December 13th, the JC voted to grant Mr. Chadderdon the appeal, on all points. In this document, the Judicial Committee will provide its analysis of the appeal and the main arguments against it. We have referenced the Libertarian Party of Michigan Bylaws as amended June 26, 2021 and Robert's Rules of Order, Newly Revised (RONR 12th Ed.)

First, we shall consider if the Judicial Committee even has purview over this matter.

*"The appeal cannot be reviewed because the Judicial Committee (JC) has no jurisdiction to overturn decisions of a convention, particularly if the appeal is not raised during the convention."* <u>Submission, Joe Brungardt + Undersigned</u>

The Bylaws, Article V, Section 2 say unambiguously:

"The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions."

No exemptions for a convention are specified in this language. Furthermore, the timeliness of the appeal has no bearing on this matter. Robert's Rules of Order (RONR) states:

23:6 "The only exceptions to the requirement that a point of order must be made promptly at the time of the breach arise in connection with breaches that are of a continuing nature, whereby the action taken in violation of the rules is null and void. In such cases, a point of order can be made at any time during the continuance of the breach - that is, at any time that the action has continuing force and effect - regardless of how much time has elapsed.
A. A main motion has been adopted that conflicts with the bylaws of the organization or assembly.
E. Any action has been taken in violation of a rule protecting absentees … or a rule protecting a basic right of an individual member (25:7, 25:10-11)."

25:10 "Rules protecting absentees cannot be suspended even by unanimous consent of or an actual unanimous vote, because the absentees do not consent to such suspension.
25:11 Rules protecting a basic right of the individual member cannot be suspended."

Mr. Chadderdon's appeal alleges that not only was the business conducted in violation of the bylaws, but that his rights as a member and the rights of absentee members were violated. These violations (his removal from the Libertarian Executive Committee (LEC) by unnoticed vote of no confidence and subsequent unnoticed elections of officers and representatives) are of a continuing nature as he still is no longer chair of the board and the officers elected at the Candidate Nominating Convention (CNC) are still acting as members of the LEC.

Regardless of how any member feels about this case or Mr. Chadderdon in particular, the protection of our members' rights should be taken very seriously, especially because we are Libertarians. In no circumstance should we find it permissible to knowingly violate a member's rights, nor should we ever dismiss such allegations out of hand. The judicial committee is designed to be the recourse by which members may protect their rights not just from the Libertarian Executive Committee (LEC), but from the other members as a whole. It is entirely in order for the Judicial Committee to adjudicate this matter, and we will proceed accordingly.

Now we proceed to analyze the appellant's case:

*"The election of officers to the Libertarian Party of Michigan Executive Committee (LEC) and removal of an officer from the LEC that were carried out on July 9, 2022 at the Candidate Nominating Convention were done in violation of the bylaws of the Libertarian Party of Michigan (LPMI). LPMI bylaws require AT LEAST 30-day notice for business to be conducted at the convention. The resignations that led to the elections and removal occurred on June 15, 2022, so sufficient notice to carry out those actions at that convention was not and could not be given."* <u>Appeal, Chadderdon</u>

Mr. Chadderdon proceeds to lay out his case as follows:

*"1. The Candidate Nominating Convention that occurred on July 9, 2022 was a special convention as defined in the LPMI Bylaws.*
*2. LPMI Bylaws, as amended in convention June 26,2021, require that notice for ALL conventions is given with AT LEAST 30-day notice to all members of the Libertarian Party of Michigan and members of the national Libertarian Party that reside in Michigan.*
*3. Robert's Rules of Order Newly Revised, 12th edition (RONR) states that notice must be given to members for filling vacancies.*
*4. RONR states that for a special meeting, all substantive business must be designated in the call of the meeting.*
*5. Resignations of the Chair and 1st Vice Chair occurred on June 15, 2022. Resignations of other officers occurred (District Representatives) on June 14, 2022.*
*6. The first attempt to make a motion of no confidence to remove an officer from the LEC was sent to members of the LEC on June 19, 2022*
*7. Details of these violations were provided at convention, prior to the actions being carried out by the convention body. The information was willfully ignored."* <u>Appeal, Chadderdon</u>

We shall analyze these claims in order:

*"1. The Candidate Nominating Convention that occurred on July 9, 2022 was a special convention as defined in the LPMI Bylaws."* <u>Appeal, Chadderdon</u>

The Appellant argues that the CNC on July 9th was a special convention. The arguments against the Appellant contend that the Candidate Nominating Convention is a regular convention and conducting regular business without notice is valid. Here are all references in the bylaws to the "candidate nominating convention" and "regular" conventions. (highlights added):

"III.

1. The officers of the Party shall be a chair, a first vice chair, a second vice chair, a secretary, a treasurer, and the Congressional district representatives described below, hereinafter referred to as the "Executive Committee." These are the same individuals who shall serve as the directors of the "Libertarian Party of Michigan Executive Committee, Inc." None of these offices shall be combined. All of these officers shall be elected to a two-year term at a regular convention of the Party by the attending delegates (as to the Congressional district representatives, those delegates from the respective districts) and shall take office immediately upon the close of such convention and shall serve until the final adjournment of the next regular convention.

2. At each regular convention, following the selection of those officers of the Executive Committee elected at large, the delegates from each Congressional district shall caucus to select one person residing in that district to serve as the Congressional district representative for that district.

V.

1. The judicial power of the Party shall be vested in a Judicial Committee composed of three Party members. All of these committee members shall be elected to a two-year term at a regular convention of the Party by the attending delegates and shall take office immediately upon the close of such convention and shall serve until the final adjournment of the next regular convention. No member of the Executive Committee may be a member of the Judicial Committee.

VI.

1. During years in which a Libertarian Party primary occurs, the Party shall hold a fall state convention after the date of the primary and not less than 60 days before the general November election in accordance with state law (MCL 168.591). During even-numbered years in which a Libertarian Party primary election is not required by state law, the Party shall hold a **candidate nominating convention** after the filing deadline for candidates to appear on Michigan's primary ballot and before the date of the primary. During odd-numbered years, the Party shall hold a **regular state convention** between April 1

and July 31, performing such business as required herein."

These bylaws, with the guidance of RONR, serve to establish a cumulative definition of "a regular convention": They must occur on odd-numbered years, officers and the JC shall be elected to two year terms at regular conventions, and shall serve until the adjournment of the next regular convention. In the most plain of readings of these bylaws, it is impossible to consider any other convention as a regular convention. RONR offers some further insight:

56:68
"2) When a provision of the bylaws is susceptible to two meanings, one of which conflicts with or renders absurd another bylaw provision, and the other meaning does not, the latter must be taken as the true meaning."

In Article 6, Section 1, the terms "Candidate Nomination Convention" and "regular convention" are referred to in two distinct sentences, each outlining two distinct conditions. If the Candidate Nominating Convention (CNC) were considered a "regular convention,' that definition would render that and several other articles of the bylaws absurd; Article III Section 1-2 would mandate we elect officers and Article V Section 1 would mandate we elect the JC at the CNC, in spite of the odd year, two year timelines specified in each bylaw. Clearly, we do not elect all officers and the JC at every convention, so every convention cannot be considered regular even in practice.

The Bylaws say, in plain language, that the CNC is a convention with the specific purpose of nominating candidates, therefore all other business is prohibited, per RONR:

56:68
"4) If the bylaws authorize certain things specifically, other things of the same class are thereby prohibited."

We've established that the CNC cannot be considered a regular convention, but can it be considered a special convention as the Appellant alleges? Here are RONR's definitions of Regular and Special Conventions:

"9:1 The term regular meeting refers to the periodic business meeting of a permanent society .. held at weekly … or similar intervals, for which the day should be prescribed by the bylaws and the hour and place should be fixed by a standing rule.
9:2 If, instead, an organization follows the practice of scheduling … its regular meetings by resolution, notice (also referred to as the call of the meeting) must be sent to all members a reasonable time in advance of each regular meeting.
9:13 A special meeting (or called meeting) is a separate session of a society held at a time different from that of any regular meeting, and convened only to consider one or more items of business specified in the call of the meeting. Notice of the time, place, and purpose of the meeting, clearly and specifically describing the subject matter of the motions or items of

business to be brought up, must be sent to all members a reasonable number of days in advance. <mark>The reason for special meetings is to deal with matters that may arise **between regular meetings** and that require action by the society before the next **regular meeting**, or to dedicate an entire session to one or more specific matters."</mark>

We have already cited the uses of regular convention, but here is how the bylaws use "special convention":

VI

3. "The Party shall hold <mark>a special convention</mark> within 45 days upon the call of the Executive Committee or when petitions are submitted by 10% of the current membership, specifying the purpose for the special convention."

Lastly, let's reference once again RONR on the interpretation of Bylaws:

56:68
"8) In cases where the bylaws use a general term and also two or more specific terms that are wholly included under the general one, a rule in which only the general term is used applies to all of the specific terms."

The bylaws use the terms "convention," "regular convention" and "special convention," throughout. "Convention" is a general term, and the applications of "regular" and "special" are specific. We've already established that the various uses of "regular convention" serve to make a cumulative definition of the specific term. However, the term "a special convention" as used specifically only in Article VI, Section 3 of the bylaws is not an exclusive use definition of the term. Furthermore, if we were to define the CNC as a special convention, as used in RONR 9:13, it would not affect the term's use in Article VI, Section 3; It is not rendered absurd and the use of the specific term is not affected.

The JC weighed these arguments and definitions at length. We came to the conclusion that while the Candidate Nominating Convention on July 9th may be considered "a special convention" as the Appellant argues, it cannot be defined as a "regular convention" as the bylaws plainly use and define the term.

*"2. LPMI Bylaws, as amended in convention June 26,2021, require that notice for ALL conventions is given with AT LEAST 30-day notice to all members of the Libertarian Party of Michigan and members of the national Libertarian Party that reside in Michigan.*

*3. Robert's Rules of Order Newly Revised, 12th edition (RONR) states that notice must be given to members for filling vacancies.*

*4. RONR states that for a special meeting, all substantive business must be designated in the call of the meeting."* <u>Appeal, Chadderdon</u>

Here are the pertinent citations from the bylaws:

"Article VI.

4.4 The Executive Committee shall notify every Libertarian Party of Michigan and Michigan resident National Libertarian Party member, whose dues were current within 3 years, of the convention date, time and location no less than 30 days prior to the convention. Notification shall be made by at least one of the acceptable modalities for which contact information has been made available by the member. Acceptable modalities shall include email, phone, and United States Postal Service."

And here is Roberts':

"9:2 If, instead, an organization follows the practice of scheduling … its regular meetings by resolution, notice (also referred to as the call of the meeting) must be sent to all members a reasonable time in advance of each regular meeting.

9:3 In any organization, notice must be sent a reasonable time in advance of each regular meeting that is separated by more than a quarterly time interval from the previous regular meeting. Notice must also be sent a reasonable time in advance of a convention of delegates.

9:13 A special meeting (or called meeting) is a separate session of a society held at a time different from that of any regular meeting, and convened only to consider one or more items of business specified in the call of the meeting. Notice of the time, place, and purpose of the meeting, clearly and specifically describing the subject matter of the motions or items of business to be brought up, must be sent to all members a reasonable number of days in advance. The reason for special meetings is to deal with matters that may arise between regular meetings and that require action by the society before the next regular meeting, or to dedicate an entire session to one or more specific matters.

47:58 Notice of filling a vacancy in an office (including a vacancy in an executive board or executive committee) must always be given to the members of the body that will elect the person to fill it, unless the bylaws or special rules of order clearly provide otherwise.

56:32 The method of filling vacancies may also be provided. Unless the bylaws clearly provide otherwise, notice of filling a vacancy must always be given to the members of the body that will elect the person to fill it."

When we consider these terms as written in both the bylaws and RONR, the Appellant is plainly correct. ALL conventions require a 30 days notice. As discussed in the previous section, the bylaws authorize specific items of business at this convention. The June 8th Call to Convention listed the convention as the "(candidate) Nominating convention." This was the only business noticed 30 days in advance.

The argument by the Appellee's that the "motion for a vote of no confidence" is exempt from such notice has merit and warrants close examination of the bylaw in question:

"Article 3
10. A member of the Executive Committee who misses three consecutive meetings of the Executive Committee or fails to perform his or her fiduciary duties may be removed from the Executive Committee and replaced by a two-thirds vote at a **regular meeting of the Executive Committee** or a majority vote at **convention** following a motion for a vote of no confidence. All Executive Committee members must be notified of the intent to remove at least 14 days prior to the meeting. A **Congressional district representative** may be **replaced** by a majority vote of a congressional district caucus at any state convention. If the chair is so removed, the first vice chair shall assume the chair and a new first vice chair elected. If a Congressional district representative resigns or is so removed, then the Executive Committee must replace him or her with a person residing in the same Congressional district, who shall serve until the next state convention, at which time the caucus for that Congressional district shall select a replacement for the balance of his or her term."

This bylaw creates a decision tree. Once it has been established that an LEC member may be removed (either by missing three consecutive meetings or failing to perform his or her fiduciary duties) they may be removed by two means: Two thirds vote at a <u>regular meeting of the executive committee</u>, or a majority vote at <u>convention</u> following a motion for a vote of no confidence. These two means are entirely distinct. Furthermore, the terms "meeting" and "convention" are not interchangeable, either in this section or in the bylaws as a whole, so to conflate the two is erroneous. The following sentence defines the notice requirement if the member is to be removed at the <u>regular meeting of the executive committee</u>, but it does not set a distinct notice requirement for the convention. The 14 days notice <u>only</u> applies to the removal of the board member at a regular meeting of the executive committee.

The next sentence states that only a Congressional district representative may be removed at any convention. The Congressional district representative is clearly distinct from the other officers defined in the bylaws, and the use of the specific term "replace"  only authorizes an election; it does not deal with the removal of the representative.

There is no condition listed in this bylaw to exempt the substantial business of conducting a vote of no confidence or holding elections at convention from the notice requirements laid out in Article VI Section 4.4. We must consider the 30 days notice requirement to be in effect for the removal and replacement of the chair by the convention process.

The proper course of action to remove an officer by this process would be to notify the LEC before the call to convention is issued and to have them consider adding such business to the agenda. Such a decision can only be made by the LEC, as the bylaws state:

Article VI
"6. The Executive Committee shall have supervision and management of all conventions."

This supervision and management entails the scheduling of the convention and noticing the business to be conducted. The LEC as a whole may vote on the content of the call to convention and the business contained therein, but has often delegated that responsibility to the Chair and Secretary in practice. The call to convention that went out on June 8th was in fact approved by both the Chair and the Secretary. However, it is not possible for an individual member who is not the chair to add any business without a vote of the board.

Even if the LEC as a whole had voted to have the vote of no confidence added to the agenda of the CNC after the 30 day deadline, it would have been a violation of these bylaws as written, and RONR is very clear that rules cannot be suspended:

"25:7 Rules contained in the bylaws cannot be suspended - no matter how large the vote in favor of doing so or how inconvenient the rule in question may be - unless the particular rule specifically provides for its own suspension, or unless the rule properly is in the nature of a rule of order as described in 2:14. Nothing in a corporate charter can be suspended unless the charter or applicable law so provides."

The JC considered the Appellee's citation of precedent on the matter:

*"Each of the three conventions referenced in the LPM Bylaws have specific*
*items of business prescribed therein but additional regular business has*
*always been conducted at them such as platform consideration,*
*resolutions, and approval of previous convention minutes.*

*LPM Bylaws in Section III.10 and past precedent provide for filling any*
*vacancies in EC district seats by the selection of a replacement by congressional*
*caucus at "any" state convention. This is what was done to fill the vacancies that*
*existed at the time of the July 9th, 2022 LPM Summer Convention, whether due to*
*prior resignations or resignations from being elected to other offices." Submission, Joe*
*Brungardt + Undersigned*

The parliamentarian retained by the Appellee's, Mr. Martin, refutes this notion by citing RONR:

"2:25 … However, if a customary practice is or becomes in conflict with the parliamentary authority or any written rule, and a Point of Order citing the conflict is raised at any time, the custom falls to the ground, and the conflicting provision in the parliamentary authority or written rule must thereafter be complied with. If it is then desired to follow the former practice, a special rule of order (or, in appropriate circumstances, a standing rule or a bylaw provision) can be added or amended to incorporate it."

The contention of the Appellant is not that the removal and replacement of officers cannot ever happen at a CNC, but that such business must be noticed properly. In the Judicial Committee hearing on December 9th, it was established during the argumentation that the previous calls to

convention did in fact contain notice for these elections, with one exception. The fact that the past practice was to provide proper notice for other business proves that notice is an established part of our processes, as it should be. If the members were not aware of a procedural violation, then of course they could not have contested it at that time. That does not mean that what happened then was correct. Expediency does not ever exempt improper behavior.

*"5. Resignations of the Chair and 1st Vice Chair occurred on June 15, 2022. Resignations of other officers occurred (District Representatives) on June 14, 2022.*
*6. The first attempt to make a motion of no confidence to remove an officer from the LEC was sent to members of the LEC on June 19, 2022*
*7. Details of these violations were provided at convention, prior to the actions being carried out by the convention body." Appeal, Chadderdon*

These are statements of fact and were not contested. They establish that it simply was not possible for the business of calling a vote of no confidence, electing officers or Congressional district representatives at this convention to be noticed properly with 30 days notice.

Considering this case and the arguments therein, the Judicial Committee spent many hours reviewing our organization's bylaws and parliamentary authority. We met several times to discuss our findings at length and consider all of the arguments presented. We came to the conclusion that the Appellant, Mr. Chadderdon, presented a thorough case proving the violations of the bylaws. Our own research and analysis of the matter unveiled even more details reinforcing this case, as we have shown above.

We have decided to grant Mr. Chadderdon's appeal. The vote of no confidence, the election of officers, and the election of Congressional district representatives conducted at the Candidate Nominating Convention on July 9th are to be considered out of order as a violation of our bylaws and parliamentary procedures. The Libertarian Executive Committee shall be reverted to its composition as of July 8th. Any actions taken by the erroneous board which are of a continuing nature are null and void.

The JC wanted to raise a couple points and make recommendations to the party that are pertinent to the matters resolved here:

The language of the motion of the vote of no confidence made at the convention by Mr. Canny levied many accusations upon Mr. Chadderdon. What the delegates had seen at convention was only one man's word versus another; no evidence or case was presented. While the bylaws do not mandate any such process, we recommend that a trial process be installed in our bylaws, in which the accuser may present a case with supporting evidence, and the accused may face their accuser and refute the claims levied against them. This process would ensure that such accusations are properly substantiated. RONR section 63 discusses at length the rights of the accused and the processes by which a fair disciplinary trial can take place. This should be a prerequisite to considering a motion calling for a vote of no confidence. We

recommend adopting a bylaw which simply points to that citation in regards to disciplinary matters greater than simply missing meetings. Ensuring consistent processes and standards would allow contentious matters to be adjudicated in a fashion that all factions can find just and fair.

Many of the matters involving notice, especially the elections of officers and the vote of no confidence, did not have exemptions in the bylaws. Obviously, the party may choose to amend the bylaws to include such provisions. However, we believe the current standards of providing notice are sufficient.

Signed


Connor J. Nepomuceno, Judicial Committee Chair


Joshua M. Smith


Robert W. Roddis, Esq.

# EXHIBIT 3

# DOSTER LAW OFFICES, PLLC

2145 Commons Parkway
Okemos, MI 48864

Eric E. Doster
Email: eric@ericdoster.com

(517) 483-2296 (main)
(517) 977-0147 (direct)
www.ericdoster.com

February 15, 2023

Joseph Brungardt                    **By Email Transmission**
4140 18 ½ Mile Road                 joebfreedom@gmail.com
Sterling Heights, Michigan 48314

RE:  Demand by Libertarian Party of Michigan (LPM) for Return of all Property Belonging to
LPM; Cease and Desist Demand by LPM to Immediately Terminate any Further Misrepresentation
as Having any Authority to Govern the Affairs of LPM

Dear Mr. Brungardt:

**INTRODUCTION**

This office represents LPM with respect to the serious issues raised in this letter.  It has come to
our attention that you are misrepresenting yourself to be the current Chair of the LPM; however,
as you know as a result of your personal and direct participation in the matter, on or about
December 19, 2022, the Judicial Committee (in accordance with the LPM Bylaws) ruled that the
actions taken at the July 9, 2022 Candidate Nominating Convention which led to your initial
selection as LPM Chair --- are invalid.  Specifically, the Judicial Committee unequivocally
determined:

> "We have decided to grant Mr. Chadderdon's appeal. The vote of no confidence,
> the election of officers, and the election of Congressional district representatives
> conducted at the Candidate Nominating Convention on July 9th are to be
> considered out of order as a violation of our bylaws and parliamentary procedures.
> The Libertarian Executive Committee shall be reverted to its composition as of July
> 8th. Any actions taken by the erroneous board which are of a continuing nature are
> null and void."

Consequently, as a result of this Judicial Committee determination, any "actions taken by the
erroneous board which are of a continuing nature are null and void" including without limitation,
your selection as LPM Chair.

In defiance of the Judicial Committee's determination, you apparently are claiming that Section
535 of the Michigan Nonprofit Corporation Act (MCL 450.2535) precludes the taking of any
action with respect to your status as LPM Chair since you were not removed by any members of

the Michigan nonprofit corporation known as "Libertarian Party of Michigan Executive Committee, Inc." (State of Michigan Identification Number 800902778). Such a claim fails for many reasons.

## "LIBERTARIAN PARTY OF MICHIGAN EXECUTIVE COMMITTEE, INC." DOES NOT HAVE MEMBERS

The Michigan nonprofit corporation known as "Libertarian Party of Michigan Executive Committee, Inc." does not have members. According to Article IV of the Articles of Incorporation of "Libertarian Party of Michigan Executive Committee, Inc." filed on January 19, 2005, this nonprofit corporation is organized on a <u>directorship</u> basis. Nowhere in these Articles of Incorporation or in the Bylaws of "Libertarian Party of Michigan Executive Committee, Inc." dated January 23, 2005 is there any reference to members. Consequently, because "Libertarian Party of Michigan Executive Committee, Inc." is organized on a directorship basis and has no members in law and in fact, any reference to a "member removal requirement" under Section 535 of the Michigan Nonprofit Corporation Act is misplaced.

## LPM EXISTS SEPARATELY FROM "LIBERTARIAN PARTY OF MICHIGAN EXECUTIVE COMMITTEE, INC." AND CONTROLS "LIBERTARIAN PARTY OF MICHIGAN EXECUTIVE COMMITTEE, INC."

LPM is the political party designated by the Libertarian National Committee as the affiliate of the Libertarian Party in the State of Michigan. As previously referenced, "Libertarian Party of Michigan Executive Committee, Inc." (State of Michigan Identification Number 800902778).is a Michigan nonprofit corporation. According to Article II of the Bylaws of "Libertarian Party of Michigan Executive Committee, Inc.":

> "The LPM Bylaws are incorporated by reference in these Bylaws. In the event of any conflict between the LPM Bylaws and these Bylaws, the LPM Bylaws shall take precedence."

According to Article III of the LPM Bylaws:

> "The officers of the Party shall be a chair, a first vice chair, a second vice chair, a secretary, a treasurer, and the Congressional district representatives described below, hereinafter referred to as the "Executive Committee." These are the same individuals who shall serve as the directors of the "Libertarian Party of Michigan Executive Committee, Inc.""

Consequently, members of the LPM Executive Committee (as established and recognized pursuant to the LPM Bylaws) automatically become officers and directors of "Libertarian Party of Michigan Executive Committee, Inc." without further corporate action. Conversely, once an individual is no longer a member of the LPM Executive Committee (as established and recognized pursuant to the LPM Bylaws) this individual automatically is no longer an officer or director of "Libertarian Party of Michigan Executive Committee, Inc." without further corporate action. Therefore, because the decision of the Judicial Committee (which established the current officers and representatives thereby invalidating your selection as LPM Chair) was made pursuant to the LPM Bylaws, and the LPM Bylaws establish the officers and directors of "Libertarian Party of Michigan

Executive Committee, Inc.", the LPM Bylaws, and any actions taken pursuant to the LPM Bylaws, take precedence.

**AS A MATTER OF CONSTITUTIONAL LAW (NOT TO MENTION LIBERTARIAN PRINCIPLES), THE AFFAIRS OF THE LIBERTARIAN PARTY OF MICHIGAN ARE GOVERNED BY THE LPM BYLAWS---AND NOT A STATE STATUTE**

Bylaws constitute a "binding contractual agreement between the [entity] and its various members." *Conlin v Upton,* 313 Mich App 243, 255 (2015). Accordingly, a board must follow the bylaws—a binding contract—unless they take steps to amend them. *See also Allied Supermarkets, Inc v Grocer's Dairy Co,* 45 Mich App 310, 315 (1973), *aff'd sub nom. Allied Supermarkets, Inc v Grocers' Dairy Co,* 391 Mich 729 (1974) ("[t]he bylaws of a corporation, so long as adopted in conformity with state law, constitute a binding contract between the corporation and its shareholders"). Here, the LPM Bylaws govern the affairs of LPM and control the affairs of "Libertarian Party of Michigan Executive Committee, Inc.". Therefore, unless LPM amends the LPM Bylaws under the proper procedure outlined in Article XII, the LPM Bylaws (including the authority of the Judicial Committee pursuant to Article V) govern. *See Slatterly v Madiol,* 257 Mich App 242, 250; 668 NW2d 154 (2003) (noting that bylaws are generally construed in accordance with the same rules used for statutory construction; thus, courts must first look at the specific language of the bylaw).

As indicated earlier in this letter, there is no conflict between the operation of the LPM Bylaws and the Michigan Nonprofit Corporation as both require adherence to the Judicial Committee's December 19, 2022 decision invalidating your selection as LPM Chair and recognizing the current LPM officers and representatives. However, for the sake of argument, let's assume that there is a conflict between a state statute (such as the Michigan Nonprofit Corporation Act) and the LPM Bylaws as to the composition of the current officers of the LPM. Even in such an instance, the consistent principles articulated by the United States Supreme Court have made it clear that where the rules of a political party conflict with state law, the First Amendment requires that the political party rules prevail. For example, in *Cousins v Wigoda*, 419 US 477 (1975), the United States Supreme Court held that political party rules supersede state law concerning the delegate selection process. The *Cousins* decision is based upon the principle that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association." 419 US at 487. This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State. *Democratic Party v Wisconsin*, 450 US 107, 121 (1981). And the freedom to associate for the common advancement of political beliefs "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party v Wisconsin*, 450 US 107, 122 (1981). "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v New Hampshire*, 354 US 234, 250 (1957). According to the United States Supreme Court, on "several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions - thus impairing the party's essential functions - and that political parties may accordingly protect themselves 'from intrusion by those with adverse political principles.' *Ray v Blair*, 343 US 214, 221-222 (1951)." *National Democratic Party, supra*, 450 US at 1 22. Furthermore, in *Roberts v United States Jaycees*, 104 S.Ct. 3244, 3249 (1984), the United States Supreme Court emphasized that:

"There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together."

In this regard, the United States Supreme Court struck down a Connecticut statute which required voters in a political party primary to be registered members of that party, which conflicted with a state Republican party rule permitting independent voters to vote in its primaries for federal and statewide offices. See *Tashjian v Republican Party of Connecticut*, 479 US 208 (1986).  Similarly, in *Heitmanis v Austin*, 899 F2d 521 (6th Cir. 1990), the Sixth Circuit Court of Appeals held as invalid certain portions of the Michigan Election Code which where contrary to the rules of the Michigan Republican Party. Significantly, the *Heitmanis* Court found that the Michigan Election Code created a significant burden on the party's right to freedom of association because it infringed upon the right of political parties to choose a method for selection of their party nominees. 899 F2d at 529.

Accordingly, to the extent that there is a conflict between a state statute (such as the Michigan Nonprofit Corporation Act) and the LPM Bylaws as to the composition of the current officers of the LPM, the LPM Bylaws, and any actions taken pursuant to the LPM Bylaws, take precedence once again.

## THE LIBERTARIAN NATIONAL COMMITTEE RECOGNIZES THE COMPOSITION OF THE CURRENT OFFICERS AND REPRESENTATIVES OF LPM, AS DETERMINED BY THE JUDICIAL COMMITTEE

In Federal Election Commission Advisory Opinion 2016-17, the Federal Election Commission determined that the LPM qualifies as the state committee of a national political party under the Federal Election Campaign Act and Commission regulations because: (1) The Libertarian National Party (LNP) qualifies as a political party; (2) LPM is part of the official structure of the LNP; and (3) LPM is responsible for the day-to-day operation of the LNP at the state level.   Consequently, recognition from the Libertarian National Committee establishes LPM as an affiliate of the Libertarian National Committee.  Stated differently, without recognition from the Libertarian National Committee, there is no LPM.

According to Article 6 of the Bylaws of the Libertarian Party as adopted in 2008 by the Libertarian National Committee, there shall be no more than one state-level affiliate party in any one state. Significantly, the Libertarian National Committee recognizes the composition of the current officers of the LPM, as determined by the Judicial Committee, to be the state-level affiliate party of the Libertarian Party:  See Leadership - Libertarian Party of Michigan (michiganlp.org).

Because the Libertarian National Committee does not recognize you as LPM Chair or the other officers and representatives you contend are legitimate, you are not allowed to use the name "Libertarian Party" pursuant to Article 6 of the Bylaws of the Libertarian Party:

"No person, group or organization may use the name "Libertarian Party" or any confusingly similar designation except the Party or an organization to which the Party grants affiliate party status or as otherwise provided in these bylaws."

Consequently, a separate cease and desist letter has already been sent to you (or will soon be sent to you) by the Libertarian National Committee demanding that you and your colleagues not use the name "Libertarian Party".

## ACTIONS RESPECTFULLY DEMANDED AND REQUESTED

On behalf of the Libertarian Party of Michigan (LPM), it is hereby DEMANDED that you and your agents return all property belonging to LPM within ten (10) days of the date of this letter. Further, you are hereby REQUESTED to immediately terminate any further misrepresentation as having any authority to govern the affairs of LPM. At a minimum, you and your agents must do the following:

1. Sign any documentation to transfer the LPM bank accounts to Andrew Chadderdon, LPM Chair and/or his designee(s).
2. Cease to engage in any fundraising on behalf of LPM.
3. Turn over the PO Box and any/all other accounts belonging to the LPM to Andrew Chadderdon, LPM Chair and/or his designee(s).

Your anticipated cooperation is appreciated.

Sincerely,

DOSTER LAW OFFICES, PLLC

Eric Doster

## CC: BY EMAIL TRANSMISSION

ANDREW CHADDERDON, LPM CHAIR chair@michiganlp.org

LIBERTARIAN NATIONAL COMMITTEE
Angela McArdle angela.mcardle@lp.org    Caryn Ann Harlos secretary@lp.org

ANGELA THORNTON angelat0763@gmail.com    ANDREW HALL halla12@ferris.edu
JORDAN MARTIN jord.martin02@protonmail.ch    MARK KING mark.king@markzz.com
DAVID CANNY cannyds@gmail.com    WILLIAM GELINEAU bill@abtitlemi.com
MIKE SALIBA themikesaliba@yahoo.com
MARY BUZUMA mary.buzuma@att.net
GREGORY STEMPFLE gregstempfle@gmail.com
RAFAEL WOLF rfwolf@gmail.com
BRIAN ELLISON bellison78@gmail.com
JONATHAN ELGAS elgasja@gmail.com
KYLE MCCAULEY k86.mccauley@gmail.com
JAMI VAN ALSTINE jamiracquel2004@yahoo.com
SCOTT BOMAN scottyeducation@yahoo.com

# EXHIBIT 4



# LIBERTARIAN
Minimum Government  Maximum Freedom

February 16, 2023

Joseph Brungardt
4140 18 1/2 Mile Rd.
Sterling Heights, MI 48314
michiganlibertarians@gmail.com,
joebrungardt@gmail.com.
joebfreedom@gmail.com

*Via Email*

**Re: The Libertarian Party of Michigan**

Mr. Joe Brungardt:

The national Libertarian Party ("LP") has a vested interest in protecting its rights and the rights of its affiliate parties, including the Libertarian Party of Michigan ("LPM"). It has come to our attention that you are holding yourself out to the public and members of the LPM as the Chair of the "Libertarian Party of Michigan". This is patently false.

The presently recognized Chair of the Michigan affiliate is Andrew Chadderdon and his legitimately elected successors, as affirmed by the LPM Judicial Committee and explicitly authorized by the LPM Bylaws. On or about December 13, 2022, the LPM Judicial Committee (in accordance with the LPM Bylaws) ruled that the actions taken at the July 9, 2022, Candidate Nominating Convention which led to your initial selection as LPM Chair are invalid.

Your claim that Michigan corporate law provides otherwise is irrelevant to the identity and leadership of the legitimate affiliate. Likewise, your recent correspondence to LPM members advertising an unauthorized and illegitimate convention was also incorrect.

Rumors have circulated that LPM's Judicial Committee removed officers with their decision. Your state affiliate's Judicial Committee did not "remove" any officer or director. Their decision invalidated a motion of no confidence that removed Andrew Chadderdon as chair because the removal and election in controversy was not validly noticed. Individuals cannot be removed from positions to which they were not validly elected. Thus, the act of voiding an invalid removal is not a removal. It is the national LP's understanding that LPM's judicial committee decision has been affirmed by counsel retained by the rightful LPM.

Absent a decision from the LNC or the national Judicial Committee to the contrary, national Platform Committee appointments and national delegate entitlements, along with ballot access, remain with the Party presently chaired by Mr. Chadderdon, and his legitimately elected successors.

In these pursuing statements and activities (holding yourself out to be chair, holding yourself out to be LPM, soliciting for donations, and other similar activities), you have violated LPM's bylaws, the national Libertarian Party's bylaws, and made unauthorized use of Libertarian Party trademarks, including but not

1444 Duke Street – Alexandria VA 22314 – 1-800-Elect-Us – www.LP.org

EXHIBIT 8

limited to the trademarked name "Libertarian Party." Further, neither the Libertarian National Committee ("LNC") nor the LPM has authorized you to make use of its trademark(s) in order to promote a different political party, and any such use is hereby expressly prohibited. We are therefore sending you this letter in an attempt to resolve this matter without the need for legal action. We demand that you immediately cease and desist from making further unauthorized use of Libertarian Party trademark(s) and fraudulently advertising a non-Libertarian Party convention as one of the Party.

In particular, the LNC has registered trademarks on the following:

- "Libertarian Party" (Reg. No. 2,423,459);
- "The Party of Principle" (Reg. No. 2,423,458);
- Libertarian Party Logo (Reg. No. 6,037,046).


Your unauthorized use of Libertarian Party trademark(s) and false claims of official position and calling of an illegitimate convention harms the LNC and LPM by willfully misleading members of the public and the LPM into believing that your alleged chairmanship and advertised convention is affiliated with the Libertarian Party, when in fact no such affiliation or authorization exists. Consequently, to avoid legal action in this matter, we demand that you immediately take any and all actions necessary to prevent your further infringement on our legal rights and interests. This includes, without limitation, that you cease and desist from using the trademarked name "Libertarian Party" in your organization in any published materials, including your mailing list, Facebook and social media pages, or any other electronic forum, as well as any other communications, whether electronic, print, audio or any other medium, including but not limited to campaign literature, brochures, advertisements, email or any other communication.

Further, it has been communicated to us by the Chair of the Libertarian Party of Michigan as well as by membership that their contact information secured in CiviCRM was potentially used to further these false representations. As you are aware, all users of CiviCRM are required to sign a Non Disclosure Agreement ("NDA") which limits the use of this data to legitimate Party business authorized by the affiliate or the national Party.

You are advised not to destroy or otherwise spoliate any evidence of your actions relating to any potential NDA violations, and/or the dissemination of confidential information, pursuant to Va. Code § 8.01-379.2:1. You have, "a duty to preserve evidence that may be relevant to reasonably foreseeable litigation." If this conflict results in litigation and you have "disposed of, altered, concealed, destroyed, or not preserved" evidence, you may place yourself at risk of an unfavorable finding by a jury, or a default judgment.


""The textbook definition of `spoliation' is `the intentional destruction of evidence[.'] . . . However, spoliation issues also arise when evidence is lost, altered or cannot be produced."" Wolfe v. Virginia Birth-Related Neuro, 40 Va. App. 565, 581 (Va. Ct. App. 2003) The law on this matter is clear in the state of Virginia and in the District of Columbia, which have overlapping jurisdiction regarding the LNC's legal affairs. "[T]here now exists in the District of Columbia an independent action for negligent or reckless spoliation of evidence". Holmes v. Amerex Rent-A-Car, 710 A.2d 846, 854 (D.C. 1998)

Based on the foregoing, we demand that you and your agents cease using the LP's registered trademarks and return all property belonging to the LP within 10 days of the date of this letter. Furthermore, we

**LPM**
**2/16/23**
**Page 3 of 3**

request you immediately terminate any further misrepresentation that you are affiliated with the LP. Thank you for your attention to this matter.


Angela McArdle, Chair

Libertarian National Committee