# JONATHAN M. JACOBS, PRP-R, CPP

*Parliamentary Consultant*

Mailing Address
630 North 63rd Street,
Apartment 3rd Floor Rear
Philadelphia, PA 19151
Telephone: (215) 229-1185
E-mail: jjparlia@yahoo.com

## Parliamentary Opinion

On November 21, 2022, Andrew Chadderdon, contacted[1] the parliamentarian regarding an appeal to the Judicial Committee of the Libertarian Party of Michigan (LPMI). He asked specific questions regarding notice. With other documents, he provided his filing with the Judicial Committee (from which the information in this opening section is taken along with a video of the meeting).

Mr. Chadderdon was the Second Vice Chair of the LPMI as of the time of the July 9, 2022 nominating convention. At this convention, in spite of Mr. Chadderdon ruling the motion out of order, the vacancies created by the submitted resignations of Tim Yow and Ben Boren, submitted on June 15, 2022, and of Brandon Warzybok, submitted on June 14, 2022, were filled.[2] Mr. Chadderdon's ruling was based on the failure to provide adequate notice to fill these vacancies. Mr. Chadderdon, none the less, chose to voluntarily relinquish the chair[3] and permit Mr. Joe Brungardt to serve as chair.

Later in the meeting a "Motion of No Confidence" was adopted removing Mr. Chadderdon as Second Vice Chair. Notice of this motion was sent to the Executive Committee of the LPMI on June 19, 2022, but was not sent to the membership.

Mr. Chadderdon has asked if the lack of notice for the election of various individuals at this nominating convention, i.e., Joe Brungardt as First Vice Chair, Mike Saliba as First Vice Chair (vice Mr. Brungardt), Mary Buzuma as Second Vice Chair, Rafael Wolf as District 6 Representative, Jon Elgas as District 8 Representative, Greg Stempfle as District 9 Representative, Kyle McCauley as District 10 Representative, and Scotty Boman as District 14 Representative, caused these elections to be null and void. He also asked if the failure of notice invalidated the motion of no confidence.

### Works Cited

The Bylaws of the LPMI are online and shall be cited as "Bylaws" with the appropriate Article and section number. The notice of the "Nominating Convention" of July 9-10, 2022, which was sent by e-mail on June 8, 2022 will be cited as "Notice." The Bylaws (Article IX, 2), state that "Robert's Rules of Order Newly Revised shall be the parliamentary authority for all matters of procedure not specifically covered by the bylaws or convention rules of the Party." The current edition of this work is the 12th (2020) edition, which will be cited in this opinion as "RONR."[4] This edition establishes that it supersedes all prior editions and is the parliamentary authority for groups that specifically adopt "Robert's Rules of Order Newly Revised" without specifying an edition (p. vii).

Other citations will appear in the endnotes.

### Commentary

RONR has what is, effectively, two types of notice requirements, one type for meetings and one type for specific items of business. It would be entirely possible for some items of business to be in order at a specific type of meeting, a general meeting, without previous notice and others to be out of order because of a lack of notice. Some types of meetings require notice for all substantive items of business. So there are two distinct standards for requiring notice. Both of these standards have a common outcome; they both protect the rights of absentees.

Notice, of either type, exists to protect absentees (25:10) and actions taken without the required notice are actions taken in violation of a rule protecting absentees. Absentee rights are treated very seriously in RONR; an action taken in violation of a rule protecting absentees is null and void (23:6 e). The LPMI Convention of July 9, 2022 managed to violate two different notice requirements in attempting to fill the vacancies.

The Bylaws provide for a "candidate nominating convention" in even numbered years. Under the principle of bylaw interpretation that when a bylaw authorizes "certain things specifically, other things of the same class are thereby prohibited (RONR, 56:68, 4)," this convention can do nothing except nominate candidates. Filling a vacancy or using the "vote of no confidence" process found in Article III, 10, are not nominating candidates.

It would have been possible for the Executive Committee to call a special meeting, using Article IV, 3, in order to fill the vacancies and adopt a vote of no confidence; this would require notice of the action needed of at least 30 days to each state party member and resident national party member, as per Article VI, 4, 4. Had there been more than 30 days between the resignations and the nominating convention, a special convention could have been scheduled to be held upon adjournment of the candidate nominating convention. Even doing all of these things in a singular meeting may have been acceptable had there been proper notice of the nomination of candidates, the filling of the vacancies and the vote of no confidence. The Notice only mentions the nominating convention, not these additional items.

As the candidate nominating convention lacked the authority to act beyond nominating candidates and because there was no proper notice to the membership of a special convention, the vote of no confidence and filling of the vacancies are null and void. Note that this specific requirement would not apply at a regular state convention held in odd numbered years[5]. This regular convention is capable "performing such business as required herein (Article VI, 1)." This clause only applies to the regular convention, not the candidate nominating convention, and under principles of bylaw interpretation, prohibits general business from being conducted at other types of conventions(RONR, 56:68, 4).

There is another problem with the attempted filling of the vacancies. RONR notes that "In the case of a resignation from office, unless the bylaws provide otherwise, the assembly cannot proceed to fill the vacancy [upon a resignation being offered and accepted] immediately since notice is a requirement (32:7)." For example, at regular state convention held in odd numbered years, notice for most motions would not be required; a motion to donate some money to a cause, for example, would not require notice. Notice to fill vacancies would still be required to be included in the notice for the convention, because the bylaws have to specifically provide that notice is not required.[6]

Much like the first violation of notice, this violation of notice would be sufficient to void the filling of the vacancies. Even in cases where notice of the meeting is not required, notice of the motion to fill the vacancy is.

The notice requirement of either type is more than some procedural nicety. A LPMI member, when he reads the notice, and notes that the deadline past, can make decisions about attending. He may have to make travel arrangements, take time off work, or get his funds together. He might decide that it is not worth it just for nominations. He may feel that it was worth it to determine who the officers will be. It is entirely possible that had proper notice been given, the results would be different.

In all cases, the failure to give required notice renders the action null and void as a violation of absentee rights.

## Opinion

**1. The candidate nominating convention may only nominate candidate; it lacks the ability to fill vacancies or adopt a vote of no confidence.**

**2. 30 days' notice is required to consider either the filling of the vacancies or a vote of no confidence at any non-regular meeting.   Failure to comply with notice requirements violated absentee rights and renders these actions null and void.**

**3. RONR requires that previous notice be given for filling vacancies in office, even at a regular meeting.  Failure to comply with the notice requirement violated absentee rights and renders this action null and void.**

Signed:

*[signature]*

Jonathan M. Jacobs, PRP-R, CPP

Date:

11/29/22

---

This is based on general principles of parliamentary procedure, the bylaws of this organization, and the cited parliamentary authorities; nothing in this opinion should be construed as an interpretation of statutory or case law.

---

End Notes:

[1] The parliamentarian had some conversations with Mr. Chadderdon prior to the July 9 Candidate Nominating Convention. While he suggested that the LPMI hire a local parliamentarian, he did send Mr. Chadderdon a copy of an article he wrote in the 2nd Quarter 2012 issue of the *National Parliamentarian*, "Putting the Motion From the Floor." In that article, the parliamentarian noted, "It is the duty of the chair to follow the rules of the assembly," and that the chair "still has that duty to enforce the rules, even if the assembly wishes to violate those rules."

[2] The parliamentarian will note, with irony, that a hypothetical example used in the article was of the assembly attempting to adopt a motion without proper notice. It is not specific to the current LPMI situation, as it was written more than a decade prior to that situation occurring.

[3] Mr. Chadderdon voluntarily, and for the duration of the session only, relinquished the chair for the course of the convention, which is permissible under RONR 47:11 and relieves him of responsibility for violating the rules. That responsibility now passes to Mr. Brungardt.

[4] Robert, Henry M., Robert's Rules of Order Newly Revised, 12th Edition. Eds. Sarah Corbin Robert, Henry M. Robert, III, William J. Evans, Daniel H. Honemann, Thomas J. Balch, Daniel E. Seabold, Shmuel Gerber, New York: Public Affairs, 2020.

[5] However, the Bylaws do require that all executive committee members be notified 14 days in advance (Article III, 10). The executive committee members were given more than 14 days' notice. Had this been a regular meeting, the vote of no confidence could have been considered.

[6] The idea that a parliamentary authority can require that, for the society to do a certain thing, the thing must be authorized in the bylaws is fairly widespread and exists well beyond RONR. See "Parliamentary Authorities' Rule Shift Function," *Parliamentary Journal*, January 2005.

**From:** jjparlia@yahoo.com <jjparlia@yahoo.com>
**To:** Andrew Chadderdon <andrew.chadderdon@gmail.com>
**Sent:** Friday, December 23, 2022 at 12:57:40 PM EST
**Subject:** Re: Questions regarding Parliamentary Opinion for LPMI

You may forward this.

First, while my opinion was written prior to that of Martin and Brown, reading their opinions has not changed my opinion in the least.

Second, the LPMI Bylaws supersede RONR, so when they define something, that definition supersedes RONR. The definition of a regular is expressed in Article VI, Section and is limited to the meeting held in odd-numbered years. Even if RONR has a different definition, it is the definition in the bylaws that is controlling. There is no ambiguity to that.

RONR may define "regular meeting" as happening at a specific interval, but the definition in your bylaws supersedes the RONR definition.

Third, the ambiguity is based in the allegation that the bylaws also create these other specified meeting as regular meetings. Based of the rule of interpretation, which are binding on the assembly, the expression of one thing precludes other things of the same type (56:68 #4). That should end any debate as to the question.

Basically, your bylaws have created a separate class of meetings, specified meetings, that are neither regular nor special meetings as RONR uses the term. They may deal with only that business authorized in the bylaws.

Fourth, since several people have insisted that, in spite of 56:68 #4, these could be regular meetings, I will address it. As noted in my oral arguments, the claim that all these specified meeting are regular meeting would conflict with the term of office of two years ending at the next regular meeting. The interpretation all these specified meetings are somehow regular meetings

violates 56:68 #2, I did not discuss this in my opinion because I had not seen anyone claiming it and did not expect anyone to make a claim that so demonstrably absurd.

I will note that in the 3th quarter 1994 *National Parliamentarian*, a peer reviewed journal of the National Association of Parliamentarians, I wrote an article dealing with the relationship between the rules. I wrote: "It is necessary for a parliamentarian to be aware that there may exist a higher authority, national, state, local laws, as well as the **society's bylaws** and special rules that supersede RONR." I can only repeat the same advice 28 years later.


Jonathan M. Jacobs, PRP-R, CPP
630 North 63rd Street, Apt 3 FL R,
Philadelphia, PA  19151
(215) 229-1185