# JONATHAN M. JACOBS, PRP, CPP

*Parliamentary Consultant*

Mailing Address
630 North 63rd Street,
Apartment 3rd Floor Rear
Philadelphia, PA 19151
Telephone: (215) 229-1185
E-mail: jjparlia@yahoo.com

---

### Parliamentary Opinion

RE: Libertarian National Committee vs. Saliba, et al. (Case No. 23-cv-11074)

On July 12, 2023, Caryn Ann Harlos, Secretary of the Libertarian National Committee, and with the approval Andrew Chadderdon, Chair of the Libertarian Party of Michigan (LPMI), contacted the parliamentarian[1] regarding claims made is a filing by the defendants in Libertarian National Committee vs. Saliba, et al. (Case No. 23-cv-11074) on July 10, 2023.

The specific claim in the filing relates to the role of the Judicial Committee of the Libertarian Party of Michigan. The filing states that:

> The release of the judicial committee opinion created substantial confusion within the party. Ex. 5 at 5 (Saliba Declaration). Although the judicial committee had existed for several decades, it had never previously claimed the authority to overrule decisions made by convention delegates. See id. at 5–6. Further, because the judicial committee is a "committee," Robert's Rules of Order [sic] indicates that its proper role is to "report its findings or recommendations to the assembly," not to order self-executing remedies. Id. at 6; Ex. 21 at 6 (Robert's Rules). Accordingly, while some members of the executive committee were initially under the impression that they had been removed from their committee seats, they eventually concluded that was not the case. Ex. 5 at 6 (Saliba Affidavit). Rather, they determined that they remained in their positions unless and until the party's members adopted the recommendations of the judicial committee and removed them from office. Id. at 6.
>
> On February 2, LPMI Chair Joe Brungardt described this position in detail in an email sent to all registered LPMI members. Ex. 9 at 1–3 (LPMI Emails); Ex. 14 at 9 (michiganlp.net Printouts). After explaining that the appropriate role of a committee is to issue recommendations to the broader assembly, Mr. Brungardt stated:
>
> > [T]he Judicial Committee has no authority to overrule the delegates of a convention body. Therefore, should the Executive Committee believe that the Judicial Committee is overstepping its authority, it is incumbent upon the Executive Committee to assert the rights of its members in opposition to the Judicial Committee if necessary.
>
> Ex. 9 at 2 (LPMI Emails). In order to exercise this responsibility, Mr. Brungardt announced that the party would hold a convention on April 1 so that party members could discuss the judicial committee's recommendations. Id. at 1–2. (Saliba Response, pp. 625-6)

Ms. Harlos asked the parliamentarian if he would be willing to write an opinion "on whether or not the assertions regarding the scope of the Michigan Judicial Committee made by the Defendants in their Response and Exhibits to the LNC's Motion for Preliminary Injunction are correct?"  After a request for clarity, she responded on July 13, 2023, "Yes, the specific claim they made in their reply that the JC can only issue recommendations."

## Works Cited

The Bylaws of the LPMI shall be cited as "Bylaws," as they existed through March 31st, 2023,[2] with article and section numbers as appropriate.

The response of the defendants in Libertarian National Committee vs. Saliba, et al. (Case No. 23-cv-11074) on July 10, 2023, shall be cited as a "Saliba Response," with the page ID number used as the reference.

Article XI Section 2 of the Bylaws provide that "Robert's Rules of Order Newly Revised shall be the parliamentary authority for all matters of procedure not specifically covered by the bylaws or convention rules of the Party."  The 12th edition of *Robert's Rules of Order Newly Revised* (2020),[3] is the current edition; it will be cited as RONR with the appropriate line and section number.

Several articles will be cited from *National Parliamentarian*, the peer-reviewed journal of the National Association of Parliamentarians, the largest professional association of parliamentarians.  It will be cited as NP in text, with full bibliographic information in an end note.

## Commentary

The parliamentarian will note that this opinion is limited to whether or not the Judicial Committee of the Libertarian Party of Michigan has the authority to make binding rulings on claims of violations of the Bylaws, without regard to some action by another body or group of members of the Party.  He is aware of, and has formally opined on, other procedural matters relating to the LPMI, but this opinion only deals with the authority of the Judicial Committee.  It



Jonathan M. Jacobs, PRP, CPP
*Parliamentary Opinion*

Page 2 of 6

does not, for example, deal with the merits of the case brought to the Judicial Committee in this opinion, but only with that Committee's ability to adjudicate that case.

The Saliba Response asserts "…because the judicial committee is a "committee," Robert's Rules of Order [sic] indicates that its proper role is to "report its findings or recommendations to the assembly," not to order self-executing remedies. Id. at 6; Ex. 21 at 6 (Robert's Rules).(p. 625)" The exhibit is a photocopy of pages 466-7 of RONR in this regard (p. 807). This claim is a misstatement of the rules in RONR, and the parliamentary procedure within the LPMI.

RONR draws a distinction between the general parliamentary rules, those incorporated into the book, which it defines as "parliamentary law," and "parliamentary procedure" which is said to be "parliamentary law as it is followed in any given assembly or organization, *together with* whatever rules of order the body may have adopted (RONR, p. xxx)." As the parliamentarian previously described this as, "Parliamentary law expresses the general and theoretical rule, while parliamentary procedure expresses the specific rule for the specific assembly (NP, p. 13, Fall, 2017)."[4] In this case, the parliamentarian will look at both the general rule in RONR and the specific rules and bylaws as they apply to the LPMI.

The Saliba Response describes the general and theoretical rule as being that a committee "report its findings or recommendations to the assembly (p. 625)." This is a misstatement of the rule in RONR. Certain types of committees may report its finding to the body that appointed, but other committees are appointed "'with power,' i.e. the "power to take all the steps necessary to carry out its instructions (50:5)." Likewise a standing committee, which may be established in either the bylaws or by special rule of order, may be granted "standing authority to act for the society on matters of a certain class without specific instructions of the assembly (50:8)." In neither case would the committee need to report its findings nor make any recommendations; it takes the action that the society has delegated to it. The parliamentarian will note that these citations were included in the exhibit submitted in the Saliba Response (p.

807).  A society, in general, may delegate its authority to a committee according to RONR and, in that case, the committee would not need any additional authorization to act.  In this case the Judicial Committee has been instructed by the Bylaws (Article XI, Section 2) to "decide cases involving alleged violations of these bylaws or resolutions," which is precisely what it did.

The Saliba Response, in the specific case, treats the Judicial Committee as something other than a standing committee, one that lacks the ability to act without further reference to the Convention[5].  The Judicial Committee is a committee of established in Article V, Section 1. of the Bylaws, and granted authority to "decide cases involving alleged violations of these bylaws or resolutions," in the Section 2. of the same article.  This meets the definition of a standing committee in RONR; as such, there is no requirement in RONR that the Judicial Committee needs to have its decisions approved by another body.  There is also no requirement in the Bylaws for their decision to be approved by another body.

The bylaws of a society supersede all other rules of the society, except for the corporate charter or a separate constitution[6] (RONR 2:12).  This is consistent with Article XI, Section 2. of the Bylaws.  In other words, both RONR and the Bylaws establish that the Bylaws are controlling when there is a conflict.  This is not a new concept; in writing on this subject about 29 years ago, the parliamentarian noted "It is necessary for a parliamentarian to be aware that there may exist a higher authority, national, state, local laws, as well as the society's bylaws and special rules that supersede RONR (NP, 3rd Quarter, 1994, p. 32)."[7] The Article V Section 2 statement that, "The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions," supersedes any provision to the contrary in RONR, if such a contrary provision exists.

Joe Brungardt is cited in the Saliba Response as saying, "the Judicial Committee has no authority to overrule the delegates of a convention body (p. 626, citing Exhibit 9)." This statement has no basis in fact.  Other than making this statement, the defendants offer no bylaw to support this claim.  The LPMI, at a previous convention of delegates, that is presumed to

have been properly constituted, has authorized the Judicial Committee to "decide cases involving alleged violations of these bylaws or resolutions," by adopting a bylaw with that wording.  When it has determined that the action of delegates violates the bylaws, the Judicial Committee has full authority to act.

RONR does provide that "[E]ach society decides for itself the meaning of its bylaws," but goes on to note that "[A]n ambiguity must exist before there can be any occasion for interpretation (56:68(1))."  Article V, Section 2 is not ambiguous.  The statement, "The Judicial Committee shall decide cases involving alleged violations of these bylaws or resolutions," is crystal clear.  Neither Mr. Brungardt, in his email (Saliba Response, pp. 753-6) nor the defendants' response, have claimed that the Bylaws are ambiguous in this regard.

### Opinion

**1.  RONR authorizes standing committees, that are granted the "standing authority to act for the society on matters of a certain class," to act on those matters without any further action from the assembly, i.e. they would not need to "report back findings and recommendations."**

**2.  A standing committee would, strictly under RONR, be established and granted that authority in a bylaw or special rule.  The Judicial Committee is created by the Bylaws (Article V, Section 1.) and is granted the authority to "decide cases involving alleged violations of these bylaws or resolutions (Article V, Section 2.)"; this clearly meets the definition of a standing committee under RONR.**

**3.  The Bylaws supersede RONR.  Even if there would be a claim that the Judicial Committee is somehow to not a standing committee, the Bylaw (Article V, Section 2) grants the Judicial Committee final authority.  That would supersede any conflicting rule in RONR.**

**4.  Under the provisions of Article V, Section 2, the Judicial Committee, unambiguously, has final authority to "decide cases involving alleged violations of these**



**bylaws or resolutions," without reference to or the need of approval from, any other group or person within the LPMI.**

Signed

*[signature]*

Jonathan M. Jacobs, PRP, CPP

7/17/23
Date

---

This is based on general principles of parliamentary procedure, the bylaws of this organization, and the cited parliamentary authorities; nothing in this opinion should be construed as an interpretation of statutory or case law.

---

End Notes

[1] The parliamentarian has had registered status with the National Association of Parliamentarians since 1995 and certified with the American Institute of Parliamentarians since 2000. He is one of fewer than ninety dual accredited parliamentarians internationally.

Within the Libertarian Party, he has served as a convention parliamentarian for the New Jersey (2021), Pennsylvania, and Delaware state parties (both 2022), and served as a bylaw consultant for the Vermont (2022) and Virginia (2021) state parties. He has been advising Mr. Chadderdon on parliamentary matters since 6/16/22.

[2] These Bylaws were amended at the June 26, 2021 Convention. These were the bylaws in force during the Judicial Committee's adjudication.

[3] Robert, Henry M., Robert's Rules of Order Newly Revised, 12th Edition. Eds. Sarah Corbin Robert, Henry M. Robert, III, William J. Evans, Daniel H. Honemann, Thomas J. Balch, Daniel E. Seabold, Shmuel Gerber, New York: Public Affairs, 2020.

[4] Jacobs, Jonathan M. "Comparing Parliamentary Law and Parliamentary Procedure." *National Parliamentarian* 79, No. 1 (Fall 2017), 12-13.

[5] An "assembly" is a generic term that refers to a body of people that assemble (RONR, 1:3). A "convention" is type of assembly (1:14).

[6] The LPMI has no constitution. RONR recommends having a single document, e.g. bylaws (2:11).

[7] Jacobs, Jonathan M. "A Higher Authority." *National Parliamentarian*, 55 (3rd Qtr. 1994), 30-32.

# A Higher Authority

By Jonathan M. Jacobs

*Robert's Rules of Order, Newly Revised* has been adopted as the parliamentary authority for numerous organizations. In most cases it is binding on all parliamentary questions. Robert, however, is not the highest authority on all parliamentary questions. Consider the following examples relating to two different types of organizations.

***Example One***: There is a deliberative assembly, a representative body, which consists of five members. A quorum is three members; RONR is the parliamentary authority. At a properly called meeting, a motion is made and seconded. The vote on the motion is taken; the result is two in favor and one against. Does the motion carry? According to RONR, yes. RONR (§43, p. 395) states, "... when the term *majority vote* is used without qualification — as in the case of the basic requirement — it means more than half of the votes cast, excluding blanks or abstentions, at a regular or properly called meeting at which a quorum is present." If you were acting as the parliamentarian of that meeting, and the presiding officer asked you if the motion carried, you would cite that section of Robert and say, "Yes!"

What if the setting would change slightly. Instead of an anonymous deliberative assembly, what if it is a unit of local government in the State of Pennsylvania, a Second Class Township Board of Supervisors. Second Class Townships exist across Pennsylvania, in both rural areas and as suburbs of cities such as Philadelphia. These townships are governed by a board of from three to five "supervisors," elected by the voters of the township. This board serves as the legislature and executive of townships, and is responsible for such functions as police and road construction. You're the parliamentarian again, perhaps working with the township solicitor. There are five supervisors, the quorum is three, three supervisors are present, and the vote, once again is two to one.

Pennsylvania's Second Class Townships operate under a set of laws known as the *Second Class Township Code*. The code does permit townships to make rules, bylaws, or regulations that "are not inconsistent with or restrained by the Constitution and laws of this Commonwealth .... [*Second Class Township Code* (Pa.), §701, LXII]." Many townships, and other local governmental units do use RONR to govern their proceedings; in point of fact Robert is commonly used in Pennsylvania local governments. So, if the board has adopted RONR, then the motion passes, right?

Wrong! The Township Code has a provision which states, "Except as otherwise provided by this act, an affirmative vote of a majority of the entire board of supervisors shall be necessary in order to transact any business (*Second Class Township Code,* §512)." A majority of members of the entire five member board, as defined by RONR, is three (RONR, §43, pp. 397-398). The motion, whether it is to approve a multi-million dollar budget or to purchase stationery, does not pass.

There are numerous examples in the various units of Pennsylvania local governments, where the state legislature drafts laws that say what local governments can do. There are also examples of this in non-governmental organizations which answer to a higher authority, sometimes in more ways than one. An interesting example, on a more spiritual plain, is the House of Bishops of the Episcopal Church.

***Example Two:*** One of the two legislative chambers of the Episcopal Church is the House of Bishops; it is composed

*(continued on page 31)*

## A Higher Authority

*(continued from page 30)*

entirely of Episcopal Bishops, who are elected for life by a complex (some would say torturous) procedure. They, in conjunction with elected diocesan representative in the other chamber, the House of Deputies, adopt the rules, called "canons," of the Church. The Bishops also adopt rules to govern their proceedings; they also have an adopted parliamentary authority. They have adopted the latest edition of Robert "Except when in conflict with the Constitution or Canons, or any Rule herein contained (*Rules of Order - House of Bishops,* Rule XXX)."

Again there is a situation which should be familiar to most parliamentarians. A voice vote is taken on a main motion with dozens of Bishops present and voting. After the vote, three Bishops stand and call for a recorded vote. RONR states that, "Where no special rule has been adopted, a majority vote is required to order a count (RONR, §44, p. 404)." If a majority of the Bishops vote against a recorded vote, there is no recorded vote, right?

Wrong, once again. There is a special rule which states that, "On any question before the House the ayes and nays may be required by any three members, and shall in such cases be entered on the Journal (*Rules of Order – House of Bishops,* Rule IX)." The three Bishops get their wish; a recorded vote is taken.

In both of these examples, the correct answer is not the "standard" answer found in RONR. Robert does, however, deal with both examples. RONR itself lists two circumstances when it is no longer controlling.

In the case of the three Bishops, a special rule of order exists. A special rule of order is one that is adopted by the assembly and modifies or supplements the parliamentary authority. RONR goes even further, stating "Special rule of order supersede any rules in the parliamentary authority with which they conflict (RONR, §2, p.15)." The rule of the House of Bishops that permits three Bishops to demand that a vote be counted and recorded, is such an example of a special rule of order. The provision in Robert, that to count a vote, a majority vote is required, is superseded by the special rule of order.

The township supervisors give an example of where the standard provisions of RONR runs counter to statute, in this case a state law. Robert is not silent on this issue either. There are two key passages. Robert states first that the parliamentary authority is binding in all cases, "... where they are not inconsistent with the bylaws or any special rules of order of the body, or any provisions of local, state, or national law applying to the particular type of organization (RONR, §2, p. 16)." There is also the passage on parliamentary authority in the section on the bylaws. RONR strongly suggests this wording: "The rules contained in the current edition of ... [specifying a standard manual of parliamentary practice, such as this book] shall govern the Society in all cases to which they are applicable and in which they are not inconsistent with these bylaws and any special rules or order the Society may adopt (RONR, §55, p. 573)." This passage is footnoted suggesting that the following should be added to the end of this passage if the organization is subject to any local, state, or national law: "and any statutes applicable to this organization." It further states that, "Such legislation supersedes all rules of the organization where in conflict with them, however, even if no mention of it is made in the bylaws (Ibid.)." The state law that requires a majority of the Board of Supervisors to take an action supersedes the statement in Robert that requires a majority of votes cast, a quorum being present.

What should a parliamentarian do in these situations? RONR does recognize that there are higher authorities. It is incumbent on the parliamentarian to be familiar not only with Robert but with the

*(continued on page 32)*

# A Higher Authority

*(continued from page 31)*

bylaws and standing rules of the organization as well as any applicable statute. What does a parliamentarian do when a higher authority, special rule of order (or a bylaw) or statute, supersedes RONR?

In the case of a special rule of order (or bylaw) superseding RONR, the answer seems to be fairly clear. A bylaw or special rule of order is within the control of the deliberative assembly. It, too, does not directly involve a statute and an opinion does not involve a "legal" opinion. A parliamentarian could offer a parliamentary opinion which would not constitute the practice of law.

The case where there is a statute which is in conflict with the parliamentary authority is different. A statute always supersedes the parliamentary authority, according to RONR. It is necessary for a lawyer to offer a legal opinion. It has been pointed out that a parliamentarian, unless also an attorney, who gives a "legal" opinion may be subject to a charge of malpractice of law; it has also been pointed that a parliamentarian has responsibility to advise clients on the proper application of rules (Green, *National Parliamentarian*, 2nd quarter, 1994, p. 11). How should a parliamentarian handle this situation?

Perhaps the best way for a parliamentarian to handle this situation is to inform the assembly that there *may* be a provision in statute which *might* affect the situation. The parliamentarian could state that because this involves the interpretation of a statute, a lawyer's opinion is necessary. The parliamentarian could also inform the assembly of the provisions in RONR which state that any local, state, or national law which conflicts with the parliamentary authority, supersedes the parliamentary authority. In this way, the parliamentarian preserves the ethical requirement to properly advise a client, but does not interpret statute.

It is necessary for a parliamentarian to be aware that there may exist a higher authority, national, state, local laws, as well as the society's bylaws and special rules, that supersede RONR.

### Bibliography

*Constitution and Canons*. The Episcopal Church, 1985.
Green, Betty S., PRP, "RONR & the Law." *National Parliamentarian*, Vol.55 (1994), Second Quarter, p. 11.
*Robert's Rules of Order, Newly Revised*, Ed. Sarah Corbin Robert, Henry M. Robert, III, William J. Evans, and James W. Cleary; Glenview, IL: Scott,Foresman, and Co., 1990.
*The Second Class Township Code*, Commonwealth of Pennsylvania, 1992.

Author's note: The author is not an attorney.

*Jonathan M. Jacobs has a solid background in Pennsylvania local government, having been elected to three different local government offices during the 1980s, the first while still in college. He last served concurrently as a school director and secretary of the Ferndale Area School Board, located in suburban Johnstown. He has also served as a consultant to numerous candidates and public officials.*

# Q&A 16

*(continued from page 9)*

bers are effectively on notice that the entire platform is up for grabs every year, even though no formal notice is given.

The practicing parliamentarian, when engaged to assist a group for the first time, would do well to determine which custom is followed by the society, as it is seldom set out in the rules. To the extent that one practice or the other causes confusion among the members, the parliamentarian may suggest to the society's leaders that the group's standard procedure be codified by rule.

# An Electing Experience

Reprinted from the *Colorado Parliamentarian*
By Katherine L. Cruson

This fall a multi-state organization conducted an election which was out of the ordinary. Because the election of the "presiding officer" could involve over 14,000 potential candidates nationwide, several steps were taken to facilitate the election.

First, delegates in each of 10 geographical areas (conferences) met in their area to list potential candidates. This was not to be construed as a nominating ballot; it was only to list potential candidates so that information could be received and given to the approximately 500 delegates. Each conference listed all the names generated by that conference. Those names were sent to a central office and the people named were contacted for biographical information. (Some names were mentioned in more than one conference.) Of the 50 people named, about half responded with one page of biographical data. The others who did not respond were not disqualified. The complete list and the one-page biographies were sent to the delegates preceding the convention date.

At the convention, the first ballot was the official nominating ballot. Each delegate was given a paper on which to write his/her nomination. Potentially, each of the 500 delegates could have nominated a different candidate, so that 500 names could have been on the next ballot, and even those 500 names could have been different from the names previously generated!

However, in reality, 48 names were listed, most of which were on the lists from the previous conferences. The chairman of the tellers read each name and the number of votes received. If one person had received 75% of the nominating votes, he/she would have been elected, but no one received 75% of the votes.

The second ballot listed all 48 names, in order of number of ballots received; the first name had the highest number of nominating ballots. The last 21 names each had one ballot each and were listed alphabetically. The second and following ballots were recorded on Scantron ballots, which made counting much faster and more accurate. Again, if one person had received 75% of the votes, he/she would have been elected, but that did not occur.

The third ballot was limited to the seven people with the highest numbers of votes and required 67% of the votes for election. Prior to the voting for the third ballot, each of the seven people spoke to the convention for five minutes each. The fourth ballot was limited to the three people with the highest number of votes and required 60% of the votes for election. Prior to the fourth ballot, each person was asked several questions which had been submitted earlier. When no one received 60% of the votes, the fifth ballot was narrowed to the two people with the highest number of votes and required a majority vote. The election was complete.

**Additional note:** A snowstorm prevented 30 delegates from attending the convention. Out of concern that they feel included in the process, they were contacted by telephone and asked if they would like to vote by telephone. Three wished to vote in that way, the others said they would accept the outcome of the attending delegates. For each ballot, the chairman of the tellers called the three out-of-state delegates and recorded their votes.

*Katherine L. Cruson, MAL Colorado, lives in Aurora, CO. She was delegate to the 1993 NAP Convention in Denver. In her own words: "My limited, but expanding, knowledge of parliamentary procedure sometimes gets me into trouble and onto committees."*

# Comparing Parliamentary LAW & Parliamentary PROCEDURE



By Jonathan M. Jacobs, PRP, CPP

The terms "parliamentary law" and "parliamentary procedure" are often used interchangeably, even by parliamentarians. Sometime, the speaker may assume that "parliamentary law" has something to do with law, in the sense that it based upon either statute or precedent set by a court. This is especially true when the term "common parliamentary law" is used, even though *Robert's Rules of Order Newly Revised* (11th ed.) notes that this term is synonymous with "general[1] parliamentary law (p. xxix)." What then is "parliamentary procedure?" Can you, without looking, explain what parliamentary procedure is?

Parliamentary law (or "common parliamentary law" or "general parliamentary law") and parliamentary procedure are two distinct things. One is almost theoretical, while the other mainly practical.

In RONR, "parliamentary law" is, broadly, those rules and customs that originated in the English parliament, that dealt with the transaction of business, but that further developed due to legislative procedure in America This parliamentary law is a broad set of rules, which when written and adopted, become "rules of order (p. xxix)." RONR itself is a codification of these rules.

"Parliamentary procedure" is something different. It is these "rules of order" together with whatever additional rules of order the society may adopt (RONR, p. xxx). In that definition, it would include bylaw provisions and any applicable statute that would deal with the transaction of business in a meeting or with the duties of officers within a meeting[2]. Basically, it is the procedural rules that govern a specific assembly. Parliamentary procedure, which would probably include large elements of parliamentary law, is much narrower than parliamentary law.

How would this function? Assume that there is a question of the time that each member is allowed to speak in debate. The limit set by "parliamentary law," as codified by RONR 11th ed., is that each member may speak twice for up to ten minutes on each debatable question (p. 387, ll. 29-34). Suppose the assembly adopted a rule to limit debate to one three-minute speech for each member on any debatable motion. The rule under parliamentary law would remain the ten-minute rule. In terms of parliamentary procedure, the rule for *this* assembly is now three minutes for each member for each debatable motion. What RONR says about the limits of debate has no bearing on the procedure of debate.

The difference can also be expressed this way: Parliamentary law expresses the general and theoretical rule, while parliamentary procedure expresses the specific rule for the specific assembly.



### ENDNOTES

1  The author prefers not to use the term "common parliamentary law" as it can be easily confused with "common law."

2  Not all rules that regulate procedure within a meeting are rules "in the nature of a rule of order." The clearest example is a statute requiring an assembly, e.g. a municipal council, to have roll call votes.

### WORKS CITED

Robert, Henry M., *Robert's Rules of Order Newly Revised*, 11th Edition. Eds. Sarah Corbin Robert, et al., Philadelphia: Da Capo Press, 2011.



**Jonathan M. Jacobs, PRP, CPP,** is the former president of the Pennsylvania Association of Parliamentarians, and the current president of the Delaware Valley Unit.